UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| FIRST BANK BUSINESS CAPITAL, INC., a Missouri corporation, | ) ) ) |
| Plaintiff, | ) Case No. 08 - 1035 ) |
| v. | ) ) |
| AGRIPROCESSORS, INC., an Iowa corporation; LOCAL PRIDE, LLC, an Iowa limited liability company; ABRAHAM AARON RUBASHKIN; and SHOLOM RUBASHKIN, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

First Bank Business Capital, Inc. f/k/a FB Commercial Finance, Inc. ("First Bank"), a

Missouri corporation, for its Complaint against Agriprocessors, Inc. ("Agriprocessors"), Local

Pride, LLC ("Local Pride"), Abraham Aaron Rubashkin, and Sholom Rubashkin (collectively,

the "Guarantors"), states as follows:

### Parties

1.    First Bank is a corporation organized and existing under the laws of the State of

Missouri with its principal place of business in St. Louis, Missouri. First Bank was formerly

known as FB Commercial Finance, Inc.

2.    Agriprocessors is a corporation organized and existing under the laws of the State of

Iowa with its principal place of business in Postville, Iowa.

GOVERNMENT EXHIBIT

3.     Local Pride is a limited liability company organized and existing under the laws of the State of Iowa with its principal place of business in Postville, Iowa. Upon information and belief, Agriprocessors is the sole member of Local Pride.

4.     Abraham Aaron Rubashkin (known generally and referred to herein as Aaron Rubashkin) is an individual citizen of the State of New York and is a shareholder and corporate officer of Agriprocessors.

5.     Sholom Rubashkin is an individual citizen of the State of New York and is a shareholder and corporate officer of Agriprocessors.

### Jurisdiction and Venue

6.     This Court has diversity subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because plaintiff and each defendant are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Agriprocessors because it is a corporation organized under the laws of the State of Iowa and its principal place of business is located within this judicial district.

8.     This Court has personal jurisdiction over Local Pride because it is a limited liability company organized under the laws of the State of Iowa, its sole member is located in the State of Iowa and this judicial district, and its principal place of business is located within this judicial district.

9.     This Court has personal jurisdiction over Aaron Rubashkin because he has conducted business within the State of Iowa and this judicial district in connection with, among other things, the contracts and relationships between First Bank and Agriprocessors and the allegations and claims set forth herein.

10. This Court has personal jurisdiction over Sholom Rubashkin because he has conducted business within the State of Iowa and this judicial district in connection with, among other things, the contracts and relationships between First Bank and Agriprocessors and the allegations and claims set forth herein.

11. This Court is a proper venue pursuant to 28 U.S.C. § 1391(a) and (c) in that this is the judicial district in which a substantial part of the events giving rise to plaintiff's claims occurred as well as the judicial district in which substantially all of the property that is the subject of this action is situated, and, for purposes of venue, the corporate defendant is deemed to reside in this judicial district.

**Allegations Common to All Counts**

A.    The Loan Transactions and Credit Agreement

12. Agriprocessors owns and operates a kosher meatpacking and food-processing facility located in Postville, Iowa. It is engaged in the business of purchasing or raising various types of livestock and butchering and packing their meat under kosher guidelines. Upon information and belief, Agriprocessors is one of the largest producers of kosher meat products in the United States.

13. Local Pride is a wholly-owned subsidiary of Agriprocessors.

14. First Bank began a lending relationship with Agriprocessors in 1999 in connection with that certain Credit and Security Agreement between FB Commercial Finance, Inc., as Lender, and Agriprocessors, Inc., as Borrower, dated September 23, 1999 (the "Initial Agreement"). The Initial Agreement has subsequently been modified, amended, and restated. Agriprocessors and Local Pride (collectively, the "Borrowers") are now parties with First Bank to that certain Second Amended and Restated Credit and Security Agreement by and among Agriprocessors, Inc. and Local Pride, LLC, as Borrowers and FB Commercial Finance, Inc. as

Lender, dated as of September 14, 2005 (as the same may have been amended, modified, or reaffirmed, the "Credit Agreement").

15. Pursuant to the Credit Agreement, First Bank agreed to lend, on a revolving basis, up to $35,000,000 to the Borrowers on the terms and conditions set forth therein. The indebtedness owing to First Bank in connection with the Credit Agreement is evidenced by, among other things, that certain Exchange Revolving Note dated September 28, 2007 in the original principal amount of $35,000,000 (the "Note") executed by the Borrowers. In addition to principal, the Note obligates the Borrowers to pay interest and costs of collection, including reasonable attorneys' fees and legal expenses.

16. Also pursuant to the Credit Agreement, the Borrowers granted to First Bank a first-priority security interest in and lien on virtually all of their personal property (other than certain equipment located at Agriprocessors' Postville, Iowa facility), including accounts receivable, inventory, and proceeds (collectively, the "Collateral"). The Collateral secures all obligations of the Borrowers to First Bank, including but not limited to obligations on the Note. First Bank properly perfected its security interest in the Collateral by filing appropriate financing statements in the office of the Secretary of State of Iowa.

B.    The Guaranties

17. In connection with the Initial Agreement, Aaron Rubashkin executed a Guaranty dated as of September 23, 1999 in favor of First Bank (the "Unlimited Guaranty") by which he unconditionally guaranteed the payment of all obligations owing by Agriprocessors to First Bank. He has subsequently reaffirmed his obligations under the Unlimited Guaranty in connection with the current Credit Agreement and its related amendments, and has acknowledged that the Unlimited Guaranty likewise applies to all amounts owing by Local Pride to First Bank, through that certain Affirmation and Modification of Guaranty dated as of

September 14, 2005. Aaron Rubashkin remains liable and indebted to First Bank for all amounts that the Borrowers owe to First Bank.

18. The Unlimited Guaranty is secured by that certain Pledge Agreement dated as of September 23, 1999 executed by Aaron Rubashkin in favor of First Bank, whereby Aaron Rubashkin granted a security interest in an account and certificate of deposit owned by him and held at First Bank N.A., in the original principal amount of $2,284,528.24 (the "Certificate of Deposit").

19. Sholom Rubashkin also executed a Guaranty dated as of September 23, 1999 in favor of First Bank (the "Limited Guaranty") by which he unconditionally guaranteed the payment of all obligations owing by Agriprocessors to First Bank, but with his liability thereunder limited to $1,000,000.00, plus all interest owing on Agriprocessors' obligations, plus all costs and expenses, including reasonable attorneys' fees and expenses paid or incurred by First Bank in efforts to collect any of Agriprocessors' obligations or to enforce the Limited Guaranty. Sholom Rubashkin has subsequently reaffirmed his obligations under the Limited Guaranty in connection with the current Credit Agreement and its related amendments, and has acknowledged that the Limited Guaranty likewise applies to all amounts owing by Local Pride to First Bank, through that certain Affirmation and Modification of Guaranty dated as of September 14, 2005. Sholom Rubashkin remains liable and indebted to First Bank for all amounts that the Borrowers owe to First Bank, subject to the limitations on maximum liability set forth in the Limited Guaranty.

C.    Credit Agreement Terms

20. The Credit Agreement utilizes a borrowing-base formula (the "Borrowing Base") to determine the Borrowers' maximum credit availability on their revolving loan from First Bank at any one time. The Borrowing Base is a function of the aggregate current values of certain items

of Collateral, and is calculated by multiplying those values by particular percentages, as outlined in the Credit Agreement. For example, as part of the Borrowing Base, First Bank agreed to advance funds to the Borrowers up to 85% of "Eligible Accounts" at a particular time, subject to the other conditions, restrictions, and requirements set forth in the Credit Agreement.

21. Prior to each request for an advance of funds, the Borrowers are required to provide First Bank with a "Notice of Borrowing" in the form attached to the Credit Agreement. In order to provide a Notice of Borrowing, the Borrowers are required to certify that certain requirements and conditions are met, including that (i) no default or event of default exists under the terms of the Credit Agreement, (ii) the representations and warranties of the Borrowers in the Credit Agreement remain true and accurate, (iii) the amount of the particular advance requested will not cause the current borrowings to exceed the Borrowing Base, and (iv) all of the other requirements for a borrowing under the Credit Agreement have been satisfied. Thus, with each Notice of Borrowing, the Borrowers must certify that the value of the Collateral is sufficient to allow the requested borrowing under the Borrowing Base.

22. Pursuant to the Credit Agreement and the related agreements between the parties, the Borrowers are required to remit the daily receipts on their accounts receivable to First Bank's designated depositary bank in Iowa, Decorah Bank & Trust Company ("Decorah Bank"). First Bank causes the funds to be transferred from Decorah Bank on a daily basis, and the Borrowers' revolving loan balance is paid down. To the extent the Borrowers have availability under the Borrowing Base following the application of such payments, they may request further borrowings through a Notice of Borrowing.

23. Section 6.10 of the Credit Agreement requires the Borrowers to deposit all checks reflecting proceeds of Collateral directly into the Decorah Bank account, to hold collections in

trust for First Bank until deposited in a Collateral account or delivered to First Bank, and to refrain from commingling collections with any other funds or property of the Borrowers.

24. Under the Credit Agreement, the Borrowers are required to maintain and abide by certain financial and other covenants (the "Covenants"), as set forth more fully in Articles 6 and 7 of the Credit Agreement. Among the Covenants are a limitation on the maximum amount of the Borrowers' capital expenditures during any fiscal year (the "CapEx Covenant") as set forth in Section 6.15 of the Credit Agreement, and a limit on the Borrowers' debt service coverage ratio (the "Debt Service Covenant") as set forth in Section 6.12 of the Credit Agreement.

D.    The Borrowers' Diversion of First Bank's Collateral

25. The Borrowers have violated the Credit Agreement by diverting at least $1,300,000 in funds that constitute the proceeds of First Bank's Collateral to an account maintained by the Borrowers at Luana Savings Bank in Luana, Iowa (the "Luana Account").

26. The Borrowers have caused numerous checks to be drawn on the Luana Account and deposited in the Borrowers' regular account at Decorah Bank. These checks reference the drawer's name as "Agri," with no address or other contact information, and are not signed. Instead, each has "SIGNED AGRI" typewritten on the signature line.

27. On or about October 22, 2008, Decorah Bank notified First Bank that nine such checks in the aggregate amount of $994,909.44 deposited in the Decorah Bank account on or about October 16 and 17, 2008 were returned due to insufficient funds in the Luana Acount. On or about October 30, 2008, Decorah Bank notified First Bank that four additional such checks in the aggregate amount of $396,503.31 deposited in the Decorah Bank account on or about October 22, 2008 were returned due to insufficient funds in the Luana Account.

28. First Bank is informed and believes that the Borrowers issued payroll checks to their salaried employees, including insiders, on or about October 24, 2008, despite not having

sufficient funds with which to honor such payroll checks. First Bank is informed and believes that on the afternoon of October 24, 2008, the chief financial officer of the Borrowers visited Luana Savings Bank. First Bank is informed and believes that while there, the Borrowers' chief financial officer convinced Luana Savings Bank to dishonor checks payable to trade creditors that had been presented against the Luana Account and to instead issue a certified check in the approximate amount of $275,000 payable to Agriprocessors. First Bank is informed and believes that Agriprocessors then deposited this certified check, which represented the proceeds of First Bank's Collateral and/or funds commingled with the Collateral, into its payroll account at another bank.

E.    Events of Default

29.    The Borrowers have defaulted on numerous obligations to First Bank under the Credit Agreement.

30.    The Borrowers' improper diversion of collections on their accounts receivable to the Luana Account constitutes an "Event of Default" under the Credit Agreement because, among other things, the Borrowers have failed to comply with Section 6.10 of the Credit Agreement, which requires the Borrowers to deposit all proceeds of account receivable directly into the Decorah Bank account, to hold such collections in trust for First Bank until deposited in a Collateral account or delivered to First Bank, and to refrain from commingling collections with any other funds or property of the Borrowers.

31.    As a result of the Borrowers' diversion of funds to the Luana Account, the Borrowers have delivered multiple certificates, Notices of Borrowing, and other documents to First Bank that have overstated the Borrowers' eligible accounts receivable for purposes of the Borrowing Base. Each such misrepresentation constitutes a further "Event of Default" under the terms of the Credit Agreement.

32. Furthermore, due to the Borrowers' various misrepresentations and diversions of First Bank's Collateral, the Borrowers have exceeded their available borrowing limits under the Borrowing Base, constituting further defaults and "Events of Default."

33. As reflected in the financial statements the Borrowers provided to First Bank for the fiscal quarter ending March 31, 2008, the Borrowers have violated the CapEx Covenant for the fiscal year ending June 30, 2008. This Covenant violation constitutes an "Event of Default" under the Credit Agreement.

34. Also as reflected in the financial statements the Borrowers provided the First Bank for the fiscal quarter ending March 31, 2008, the Borrowers have violated the Debt Service Covenant for the fiscal quarter ending March 31, 2008. This Covenant violation constitutes an "Event of Default" under the Credit Agreement.

35. Upon the occurrence of an "Event of Default" under the Credit Agreement, First Bank may accelerate all amounts owing under the Note, causing all amounts owing under the Note to become immediately due and payable. Upon default and acceleration of the Note, First Bank is entitled to possession of the Collateral.

36. The terms of each Guaranty also allow First Bank to proceed directly and immediately against each Guarantor in order to collect the amounts due and owing under the Note upon an Event of Default.

37. Although not required to do so, First Bank notified the Borrowers of the CapEx Covenant default and the Debt Service Covenant default by letters dated June 19, 2008 and October 23, 2008.

38. First Bank also notified the Borrowers in writing on October 23, 2008 that it was aware of the Borrowers' actions with respect to the diversion of funds to the Luana Account, which constituted a further default and Event of Default.

39. On October 29, 2008, following intensive efforts to work out the parties' disputes, First Bank notified the Borrowers, Aaron Rubashkin, and Sholom Rubashkin in writing of certain defaults and Events of Default existing under the terms of the Credit Agreement; accelerated all obligations due and owing under the Note; terminated the Credit Agreement; demanded immediate payment of all amounts outstanding under the Note, the Unlimited Guaranty, and the Limited Guaranty, and demanded that the Borrowers turn over all of the Collateral to First Bank.

40. Neither the Borrowers, Aaron Rubashkin, nor Sholom Rubashkin have paid the amounts due to First Bank under the Note, the Unlimited Guaranty, and the Limited Guaranty.

41. As of October 30, 2008, the outstanding balance of the Note is $33,527,712.15, including principal and letter of credit obligations, but excluding accrued interest, default interest, late charges, fees, expenses, and other costs of collection that the Borrowers are obligated to pay under the terms of the Note.

## COUNT I – SUIT ON NOTE

42. First Bank incorporates by reference the allegations set forth in paragraphs 1 through 41 above as if fully set forth herein.

43. The Note has been accelerated, and its balance is immediately due and payable by the Borrowers, including accrued interest, default interest, late charges, fees, expenses, and other costs of collection that the Borrowers are obligated to pay under the terms of the Note.

44. Despite demand, the Borrowers have failed and refused to pay the amounts due under the Note to First Bank.

WHEREFORE, First Bank respectfully requests a judgment against the Borrowers in the amount of the balance due under the Note, and granting such other and further relief as is just and proper.

## COUNT II – APPOINTMENT OF RECEIVER

45.   First Bank incorporates by reference the allegations set forth in paragraphs 1 through 44 above as if fully set forth herein.

46.   The Borrowers are currently in possession of First Bank's Collateral.

47.   First Bank is entitled to possession of the Collateral due to the breach of the Credit Agreement and acceleration of unpaid obligations due and owing under the Note.

48.   First Bank has properly exercised its rights under the Credit Agreement in demanding that the Borrowers turn over all of the Collateral to First Bank.

49.   The Borrowers have refused to turn over the Collateral to First Bank and have not paid their obligations under the Credit Agreement and the Note secured by the Collateral.

50.   Section 8.2 of the Credit Agreement provides that upon an Event of Default, First Bank may take certain specifically-identified actions to collect amounts owed by the Borrowers, as well as pursue any other remedies authorized by law.

51.   The Borrowers have repeatedly made misrepresentations to First Bank by providing inaccurate and misleading Notices of Borrowing and other documents that misstated the value of the Collateral.

52.   Officers of the Borrowers have admitted to diverting funds constituting First Bank's Collateral to the Luana Account.

53.   First Bank is concerned that the Borrowers may have misappropriated other Collateral as well, and unless a receiver is appointed, the Borrowers may attempt to conceal or transfer other assets constituting First Bank's Collateral.  On October 30, 2008, the Borrowers instructed employees of First Bank, who were present on the Borrowers' premises to verify the collection and deposit of accounts receivable, to leave the Borrowers' premises.

54. First Bank is informed and believes that, as of October 30, 2008, the Borrowers are continuing to operate their business and to incur obligations that they do not have the ability to pay as they come due. Certain of these obligations may give rise to claims by creditors who may assert rights in the Collateral, thereby further impairing the interests of First Bank.

55. Furthermore, according to published news reports, Sholom Rubashkin was arrested by federal authorities on October 30, 2008 on charges related to the immigration and identity-theft laws.

56. First Bank intends to collect the Borrowers' accounts receivable and to conduct one or more public or private foreclosure sales of the tangible Collateral under the provisions of Article 9 of the Uniform Commercial Code.

57. Due to the nature of the Borrowers' business, much of First Bank's Collateral consists of perishable food items and livestock. Unless a receiver is appointed to take possession of the Collateral to monitor it and to ensure its safekeeping, First Bank's Collateral is in imminent danger of losing value before First Bank can conclude the process of collection and foreclosure. First Bank is informed and believes that the electric utility supplying power to the Borrowers' Postville, Iowa operations intends to terminate service if it does not receive payment of approximately $188,000 in past-due amounts and a deposit of approximately $88,000 on or before Monday, November 3, 3008. The termination of electric service could result in the spoilage of millions of dollars in fresh and frozen meat products in the Borrowers' inventory. In addition, First Bank is informed and believes that millions of chicks and chickens in the Borrowers' inventory are in danger of starving to death if they are not provided with appropriate feed and water.

58. Appointment of a third party to take control of the Collateral is the only way in which First Bank can protect its interest in the Collateral. Without such relief, First Bank may

well lose its Collateral, rendering it unable to realize the benefit of its bargain with the Borrowers.

59. Moreover, certain of the Collateral may be subject to the claims of multiple parties with conflicting claims of priority. For example, sellers of livestock to the Borrowers may claim rights arising under the Packers and Stockyards Act of 1921, and other creditors may claim liens under other statutes or the common law. In such a situation, First Bank cannot conduct a meaningful foreclosure sale, because no rational buyer will purchase the Collateral if it cannot be certain that it will take title free and clear of liens and other adverse claims. Only a receiver with the power to sell the Collateral free and clear of liens and other claims, with those liens and rights attaching to the proceeds of sale, can liquidate the Collateral for the benefit of all claimants.

60. First Bank is entitled to the appointment of a receiver of the Collateral.

61. Atec Liquidations, Inc. d/b/a/ Atec, Inc. is engaged in the business of working with and marshaling the assets of insolvent and troubled companies and is prepared to act as receiver upon this Court's appointment.

WHEREFORE, First Bank respectfully requests a judgment in its favor appointing Atec Liquidations, Inc. d/b/a/ Atec, Inc. as receiver of First Bank's Collateral, with the power to perform all acts necessary to protect and preserve the Collateral (including but not limited to the sale of the Collateral free and clear of liens and other claims), and granting such other and further relief as is just and proper.

## COUNT III – SUIT ON UNLIMITED GUARANTY

62. First Bank incorporates by reference the allegations set forth in paragraphs 1 through 61 above as if fully set forth herein.

63. Despite demand, Aaron Rubashkin has failed and refused to pay the amount due to First Bank pursuant to the Unlimited Guaranty.

WHEREFORE, First Bank respectfully requests a judgment against Aaron Rubashkin in the amount of all obligations owing by the Borrowers to First Bank, and granting such other and further relief as is just and proper.

## COUNT IV – SUIT ON LIMITED GUARANTY

64. First Bank incorporates by reference the allegations set forth in paragraphs 1 through 63 above as if fully set forth herein.

65. Despite demand, Sholom Rubashkin has failed and refused to pay the amount due to First Bank pursuant to the Limited Guaranty.

WHEREFORE, First Bank respectfully requests a judgment against Sholom Rubashkin in the amount of $1,000,000, plus all interest owing on the Borrowers' obligations, plus all costs and expenses, including reasonable attorneys' fees and expenses paid or incurred by First Bank in efforts to collect any of the Borrowers' obligations or to enforce the Limited Guaranty, and granting such other and further relief as is just and proper.

This 30th day of October, 2008.

Respectfully submitted,

MOYER & BERGMAN, P.L.C.

By: _____
     Eric W. Lam (#AT0004416)
     Abbe M. Stensland (#AT0008831)
     2720 First Avenue NE
     Cedar Rapids, Iowa 52402
     Telephone: 319-366-7331
     Facsimile: 319-366-3668
     e-mail: elam@moyerbergman.com

Attorneys for First Bank Business Capital, Inc.

Of counsel:

Kevin M. Abel
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: 314-259-2000
Facsimile: 314-259-2020
e-mail: kmabel@bryancave.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA

FIRST BANK BUSINESS )
CAPITAL, INC., a Missouri corporation, )
                 )
        Plaintiff, )    Case No. 08-1035
                 )
v. )
                 )
AGRIPROCESSORS, INC., an Iowa )    AFFIDAVIT OF ATTORNEY'S
corporation; LOCAL PRIDE, LLC, an )    FEES
Iowa limited liability company; )
ABRAHAM AARON RUBASHKIN; )
and SHOLOM RUBASHKIN, )
                 )
        Defendants. )

STATE OF IOWA   )
             )ss:
COUNTY OF LINN  )

     I, Eric W. Lam, an attorney in the law firm of Moyer & Bergman, P.L.C. being first duly

sworn on oath, depose and state that Moyer & Bergman, P.L.C. are the attorneys for the Plaintiff

in the above-captioned cause, and that there is no contract, agreement or arrangement, either oral

or written, express or implied, contemplating any divisions of compensation, directly or

indirectly, by any other person, firm or corporation with such attorneys except other legal

counsel in a regular and bona fide law partnership with the undersigned in the above-entitled

matter.

                                   _____
                                   Eric W. Lam

     Subscribed and sworn to before me, the undersigned, by Eric W. Lam this 30th day of
October, 2008.

                                   _____
                                   Notary Public in and for the State of Iowa

> TAMARA S. DOMEYER
> COMMISSION NO. 161153
> MY COMMISSION EXPIRES
> 6|28|09