**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 08-CR-1324-LRR |
| vs. | | **ORDER** |
| SHOLOM RUBASHKIN, | | |
| Defendant. | | |

_____

*TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.     **RELEVANT PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . **3**

III.    **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . **5**

    *A.    The Loan Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        *1.    Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        *2.    Credit Agreement and guaranties* . . . . . . . . . . . . . . . . . . **5**
        *3.    Loan structure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
        *4.    Other covenants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

IV.     **MOTION FOR JUDGMENT OF ACQUITTAL** . . . . . . . . . . . . . . . . . . **7**

    *A.    Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
    *B.    Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *1.    Waiver of multiplicity challenge* . . . . . . . . . . . . . . . . . . . **8**
        *2.    Counts of conviction* . . . . . . . . . . . . . . . . . . . . . . . . . **9**
            *a.    Bank Fraud Counts* . . . . . . . . . . . . . . . . . . . . . . . **9**
                *i.    Sufficiency of the evidence on Counts 1-14* . . . . **9**
                *ii.   Defendant's knowledge of FDIC insurance* . . . **15**
                *iii.  Multiplicity challenge to Counts 1-14* . . . . . . **17**
                *iv.   Miscellaneous arguments* . . . . . . . . . . . . . . **17**
                *v.    Summary* . . . . . . . . . . . . . . . . . . . . . . . . . **19**
            *b.    False Statement Counts* . . . . . . . . . . . . . . . . . . . . **19**
                  *i.    Sufficiency of the evidence on Counts 15-28* . . **19**
                *ii.   Sufficiency of the evidence on Count 29* . . . . . **21**

|  |  | iii. | Sufficiency of the evidence on Counts 30-38 . . . | 22 |
|  |  | iv. | Multiplicity challenge to counts 15-38 . . . . . . | 28 |
|  |  | v. | Summary . . . . . . . . . . . . . . . . . . . . . . | 28 |
|  | c. | Wire Fraud Counts . . . . . . . . . . . . . . . . . . . . . | 28 |
|  |  | i. | Sufficiency of the evidence on Counts 39-52 . . . | 29 |
|  |  | ii. | Merger . . . . . . . . . . . . . . . . . . . . . . | 30 |
|  |  | iii. | Summary . . . . . . . . . . . . . . . . . . . . . . | 31 |
|  | d. | Mail Fraud Counts . . . . . . . . . . . . . . . . . . . . . | 31 |
|  |  | i. | Sufficiency of the evidence on Counts 53-61 . . . | 32 |
|  |  | ii. | Merger . . . . . . . . . . . . . . . . . . . . . . | 34 |
|  |  | iii. | Summary . . . . . . . . . . . . . . . . . . . . . . | 34 |
|  | e. | Money Laundering Counts . . . . . . . . . . . . . . . . | 34 |
|  |  | i. | Sufficiency of the evidence on Counts 62-71 . . . | 34 |
|  |  | ii. | Profits/proceeds . . . . . . . . . . . . . . . . . . | 39 |
|  |  | iii. | Summary . . . . . . . . . . . . . . . . . . . . . . | 40 |
|  | f. | Packers and Stockyards Act Counts . . . . . . . . . . . | 41 |
|  |  | i. | Sufficiency of the evidence on Counts 72-91 . . . | 41 |
|  |  | ii. | Fifth and Eighth Amendment challenges . . . . . | 44 |
|  |  | iii. | Summary . . . . . . . . . . . . . . . . . . . . . . | 45 |
| C. | Summary | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45 |
| V. | MOTION FOR A NEW TRIAL | | . . . . . . . . . . . . . . . . . . . . . . . | 46 |
| A. | Legal Standard | | . . . . . . . . . . . . . . . . . . . . . . . . . . | 46 |
| B. | Analysis | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47 |
|  | 1. | Exclusion of defense witnesses . . . . . . . . . . . . . . . | 47 |
|  |  | a. | Nota Feinstein and Stan Martin . . . . . . . . . . | 47 |
|  |  | b. | Neil Westin . . . . . . . . . . . . . . . . . . . . . | 48 |
|  |  | c. | Jim Smith and Abe Roth . . . . . . . . . . . . . | 48 |
|  | 2. | Jury Instructions . . . . . . . . . . . . . . . . . . . . . . | 49 |
|  |  | a. | Instruction on money laundering . . . . . . . . . | 49 |
|  |  | b. | Instruction on FDIC insurance . . . . . . . . . . | 49 |
|  |  | c. | Instruction on the law of no-match letters . . . . . . . | 49 |
|  |  | d. | Instruction on the Packers and Stockyards Act Counts | 51 |
|  | 3. | Variance of proof . . . . . . . . . . . . . . . . . . . . . . | 51 |
|  | 4. | Motions for Mistrial . . . . . . . . . . . . . . . . . . . . | 52 |
| C. | Summary | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 |
| VI. | CONCLUSION | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 |

## I. INTRODUCTION

The matters before the court are Defendant Sholom Rubashkin's "Motion for Judgment of Acquittal" ("First Motion") (docket no. 721) and "Combined Motion for Judgment of Acquittal and Motion for New Trial" ("Second Motion") (docket no. 747).

## II. RELEVANT PROCEDURAL BACKGROUND

On July 16, 2009, a grand jury returned a 163-count Seventh Superseding Indictment (docket no. 544) against Defendant. Count 1 charged Defendant with Conspiracy to Harbor Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i). Counts 2 through 70 charged Defendant with Harboring and Aiding and Abetting the Harboring of Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), 1324(a)(1)(A)(iv), 1324(a)(1)(A)(v)(II) and 1324(a)(1)(B)(i). Count 71 charged Defendant with Conspiracy to Commit Document Fraud, in violation of 18 U.S.C. § 371. Count 72 charged Defendant with Aiding and Abetting Document Fraud, in violation of 18 U.S.C. §§ 1546(a) and 2. Counts 73 through 86 charged Defendant with Bank Fraud, in violation of 18 U.S.C. § 1344 ("Bank Fraud Counts"). Counts 87 through 110 charged Defendant with False Statements and Reports to a Bank, in violation of 18 U.S.C. § 1014 ("False Statement Counts"). Counts 111 through 124 charged Defendant with Wire Fraud, in violation of 18 U.S.C. § 1343 ("Wire Fraud Counts"). Counts 125 through 133 charged Defendant with Mail Fraud, in violation of 18 U.S.C. § 1341 ("Mail Fraud Counts"). Counts 134 through 143 charged Defendant with Money Laundering and Aiding and Abetting Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2 ("Money Laundering Counts"). Counts 144 through 163 charged Defendant with Willful Violation of an Order of the Secretary of Agriculture and Aiding and Abetting a Willful Violation of an Order of the Secretary of Agriculture, in violation of 7 U.S.C. § 195 and 18 U.S.C. § 2 ("Packers and

3

Stockyards Act Counts"). The Indictment also contains a forfeiture allegation on Counts 1 through 70.

On June 25, 2009, the court granted Defendant's Motion for Separate Trial (docket no. 519). The court ordered separate trials on Counts 1 through 74 ("Immigration Counts") and Counts 75 through 143 ("Financial Counts").[1] From October 13, 2009 to November 12, 2009, the court held a jury trial on the Financial Counts, which the court renumbered as Counts 1 through 91. The renumbered Counts are as follows: Counts 73 through 86 became Counts 1 through 14, Counts 87 through 110 became Counts 15 through 38, Counts 111 through 124 became Counts 39 through 52, Counts 125 through 133 became Counts 53 through 61, Counts 134 through 143 became Counts 62 through 71 and Counts 144 through 163 became Counts 72 through 91.[2] On November 2, 2009, at the close of the government's case, Defendant filed the First Motion. The court reserved ruling on the First Motion.

On November 12, 2009, the jury returned verdicts of guilty on Counts 1 through 71, 73 through 80, 84 through 89 and 91 (docket no. 736). The jury returned verdicts of not guilty on Counts 72, 81, 82, 83 and 90. Defendant orally renewed the First Motion after the court read the verdicts. The court again reserved ruling.

On November 16, 2009, the government filed a Resistance to the First Motion (docket no. 740). On November 24, 2009, Defendant filed a Reply (docket no. 752).

On November 19, 2009, Defendant filed the Second Motion. On December 2, 2009, the government filed a Resistance to the Second Motion (docket no. 759).

---

[1] Counts 144 through 163 were charged after the court granted Defendant's Motion for Separate Trial. These counts were tried with the Financial Counts.

[2] The remainder of the instant Order refers to the Financial Counts in their renumbered version. A conversion chart is attached as Exhibit 1 for convenience.

4

On November 19, 2009, the government filed a "Motion for Leave to Dismiss without Prejudice" ("Motion to Dismiss") (docket no. 745), which asked the court to dismiss the Immigration Counts without prejudice. On that same date, the court entered an Order (docket no. 746) granting the Motion to Dismiss.

## III. RELEVANT FACTUAL BACKGROUND

### A. The Loan Agreement

#### 1. Players

First Bank Business Capital ("FBBC") is a wholly-owned subsidiary of First Bank, a Missouri-based bank. FBBC is the lending group for First Bank and is primarily involved in commercial loans. FBBC and First Bank share officers and directors and have offices in the same building. First Bank fully funds FBBC. First Bank is insured by the Federal Deposit Insurance Corporation ("FDIC"). FBBC is regulated by the same entities as First Bank, including the Federal Reserve, the FDIC and the State of Missouri. FBBC loans appear in the same quality reports as First Bank.

Agriprocessors was an Iowa corporation based in Postville, Iowa. Agriprocessors owned and operated a kosher meatpacking plant in Postville. Defendant was a corporate officer of Agriprocessors, holding the position of Vice President.

#### 2. Credit agreement

On September 23, 1999, FBBC and Agriprocessors entered into a lending relationship pursuant to a Credit and Security Agreement ("Credit Agreement"). The Credit Agreement was introduced at trial as Exhibit 2000. Pursuant to the Credit Agreement, FBBC agreed to lend Agriprocessors up to $35,000,000. Of the $35,000,000 revolving line of credit, FBBC kept $25,000,000 and sold $10,000,000 to another institution. FBBC and Agriprocessors also executed an "Exchange Revolving Note"

5

("Note") in the amount of $35,000,000 in connection with the Credit Agreement. Defendant executed the Note on behalf of Agriprocessors.[3]

### 3. Loan structure

The Credit Agreement used a "borrowing base" formula to calculate Agriprocessors' available credit at any one time. The borrowing base was determined by calculating the current value of Agriprocessors' collateral, including its accounts receivable. Under this formula, Agriprocessors could borrow up to 85% of its "eligible" accounts receivable at a particular time. Agriprocessors' accounts receivable were "eligible" if they remained unpaid and were no more than 60 days old.

Each time Agriprocessors wanted an advance of funds, it was required to provide FBBC with a "Notice of Borrowing." A Notice of Borrowing required Agriprocessors to certify that certain conditions were met. These conditions included that: (1) no default or event of default existed under the Credit Agreement; (2) the representations and warranties of the Credit Agreement remained true; (3) the amount requested would not exceed the borrowing base; and (4) all conditions in the credit agreement required to obtain an advance on the loan were satisfied. Agriprocessors was always cash-starved and made frequent requests for advances on the loan.

Pursuant to the Credit Agreement, Agriprocessors was required to deposit daily customer payments on accounts receivable into a designated account at Decorah Bank & Trust Company. All sale proceeds and collections from accounts receivable were to be held in trust for FBBC and were not to be commingled with Agriprocessors' other funds or property.

---

[3] The court hereafter generally refers to FBBC's lending relationship with Agriprocessors, including both the Credit Agreement and Note, as the "loan" or the "loan agreement."

6

### 4. Other covenants

The Credit Agreement also required Agriprocessors to comply with certain covenants. One such covenant was an agreement to comply with the Packers & Stockyards Act of 1921. Compliance with the Packers Act required Agriprocessors to promptly pay for certain inventory and farm products.

Other covenants included representations to FBBC that: (1) all accounts receivable were genuine and not subject to a Packers Act Trust; (2) Agriprocessors was not in violation of any law that would adversely affect the collateral or Agriprocessors' business, operations or condition; and (3) no document or statement that Agriprocessors furnished to FBBC contained any untrue statement of material fact or omitted facts necessary to make the statements not misleading.

## IV. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Legal Standard

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Such a motion is permitted after trial, in which case the court may set aside the verdict and enter a judgment of acquittal. Fed. R. Crim. P. 29(c). "The court may reserve decision on the motion, proceed with trial[,]. . . submit the case to the jury, and decide the motion either before the jury returns or is discharged after it returns a verdict of guilty[.]" Fed. R. Crim. P. 29(b). It is well-settled that jury verdicts are not lightly overturned. *See, e.g., United States v. Peneaux*, 432 F.3d 882, 889 (8th Cir. 2005); *United States v. Stroh*, 176 F.3d 439, 440 (8th Cir. 1999). The court must view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences. *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). The court must uphold the jury's verdict so long as a reasonable-minded jury could have found Defendant guilty beyond a

reasonable doubt. *Id.* Moreover, the court "must uphold the jury's verdict even where the evidence 'rationally supports two conflicting hypotheses' of guilt and innocence." *Id.* (quoting *United States v. Serrano-Lopez*, 366 F.3d 628, 634 (8th Cir. 2004)). It is not the province of the court to evaluate the credibility of witnesses. *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004). That task is for the jury. *Id.*

## B. Analysis

Defendant moves for a judgment of acquittal on all counts of conviction. *See* First Motion at 1 (stating Defendant "moves this Court for a judgment of acquittal as to Renumbered Counts 1-91 (Counts 74-163) of the Seventh Superseding Indictment."). Accordingly, the court shall evaluate the sufficiency of the evidence and any other issues Defendant has raised regarding each count of conviction. First, the court shall address whether Defendant waived a multiplicity challenge. Then, the court will evaluate each count of conviction.

### 1. *Waiver of multiplicity challenge*

Defendant argues that certain counts charged in the Seventh Superseding Indictment are multiplicitous. Defendant also refers to this argument as "merger" with respect to certain counts. *See* Defendant's Brief in Support of the Second Motion ("Def. Second Brief") (docket no. 747-1), at 11 (arguing that the Wire Fraud Counts merge with the Bank Fraud Counts and that the Mail Fraud Counts merge with the False Statement Counts).

Defendant has waived this argument. *See* Fed. R. Crim. P. 12(b)(3)(B) (stating that "a motion alleging a defect in the indictment" must be raised before trial); *see also United States v. Prescott*, 42 F.3d 1165, 1167 (8th Cir. 1994) (holding that "defenses and objections based on defects in the indictment must be raised before trial" and that failure to do so constitutes a waiver of that claim); *United States v. Shephard*, 4 F.3d 647, 650 (8th Cir. 1993) (holding that a challenge to an indictment based on multiplicity must be raised before trial). Accordingly, the court denies the First and Second Motions to the

8

extent they seek a judgment of acquittal on the basis of multiplicity. Further, as discussed more fully below, even if the court considered the multiplicity challenges as timely, the court finds that all of Defendant's multiplicity arguments are without merit.

### 2. Counts of conviction

#### a. Bank Fraud Counts

Defendant moves for a judgment of acquittal on the Bank Fraud Counts. Defendant argues that there is insufficient evidence to support these convictions, that the government did not prove Defendant knew the defrauded bank was insured by the FDIC, that the charges are multiplicitous and that other miscellaneous issues warrant a judgment of acquittal.

#### i. Sufficiency of the evidence on Counts 1-14

The government alleged that Defendant committed bank fraud in at least one of three ways: (1) by participating in a scheme to defraud a financial institution; (2) by executing a scheme to defraud a financial institution; and/or (3) by aiding or abetting another in executing a scheme to defraud. The crime of bank fraud, as alleged in Counts 1 through 14, under the first alternative, participating in a scheme to defraud a financial institution, has three essential elements, which are:

> **One**, the defendant knowingly participated in a scheme to defraud a financial institution or to obtain funds owned by or under the custody and control of a financial institution by means of material false or fraudulent representations, pretenses, or promises, in that the defendant knowingly participated in a scheme to fraudulently obtain advances of money from a financial institution under a revolving loan to Agriprocessors, Inc. as follows:
>
> > Count 1: advance of $2,900,000 on September 4, 2007;
> > Count 2: advance of $525,000 on October 1, 2007;
> > Count 3: advance of $825,000 on November 1, 2007;
> > Count 4: advance of $1,210,000 on December 3, 2007;
> > Count 5: advance of $1,550,000 on January 2, 2008;

Count 6: advance of $640,000 on February 1, 2008;
Count 7: advance of $1,064,000 on March 3, 2008;
Count 8: advance of $1,579,000 on April 1, 2008;
Count 9: advance of $1,343,000 on May 1, 2008;
Count 10: advance of $1,035,000 on June 2, 2008;
Count 11: advance of $1,125,000 on July 1, 2008;
Count 12: advance of $475,000 on August 1, 2008;
Count 13: advance of $615,000 on September 2, 2008;
Count 14: advance of $1,100,000 on October 7, 2008;

*Two*, the defendant did so with intent to defraud; and

*Three*, the financial institution was insured by the FDIC.

Final Jury Instruction No. 12 (docket no. 742); *see also* 8th Cir. Model Criminal Instr. 6.18.1344 (2007) (same); *Feingold v. United States*, 49 F.3d 437, 439 (8th Cir. 1995) (affirming the use of the Eighth Circuit Model Instruction on bank fraud).

Under the second alternative, executing a scheme to defraud a financial institution, the first element is as follows:

*One*, the defendant knowingly executed a scheme to defraud a financial institution or to obtain funds owned by or under the custody and control of a financial institution by means of material false or fraudulent representations, pretenses, or promises, in that the defendant fraudulently obtained or voluntarily and intentionally caused others to obtain advances of money from a financial institution under a revolving loan to Agriprocessors, Inc.

Final Jury Instruction No. 12 (docket no. 742); *see also* 8th Cir. Model Criminal Instr. 6.18.1344 (2007) (same); *Feingold*, 49 F.3d at 439 (affirming the use of the Eighth Circuit Model Instruction on bank fraud). Elements two and three remain the same as the first alternative.

Under the third alternative, aiding and abetting another in executing a scheme to defraud, the first element is as follows:

10

> ***One***, [Defendant must] have known bank fraud was being
> committed or going to be committed in that some person or
> persons were fraudulently obtaining or going to obtain
> advances of money from a financial institution under a
> revolving loan to Agriprocessors, Inc.

Final Jury Instruction No. 12 (docket no. 742); *see also* 8th Cir. Model Criminal Instr. 6.18.1344 (2007) (same); *Feingold*, 49 F.3d at 439 (affirming the use of the Eighth Circuit Model Instruction on bank fraud). Elements two and three remain the same as the first alternative. The government presented four theories of criminal liability for the Bank Fraud Counts: (1) Defendant falsely stated that Agriprocessors was in compliance with all laws when Agriprocessors and its employees were harboring or conspiring to harbor undocumented aliens; (2) Defendant created false accounts receivable collateral supporting the loan; (3) Defendant diverted collections from accounts receivable supporting the loan; and (4) Defendant falsely stated that Agriprocessors was in compliance with all laws when Agriprocessors and its employees were failing to comply with the Packers and Stockyards Act.[4] The court finds that sufficient evidence supports the jury's verdicts under all four theories.

---

[4] With respect to the first theory, the jury unanimously found beyond a reasonable doubt that Defendant committed bank fraud by falsely stating that Agriprocessors was in compliance with all laws while Agriprocessors harbored undocumented aliens on Counts 1-9. Verdict and Interrogatory Forms (docket no. 736), at 1-18. With respect to the second theory, the jury unanimously found beyond a reasonable doubt that Defendant committed bank fraud by creating false accounts receivable on all the Bank Fraud Counts. Verdict and Interrogatory Forms at 1-28. With respect to the third theory, the jury unanimously found beyond a reasonable doubt that Defendant committed bank fraud by diverting accounts receivable on all the Bank Fraud Counts. *Id.* With respect to fourth theory, the jury unanimously found beyond a reasonable doubt that Defendant committed bank fraud by falsely stating that Agriprocessors was in compliance with all laws while Agriprocessors failed to comply with the Packers and Stockyards Act on Counts 7 and 8. *Id.* at 14-16.

With respect to the first theory of criminal liability, Senior Credit Officer of First Bank, Phil Lykens, testified that, pursuant to the loan agreement, Agriprocessors reaffirmed the loan agreement's warranties and representations upon every advance request. These warranties and representations included a warranty of compliance with all laws.

On May 12, 2008, Immigration and Customs Enforcement ("ICE") conducted an enforcement action at Agriprocessors. During the enforcement action, federal agents discovered evidence that Agriprocessors employed hundreds of illegal immigrants. Almost 400 undocumented workers were arrested, charged and convicted. In addition, Elizabeth Billmeyer, the former human resources manager for Agriprocessors, testified that Agriprocessors received "no-match" letters from the Social Security Administration for a number of Agriprocessors' employees. The "no-match" letters listed Social Security numbers that did not "match" the employee using the number at Agriprocessors. Billmeyer testified that she informed Defendant of the "no-match" problem, and he instructed her not to worry about it. Billmeyer created a list of more than 200 employees with questionable documentation. Additionally, Billmeyer testified that an Immigration and Customs Enforcement agent advised her to stop hiring workers that presented pink-colored Resident Alien Cards, because these cards were no longer valid. Billmeyer informed Defendant of this by an e-mail, admitted as exhibit 1108. Billmeyer later learned that employees had been hired by Agriprocessors and placed on a special payroll, called the "Hunt Payroll," without her knowledge.[5] Billmeyer testified that Laura Althouse, a lower-level payroll employee, told her that Defendant did not want Billmeyer to know that Agriprocessors had hired these employees.

---

[5] At trial, the court heard evidence that the Hunt Payroll was originally used to pay employees that were able to work on the Jewish Sabbath.

Althouse testified that Defendant instructed her to hire applicants who presented pink-colored Resident Alien Cards. Defendant directed Althouse to add these employees to the Hunt Payroll. Defendant directed her to conduct this hiring after normal business hours so Billmeyer would not know about it.

With respect to the second theory of criminal liability, collateral certificates and advance requests submitted on the dates charged in the Indictment and requesting the amounts charged in the Indictment were admitted into evidence as exhibits 2052 through 2062. Yomtov "Toby" Bensasson, the former controller of Agriprocessors, testified that Defendant directed him to falsify documents to overstate Agriprocessors' accounts receivable. Those overstatements had the effect of artificially increasing Agriprocessors' collateral, which allowed it to borrow more funds from FBBC. Bensasson testified that Agriprocessors did not submit any accurate collateral certificates to FBBC after September 4, 2007.

Darlis Hendry, a former customer service representative at Agriprocessors, testified that her job duties included preparing and sending Agriprocessors' customers an invoice for product they ordered. She testified that Defendant directed her to create invoices showing that customers had purchased product that they had not, in fact, purchased. Hendry testified that Defendant, on numerous occasions, came to her office holding a piece of paper with a customer name and dollar amount written on it in Defendant's handwriting. Hendry would then create an invoice to reflect purchases consistent with the name and dollar amount written on the piece of paper. Hendry testified that she simply chose any product or combination of products to reach the desired dollar amount. Hendry testified that Defendant asked her to store these invoices separately from other invoices.

With respect to the third theory of criminal liability, April Hamilton, a former accounts receivable employee at Agriprocessors, testified that Defendant directed her to

13

divert customer payments from the Decorah Bank & Trust account to other accounts owned by Agriprocessors. Additionally, she testified that Defendant occasionally directed her to refrain from crediting a customer account after receiving payment from the customer.

In addition to his testimony on the creation of false collateral certificates, Bensasson testified that the diversion of customer payments into accounts other than the Decorah Bank & Trust account caused Agriprocessors' accounts receivable to appear higher than they actually were. This effectively inflated Agriprocessors' outstanding accounts receivable, which, in turn, gave Agriprocessors more collateral to borrow against.

With respect to the fourth theory of criminal liability, Adam Fast, a Senior Auditor for the United States Department of Agriculture's Packers and Stockyards Program, testified that Agriprocessors is a "packer" within the meaning of the Packers and Stockyards Act. As such, Agriprocessors was required to pay for livestock by the close of the next business day following the day the livestock is purchased. Although suppliers can waive the prompt payment requirement, to be effective, the waiver must be in writing and occur before the sale. Shella Chiu, a former accounts payable employee at Agriprocessors, testified about Agriprocessors' payments to cattle suppliers. Chiu testified that Defendant gave her directions about when to release checks to cattle suppliers. At trial, the court admitted Exhibit 3000 into evidence. Exhibit 3000 is a March 7, 2002 Order from an Administrative Law Judge finding that Agriprocessors violated the Packers and Stockyards Act ("Order"). The Order directed Agriprocessors and its agents and employees to cease and desist violating the Packers and Stockyards Act. The court also admitted into evidence Exhibit 3007, which is an affidavit of Defendant dated March 22, 2006, in which he states that he is aware of the Packers and Stockyards Act's requirements. The court admitted into evidence exhibit 3002, which is a summary of checks from Agriprocessors to various cattle suppliers. These checks are signed by

14

Defendant, with the exception of the checks relevant to Counts 72, 81, 82, 83 and 90. The postmark and/or receipt dates on the envelopes are several days after the dates Agriprocessors purchased the cattle. Representatives of several entities involved in cattle sales to Agriprocessors testified that payments for cattle purchased by Agriprocessors were untimely under the Packers and Stockyards Act in 2007 through 2008. No evidence was presented that they had waived their right to timely payments. Suppliers received no explanation from Agriprocessors for the late payment.

Finally, the government presented sufficient evidence to show that FBBC is an FDIC insured institution. Gary Pratte is an Executive Vice President and Senior Regional Credit Officer of First Bank. Pratte testified that FBBC is a wholly-owned subsidiary of First Bank. According to his testimony, FBBC is the lending group for First Bank and is primarily involved in commercial loans. Pratte testified that FBBC and First Bank share officers and directors, have offices in the same building and that First Bank fully funds FBBC. He testified that First Bank is insured by the FDIC. Pratte also testified that FBBC is regulated by the same entities as First Bank, including the Federal Reserve, the FDIC and the State of Missouri. In light of the foregoing, the court finds that sufficient evidence supports the jury's verdicts on the Bank Fraud Counts.

### ii.     Defendant's knowledge of FDIC insurance

Defendant argues that the court must grant the First and Second Motions to the extent they seek a judgment of acquittal on the Bank Fraud Counts, because "the [g]overnment has presented no evidence . . . that [Defendant] knew [First Bank] or FBBC was a[] FDIC insured institution." Defendant's Brief in Support of the First Motion ("Def. First Brief") (docket no. 721-2), at 13.

This argument is a red herring. "The status of the victim-institution is not a separate knowledge element of bank fraud under § 1344, but an objective fact that must be established in order for the statute to apply." *United States v. Brandon*, 17 F.3d 409,

425 (1st Cir. 1994). Defendant cites no authority that requires the government to prove that a defendant charged with bank fraud knew that the defrauded bank was FDIC insured. Rather, Defendant analogizes the bank fraud statute, 18 U.S.C. § 1344, to the aggravated identity theft statute, 18 U.S.C. § 1028A(c).

Aggravated Identity Theft occurs when a person "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(c). In *Flores-Figueroa v. United States*, the Supreme Court held that the word "knowingly" modifies the phrase "of another person," and therefore requires that the government prove that a defendant charged with Aggravated Identity Theft knew that the means of identification belonged to another person. 129 S.Ct. 1886, 1894 (2009). Defendant argues that *Flores-Figueroa* compels the court to find that the bank fraud statute requires the government to prove that a defendant charged with bank fraud actually knew that the defrauded bank was FDIC insured.

The court finds that the aggravated identity theft statute and the bank fraud statute are distinguishable on this issue. In *Flores-Figueroa*, the Supreme Court reasoned that "knowingly" modifies the words after it, because "where a transitive verb has an object, listeners in most contexts assume that an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject performed the entire action, including the object as set forth in the sentence." *Flores-Figueroa*, 129 S.Ct. at 1890. When the court applies this same textual analysis to the bank fraud statute, Defendant's argument is unavailing. Unlike the aggravated identity theft statute, the object at issue here (FDIC insurance) is not in the same sentence as the transitive verb, "knowingly." 18 U.S.C. § 1344. The object modified by the transitive verb is "a financial institution," indicating that the government must prove that a defendant knew that the fraud was directed at a financial institution—not that a defendant knew that the financial institution was FDIC insured.

### iii.     Multiplicity challenge to Counts 1-14

Defendant argues that the Bank Fraud Counts charge Defendant multiple times for "one criminal scheme." Def. Second Brief at 7. The court finds that Defendant's multiplicity argument is without merit. *See United States v. George*, 986 F.2d 1176, 1179 (8th Cir. 1993) (stating that "the language of 18 U.S.C. § 1344, the bank fraud statute under which [the defendant] was charged, clearly states that each execution of the scheme to defraud may be charged as a separate act.").

In *George*, the defendant, a vice president of a leasing company, directed employees to alter invoices to increase the amount of collateral it could borrow against. *Id.* at 1178. The defendant brought a multiplicity challenge, arguing that the conduct constituted a single offense. *Id.* at 1179. The Eighth Circuit Court of Appeals disagreed and found that "[e]ach of the invoices was altered separately . . . and occurred on a separate date." *Id.* at 1179-80. In this case, as in *George*, each Bank Fraud Count constituted a separate act. Each count represents distinct acts, occurring on separate dates, of falsifying invoices, diverting funds and misrepresenting Agriprocessors' compliance with the laws and accounts receivable to FBBC. Accordingly, the court finds that the Bank Fraud Counts are not multiplicitous.

### iv.     Miscellaneous arguments

Defendant offers other arguments in support of his motion for judgment of acquittal on the Bank Fraud Counts, including: the assertion that breach of contract is not a crime, Defendant's harboring of undocumented immigrants was not material, Defendant had a right to invoke the Fifth Amendment privilege with respect to the harboring of undocumented immigrants and that FBBC suffered no loss.

The court agrees with Defendant that breach of contract is not a crime. However, this is not a breach of contract case. As discussed in greater detail above, the government

presented sufficient evidence to establish that Defendant committed every element of bank fraud.

With respect to Defendant's claim that the harboring was not material, the court notes that the jury, according to the interrogatory forms, found Defendant guilty of Bank Fraud under multiple theories. Jury Verdicts (docket no. 763), at 1-29. Therefore, even if the court accepts Defendant's argument, the jury's verdicts remain the same under alternate theories of criminal liability. In any event, the court finds that Agriprocessors' harboring of undocumented immigrants was material. Lykens's testimony established that he confronted Defendant after the enforcement action to ascertain whether Defendant knew that Agriprocessors had employed undocumented workers. According to Lykens, Defendant asserted that he did not know there were undocumented workers at Agriprocessors. Testimony and other evidence introduced through witnesses, including Billmeyer and Althouse, establish Defendant's statement was untrue, in breach of the loan agreement.

Next, Defendant asserts that he had a right to assert his Fifth Amendment privilege when asked about Agriprocessors' compliance with the law after the enforcement action. Defendant argues that his Fifth Amendment privilege somehow permitted him to lie to FBBC when Agriprocessors submitted the advance requests. Again, even if the court accepts this argument, the jury found Defendant guilty under multiple theories on every Bank Fraud Count. Additionally, the Fifth Amendment privilege does not give one the right to commit a crime. Defendant asks the court to adopt a very expansive view of the Fifth Amendment. The Supreme Court has rejected an interpretation of the Fifth Amendment that "assumes the existence of a periphery of the Self-Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched."

18

*United States v. Apfelbaum*, 445 U.S. 115, 130 (1980) (citing *United States v. Freed*, 401 U.S. 601, 606-07 (1971)).

Finally, Defendant argues that the court must grant the First Motion to the extent it asks for a judgment of acquittal on the Bank Fraud Counts, because FBBC suffered no loss. The Eighth Circuit Court of Appeals has "held that no actual loss or intent to cause a loss is required, so long as the defendant has 'defraud[ed]' a financial institution." *United States v. Staples* 435 F.3d 860, 867 (2006) (quoting *United States v. Whitehead*, 176 F.3d 1030, 1041 (8th Cir. 1999)). Accordingly, this argument is without merit.

### v. Summary

In light of the foregoing, the court finds that there is sufficient evidence to support the verdicts on Counts 1 through 14, the Bank Fraud Counts, and that Defendant's other arguments for judgment of acquittal on the Bank Fraud Counts are without merit. Accordingly, the court shall deny the First and Second Motions to the extent they seek a judgment of acquittal on Counts 1 through 14.

### b. False Statement Counts

Defendant moves for a judgment of acquittal on the False Statement Counts. Defendant argues that there is insufficient evidence to sustain the jury's verdicts and that the False Statement Counts are multiplicitous.

### i. Sufficiency of the evidence on Counts 15-28

The crime of making a false statement or report to a financial institution, as charged in Counts 15 through 28, has three essential elements, which are:

> ***One***, the defendant knowingly made a false statement or report, or voluntarily and intentionally caused another to make a false statement or report, in the following certifications that Agriprocessors, Inc. submitted to FBBC which stated that there was no Event of Default as of the date of the certification and that Agriprocessors' loan agreement representations and warranties were true as of the date of the certifications:

19

Count 15:     a certification submitted on September 4, 2007;
Count 16:     a certification submitted on October 1, 2007;
Count 17:     a certification submitted on November 1, 2007;
Count 18:     a certification submitted on December 3, 2007;
Count 19:     a certification submitted on January 2, 2008;
Count 20:     a certification submitted on February 1, 2008;
Count 21:     a certification submitted on March 3, 2008;
Count 22:     a certification submitted on April 1, 2008;
Count 23:     a certification submitted on May 1, 2008;
Count 24:     a certification submitted on June 2, 2008
Count 25:     a certification submitted on July 1, 2008;
Count 26:     a certification submitted on August 1, 2008;
Count 27:     a certification submitted on September 2, 2008;
Count 28:     a certification submitted on October 7, 2008;

*Two*, the defendant made the false statement or caused another to make the false statement for the purpose of influencing the action of a financial institution upon requests for advances on a loan; and

*Three*, that the financial institution was insured by the FDIC at the time the statement was made.

Final Jury Instruction No. 13 (docket no. 742); *see also* 8th Cir. Model Jury Instr. 6.18.1014 (2007) (same); *United States v. Reeves*, 674 F.2d 739, 747 (8th Cir. 1982) (setting forth the elements of making a false statement or report to a bank).

At trial, the government introduced sufficient evidence to show that Defendant made false statements to a financial institution. Lykens testified that, pursuant to the loan agreement, Agriprocessors reaffirmed the loan agreement's warranties and representations upon every advance request. These warranties and representations included a warranty of compliance with all laws and a representation that the accounts receivable offered as collateral were legitimate and assignable.

The evidence presented at trial establishes that Defendant misrepresented Agriprocessors' compliance with the law as well as the amount of its accounts receivable. For instance, testimony and other evidence introduced from witnesses, including Billmeyer

20

and Althouse, establishes that Defendant misrepresented Agriprocessors' compliance with laws prohibiting the harboring of undocumented immigrants. Testimony and other evidence introduced through witnesses, including Chiu and Fast, establishes that Defendant misrepresented Agriprocessors' compliance with the Packers and Stockyards Act. Testimony and other evidence introduced from witnesses, including Hendry, Bensasson and Hamilton, establishes that Defendant overstated Agriprocessors' accounts receivable by directing the creation of false invoices and directing the diversion of customer payments from the Decorah Bank & Trust account. Pratte's testimony established that FBBC is a wholly-owned subsidiary of First Bank, which is FDIC-insured. The court finds that this evidence is sufficient to sustain the jury's verdicts on False Statement Counts 15 through 28.

### *ii.* *Sufficiency of the evidence on Count 29*

The crime of making a false statement or report to a financial institution, as charged in Count 29 of the Indictment, has three essential elements, which are:

> *One*, the defendant knowingly made a false statement, that is, that during the time period leading up to the arrests of approximately 389 undocumented alien workers at Agriprocessors, Inc. on May 12, 2008, the defendant had been unaware that such alien workers were undocumented;

> *Two*, the defendant made the false statement for the purpose of influencing the action of a financial institution upon requests for advances on a loan; and

> *Three*, that the financial institution was insured by the FDIC at the time the statement was made.

Final Jury Instruction No. 13 (docket no. 742); *see also* 8th Cir. Model Jury Instr. 6.18.1014 (2007) (same); *Reeves*, 674 F.2d at 747 (setting forth the elements of making a false statement or report to a bank).

Lykens testified that Defendant told him Agriprocessors had complied with all laws when Lykens visited Agriprocessors after the enforcement action. Defendant made this statement to Lykens to authorize further advances pursuant to the loan agreement. Testimony from Billmeyer and Althouse establishes that, at the time Defendant made the statement to Lykens, Defendant knew that Agriprocessors was not in compliance with laws prohibiting the harboring of undocumented workers. The court finds that this evidence is sufficient to sustain the jury's verdict on False Statement Count 29.

### iii.    Sufficiency of the evidence on Counts 30-38

The crime of making a false statement or report to a financial institution, as charged in Counts 30 through 38 of the Indictment, has three elements, which are:

> *One*, the defendant knowingly made or voluntarily and intentionally caused another to make a false statement or report, or willfully overvalued property and security or caused another to overvalue property or security, by submitting or causing to be submitted false monthly financial reports that overstated the accounts receivable collateral that supported a revolving loan to Agriprocessors, Inc. as follows:
>
> Count 30:    submission of a false report on or about February 29, 2008, regarding accounts receivable as of January 25, 2008.
>
> Count 31:    submission of a false report on or about March 27, 2008, regarding accounts receivable as of February 29, 2008;
>
> Count 32:    submission of a false report on or about April 18, 2008, regarding accounts receivable as of March 28, 2008;
>
> Count 33:    submission of a false report on or about May 20, 2008, regarding accounts receivable as of April 25, 2008;
>
> Count 34:    submission of a false report on or about July 2, 2008, regarding accounts receivable as of May 30, 2008;

22

Count 35: submission of a false report in or about July or August of 2008, regarding accounts receivable as of June 27, 2008;

Count 36: submission of a false report on or about September 3, 2008, regarding accounts receivable as of July 25, 2008;

Count 37: submission of a false report in or about September or October of 2008, regarding accounts receivable as of August 29, 2008;

Count 38: submission of a false report in or about October of 2008, regarding accounts receivable as of September 26, 2008;

*Two*, the defendant made the false statement or caused another to make a false statement, or overvalued the property or security or caused another to overvalue the property or security, for the purpose of influencing the action of a financial institution upon requests for advances on a loan; and

*Three*, that the financial institution was insured by the FDIC at the time the statement was made.

Final Jury Instruction No. 13 (docket no. 742); *see also* 8th Cir. Model Jury Instr. 6.18.1014 (2007) (same); *Reeves*, 674 F.2d at 747 (setting forth the elements of making a false statement or report to a bank).

At trial, the government introduced sufficient evidence to show that Defendant knowingly and intentionally directed the creation of false invoices to overstate Agriprocessors' accounts receivable. Evidence from Agriprocessors' customers described below shows that a large number of invoices reflecting Agriprocessors' purported sales to these customers had not been received by the customers and the customers never received the product reflected in the invoices:

Albert Barel, the controller of City Glatt, based in Los Angeles, California, testified that City Glatt's purchases from Agriprocessors averaged $40,000 in value. City Glatt paid by check and occasionally wired payments to Citizens State Bank or Freedom Bank. City Glatt never owed Agriprocessors more than approximately $500,000. However, accounts receivable reports prepared by Agriprocessors indicate that City Glatt owed Agriprocessors $1,217,961.02 in February 2008, $1,140,107.48 in March 2008, $1,145,873.54 in April 2008, $1,301,853.77 in May 2008, $1,308,367.19 in July 2008, $1,380,244.72 in July or August 2008, $1,162,035.79 in September 2008, $1,280,596.73 in September or October 2008 and $1,502,701.61 in October 2008. Exhibit 2076C contains the invoices that purported to bill these amounts to City Glatt. Barel testified that City Glatt's records do not reflect that it received these invoices or paid for any product listed therein.

Charles Knudtson, controller of Twin City Hides, based in St. Paul, Minnesota, testified that Twin City Hides "pre-paid" Agriprocessors for the hides it purchased. In other words, according to Knudtson's testimony, Twin City Hides never owed Agriprocessors any money. However, accounts receivable reports prepared by Agriprocessors indicate that Twin City Hides owed Agriprocessors $617,301.95 in February 2008, $941,763 in March 2008, $521,013 in April 2008, $983,317.75 in May 2008, $1,172,194.63 in July 2008, $1,076,961.12 in July or August 2008, $787,025.60 in September 2008, $1,113,035.19 in September or October 2008 and $993,038.79 in October 2008. Exhibit 2049 contains the invoices that purported to bill these amounts to Twin City Hides. Knudtson testified that Twin City Hides' records do not reflect that it received these invoices.

Steven Haider and Gene Parks, both employees at Sanimax (formely Van Hoven), based in St. Paul, Minnesota, testified that Van Hoven purchased bi-products from Agirpropcessrs. Van Hoven had an "advance payment arrangement" with Agriprocessors. In other words, according to Parks and Haider , Van Hoven never owed Agriprocessors

any money. However, accounts receivable reports prepared by Agriprocessors indicate that Van Hoven owed Agriprocessors $704,042.14 in February 2008, $951,679.19 in March 2008, $627,244 in April 2008, $854,911.31 in May 2008, $924,838.05 in July 2008, $799,429.18 in July or August 2008, $893,308.26 in September 2008, $1,176,335.70 in September or October 2008 and $912,136.38 in October 2008. Parks testified that Agriprocessors never sent Van Hoven any invoices.

Douglas Berkhouse, the Chief Operating Officer of Colorado Meat Packers, based in Denver, Colorado, testified about Colorado Meat Packers's relationship with Agriprocessors. Accounts receivable reports prepared by Agriprocessors indicate that Colorado Meat Packers owed Agriprocessors $944,230.68 in February 2008, $1,005,032.64 in March 2008, $1,009,409.75 in April 2008, $707,597.62 in May 2008, $282,361.24 in July 2008, $646,608.20 in July or August 2008, $1,854,451.91 in September 2008, $2,346,163.56 in September or October 2008 and $1,474,421.37 in October 2008. Exhibit 2049 contains the invoices that purported to bill these amounts to Colorado Meat Packers. Berkhouse testified that Colorado Meat Packers never received these invoices or the product reflected in them. Berkhouse also testified that many of these invoices purported to bill Colorado Meat Packers for the front half of cows. According to Berkhouse, however, Colorado Meat Packers never purchased or received the front half of cows from Agriprocessors. The invoices reflected purported purchases from Agriprocessors' Postville, Iowa plant. However, Berkhouse testified that Colorado Meat Packers purchased their meat from Agriprocessors' plant in Gordon, Nebraska, not Postville, Iowa.

Steve Cohen, the president of Twin City Poultry, based in St. Paul, Minnesota, testified about Twin City Poultry's relationship with Agriprocessors. Accounts receivable reports prepared by Agriprocessors indicate that Twin City Poultry owed Agriprocessors $873,458.21 in February 2008, $1,039,590.07 in March 2008, $1,084,594.56 in April 2008, $876,468.13 in May 2008, $1,085,911.24 in July 2008, $1,765,746.75 in July or

August 2008, $2,072,638.81 in September 2008, $1,916,348.03 in September or October 2008 and $1,467,883.58 in October 2008. Exhibit 2080C contains the invoices that purported to bill these amounts to Twin City Poultry. Cohen testified that Twin City Poultry never received these invoices. According to Cohen, in the regular course of business, Twin City Poultry ordered approximately $150,000 to $200,000 of product per week and paid Agriprocessors within thirty days of receipt of an invoice.

Michael Engelman of Doheny Kosher, based in Los Angeles, California, testified that, throughout its relationship with Agriprocessors, Doheny Kosher never owed Agriprocessors more than $1,000,000. However, accounts receivable reports prepared by Agriprocessors indicate that Doheny Kosher owed Agriprocessors $1,142,424 in February 2008, $1,076,736.42 in March 2008, $1,011,268.88 in April 2008, $1,182,945.24 in May 2008, $1,242,818.93 in July 2008, $1,171,658.12 in July or August 2008, $943,772.77 in September 2008, $836,341.60 in September or October 2008 and $1,394,769.50 in October 2008. Exhibit 2081C contains the invoices that purported to bill these amounts to Doheny Kosher. Engelman testified that only one of these invoices was found in Doheny Kosher's records.

David Kagan, the owner of Western Kosher, based in Los Angeles, California, testified that, throughout its relationship with Agriprocessors, Western Kosher never owed Agriprocessors more than approximately $150,000 to $200,000. However, accounts receivable reports prepared by Agriprocessors indicate that Western Kosher owed Agriprocessors $475,543.90 in February 2008, $428,263.74 in March 2008, $427,219.45 in April 2008, $200,313.84 in May 2008, $180,153.93 in July 2008, $420,334.92 in July or August 2008, $831,111.23 in September 2008, $1,029,422.24 in September or October 2008 and $752,464.06 in October 2008. Exhibit 2082C contains the invoices that purported to bill these amounts to Western Kosher. Kagan testified that Western Kosher never received these invoices or the product reflected in them.

Eleazer Meyers, president of The Right Place, a clothing store based in New York, New York, testified about The Right Place's relationship with Agriprocessors. Accounts receivable reports prepared by Agriprocessors indicate that The Right Place owed Agriprocessors $234,298.68 in February 2008, $517,548.04 in March 2008, $371,550.63 in April 2008, $344,628.09 in May 2008, $386,996.34 in July 2008, $606,351.80 in July or August 2008, $639,344.41 in September 2008, $574,852.77 in September or October 2008 and $562,192.40 in October 2008 for meat purchases. However, Meyers testified that The Right Place was a clothing store, and thus never ordered meat from Agriprocessors. Meyers testified that he ordered meat from Agriprocessors for his personal consumption, but that it never totaled more than $10,000.

Aaron Tzivin, owner of House of Glatt, based in New York, New York testified about House of Glatt's relationship with Agriprocessors. Accounts receivable reports prepared by Agriprocessors indicate that House of Glatt owed Agriprocessors $283,264.45 in March 2008, $283,264.45 in April 2008, $426,514.13 in May 2008, $432,601.60 in July 2008, $556,347 in July or August 2008, $1,207,582.81 in September 2008, $661,021.77 in September or October 2008 and $1,055,313.15 in October 2008. Exhibit 2049 contains the invoices that purported to bill these amounts to House of Glatt. Tzivin testified that House of Glatt never received these invoices, and that the purchase amounts reflected in the invoices were larger than House of Glatt's regular invoices.

Additionally, Darlis Hendry testified that Defendant directed her to create invoices showing that customers had purchased product that they had not, in fact, purchased. Hendry testified that Defendant, on numerous occasions, came to her office holding a piece of paper with a customer name and dollar amount written on it in Defendant's handwriting. Hendry would then create an invoice to reflect purchases consistent with the name and dollar amount written on the piece of paper. Hendry testified that she simply chose any product or combination of products to reach the desired dollar amount. Hendry testified that Defendant asked her to store these invoices separately from other invoices. Pratte's

testimony established that FBBC is a wholly-owned subsidiary of First Bank, which is FDIC insured. The court finds that this evidence is sufficient to sustain the convictions on False Statement Counts 30 through 38.

### iv. Multiplicity challenge to Counts 15-38

In addition to arguing that insufficient evidence exists to sustain the jury's verdict on Counts 15 through 38, Defendant argues that "Counts 15-38 suffer from [a]. . . multiplicity defect based on the evidence presented at trial." Def. Second Brief at 9. Defendant argues that the False Statement Counts charge a "continuing execution of a unitary scheme." *Id.* The court finds that Defendant's multiplicity argument is without merit. False statements made in separate documents can constitute separate counts. *United States v. Glanton*, 707 F.2d 1238, 1240 (11th Cir. 1983). In *Glanton*, the defendant argued that the indictment charging him with three counts of making false statements to a bank was multiplicitous, because "his acts arose from a continuous course of conduct." *Id.* at 1241. The Eleventh Circuit Court of Appeals disagreed and held that the indictment was not multiplicitous, because "[e]ach count required the government to prove a different fact[.]" *Id.* In this case, each count of false statements to a financial institution required the government to prove a different fact or different facts, namely that Defendant fabricated different invoices for different customers.

### v. Summary

In light of the foregoing, the court finds that there is sufficient evidence to support the verdicts on Counts 15 through 38 and that Defendant's other arguments for judgment of acquittal are without merit. Accordingly, the court shall deny the First and Second Motions to the extent they seek a judgment of acquittal on Counts 15 through 38.

### c. Wire Fraud Counts

Defendant moves for a judgment of acquittal on Counts 39 through 52. Defendant argues that there is insufficient evidence to sustain the jury's verdict and that the Wire Fraud Counts merge with the Bank Fraud Counts.

28

### i. Sufficiency of the evidence on Counts 39-52

The crime of wire fraud, as charged in Counts 39 through 52, has three essential elements, which are:

> **One**, the defendant voluntarily and intentionally participated in a scheme to defraud with knowledge of its fraudulent nature or devised or participated in a scheme to obtain money or property by means of material false representations or promises which scheme is described as follows: fraudulently obtaining advances of money from FBBC under a revolving loan to Agriprocessors, Inc. by lying about Agriprocessors' compliance with the law, diverting collections from accounts receivable collateral supporting the loan and/or creating false accounts receivable collateral supporting the loan

> **Two**, the defendant did so with the intent to defraud; and

> **Three**, the defendant used, or caused to be used, interstate wire facilities in furtherance of, or in an attempt to carry out, some essential step in the scheme, specifically, the interstate submission by facsimile machine of the following advance requests:

> Count 39:   advance of $2,900,000 on September 4, 2007;
> Count 40:   advance of $525,000 on October 1, 2007;
> Count 41:   advance of $825,000 on November 1, 2007;
> Count 42:   advance of $1,210,000 on December 3, 2007;
> Count 43:   advance of $1,550,000 on January 2, 2008;
> Count 44:   advance of $640,000 on February 1, 2008;
> Count 45:   advance of $1,064,000 on March 3, 2008;
> Count 46:   advance of $1,579,000 on April 1, 2008;
> Count 47:   advance of $1,343,000 on May 1, 2008;
> Count 48:   advance of $1,035,000 on June 2, 2008;
> Count 49:   advance of $1,125,000 on July 1, 2008;
> Count 50:   advance of $475,000 on August 1, 2008;
> Count 51:   advance of $615,000 on September 2, 2008;
> Count 52:   advance of $1,100,000 on October 7, 2008.

Final Jury Instruction no. 17 (docket no. 742); *see also* 8th Cir. Model Instr. 6.18.1341 (2007) (same); *United States v. Frank*, 354 F.3d 910, 918 (8th Cir. 2004) (setting forth the elements of wire fraud).

At trial, the government introduced sufficient evidence to show that Defendant used a facsimile machine to send advance requests to FBBC in an attempt to fraudulently obtain advances on Agriprocessors' loan. Therese Jones, a Senior Client Services Technician for FBBC, testified that Agriprocessors submitted collateral certificates and advance requests to FBBC through a facsimile machine. Jones reviewed these submissions and forwarded them to Lykens, who ultimately decided whether to grant the advance request.

Exhibits 2052 through 2064 contain the collateral certificates referenced in Counts 39 through 52. Bensasson testified that Defendant directed him to falsify accounts receivable documents to overstate Agriprocessors' income. Those overstatements had the effect of artificially increasing Agriprocessors' collateral, which allowed it to borrow more funds from FBBC. Bensasson testified that Agriprocessors did not submit any accurate collateral certificates to FBBC after September 4, 2007. All collateral certificates submitted after that date were intentionally overstated. The court finds that this evidence is sufficient to sustain the convictions on the Wire Fraud Counts.

### ii. Merger

Defendant also argues that the Wire Fraud Counts "merge with the [B]ank [F]raud counts." Def. Second Brief at 11. Defendant cites no authority for this proposition. When an indictment contains multiplicitous counts, merger of the multiplicitous counts is the proper remedy. *United States v. Platter*, 514 F.3d 782, 787 (8th Cir. 2008) (citing *United States v. Richardson*, 439 F.3d 421, 423 (8th Cir. 2006)). An indictment is multiplicitous when it charges a single offense as separate counts. *United States v. Worthon*, 315 F.3d 980, 983 (8th Cir. 2003). A multiplicitous indictment can lead to a violation of the double jeopardy clause of the Fifth Amendment by "subjecting the defendant to two punishments for the same crime. . . ." *United States v. Chipps*, 410 F.3d

30

438, 447 (8th Cir. 2005). "Offenses are considered separate, and therefore not multiplicitous, if each requires proof of a fact not common to the others." *DaMier v. United States*, 616 F.2d 366, 370 (8th Cir. 1980) (citing *Ianelli v. United States*, 420 U.S. 770, 785, n. 17 (1975)).

The court finds that the wire fraud statute requires proof of an additional fact or additional facts that the bank fraud statute does not require or contain. Specifically, 18 U.S.C. § 1344, the bank fraud statute, requires the government to prove that a defendant knowingly executed or attempted to execute a "scheme or artifice to defraud a financial institution." 18 U.S.C. § 1344. The wire fraud statute does not require that the government prove the existence of a scheme to defraud a financial institution. 18 U.S.C. § 1343. It does, however, require that the government prove a "scheme or artifice to defraud" through the use of "wire, radio, or television communication in interstate or foreign commerce. . . ." *Id.* In contrast, bank fraud does not require the use of a wire communication. 18 U.S.C. § 1344. Therefore, the court declines to merge the Wire Fraud Counts and the Bank Fraud Counts.

### iii. Summary

In light of the foregoing, the court finds that there is sufficient evidence to support the verdicts on Counts 39 through 52 and that Defendant's other arguments for judgment of acquittal are without merit. Accordingly, the court shall deny the First and Second Motions to the extent they seek a Motion for Judgment of Acquittal on Counts 39 through 52.

### d. Mail Fraud Counts

Defendant moves for a judgment of acquittal on Counts 53 through 61. Defendant argues that there is insufficient evidence to sustain the jury's verdicts and that the Mail Fraud Counts merge with the False Statement Counts.

31

### i.    Sufficiency of the evidence on Counts 53-61

The crime of mail fraud, as charged in Counts 53 through 61, has three essential elements, which are:

> *One*, the defendant voluntarily and intentionally participated in a scheme to defraud with knowledge of its fraudulent nature or devised or participated in a scheme to obtain money or property by means of material false representations or promises which scheme is described as follows: fraudulently obtaining advances of money from FBBC under a revolving loan to Agriprocessors, Inc. by lying about Agriprocessors' compliance with the law, diverting collections from accounts receivable collateral for the loan, and/or creating accounts receivable collateral supporting the loan.
>
> *Two*, the defendant did so with the intent to defraud; and
>
> *Three*, the defendant used, or caused to be used, a commercial interstate carrier in furtherance of, or in an attempt to carry out, some essential step in the scheme, specifically, the use of a commercial interstate carrier to send the following false financial reports to FBBC which overstated the accounts receivable collateral supporting the loan:
>
> Count 53:    submission of a false report on or about February 29, 2008, regarding accounts receivable as of January 25, 2008;
>
> Count 54:    submission of a false report on or about March 27, 2008, regarding  accounts receivable as of February 29, 2008;
>
> Count 55:    submission of a false report on or about April 18, 2008, regarding accounts receivable as of March 28, 2008;
>
> Count 56:    submission of a false report on or about May 20, 2008, regarding accounts receivable as of April 25, 2008;
>
> Count 57:    submission of a false report on or about July 2, 2008, regarding accounts receivable as of May 30, 2008;

Count 58:     submission of a false report in or about July or August of 2008, regarding accounts receivable as of June 27, 2008;

Count 59:     submission of a false report on or about September 3, 2008, regarding accounts receivable as of July 25, 2008;

Count 60:     submission of a false report in or about September or October of 2008, regarding accounts receivable as of August 29, 2008;

Count 61:     submission of a false report in or about October of 2008, regarding accounts receivable as of September 26, 2008

Final Jury Instruction no. 18 (docket no.742); *see also* 8th Cir. Model Instr. 6.18.1341 (2007) (same); *United States v. French*, 88 F.3d 686, 688 (8th Cir. 1996) (setting forth the elements of mail fraud).

At trial, the government introduced sufficient evidence to show that Defendant used the mail to send accounts receivable reports to FBBC in an attempt to fraudulently acquire advances on Agriprocessors' loan. Jones testified that she received financial records from Agriprocessors via the mail. Testimony from Hamilton, Hendry and Bensasson establishes that Defendant overstated Agriprocessors' accounts receivable by directing the creation of false invoices and directing the diversion of funds from the Decorah Bank & Trust account. The court finds that this evidence is sufficient to sustain convictions on the Mail Fraud Counts.[6]

---

[6] The court notes that the jury, according to Interrogatory Forms 53 through 61, found that Defendant committed mail fraud only by creating false accounts receivable and by diverting collections from accounts receivable collateral for the loan. The court, therefore, does not address the sufficiency of the evidence for the compliance with all laws alternative.

33

### ii. Merger

Defendant argues that the Mail Fraud Counts "must necessarily merge with Counts 30-38 [the False Statement Counts]." Def. Second Brief at 12. The court finds that the crimes of mail fraud and false statements to a bank each require proof of a fact or facts that the other does not. Specifically, the mail fraud statute requires the government to prove that Defendant used the Postal Service or "any private or commercial interstate carrier" in connection with a fraudulent "scheme or artifice." 18 U.S.C. § 1341. The crime of making false statements to a financial institution does not require the government to prove a defendant used the mail. 18 U.S.C. § 1014. It requires the government to prove that a defendant made a false statement to a bank through any medium. Therefore, the court declines to merge the Mail Fraud Counts and the False Statement Counts. *DaMier*, 616 F. 2d at 370.

### iii. Summary

In light of the foregoing, the court finds that there is sufficient evidence to support the verdicts on Counts 53 through 61 and that Defendant's other arguments for judgment of acquittal are without merit. Accordingly, the court shall deny the First and Second Motions to the extent they seek a judgment of acquittal on Counts 53 through 61.

### e. Money Laundering Counts

Defendant moves for a judgment of acquittal on Counts 62 through 71. Defendant argues that there is insufficient evidence to sustain the jury's verdicts and that the government failed to show that the money laundering transactions involved the profits of a specified illegal activity.

### i. Sufficiency of the evidence on Counts 62-71

The government alleged that Defendant committed the crime of money laundering in one or both of the following ways: (1)by conducting an illegal financial transaction and/or (2) by aiding or abetting another in conducting an illegal financial transaction.

34

The crime of Conducting an Illegal Financial Transaction, as charged under the first alternative in Counts 62 through 71, has four essential elements, which are:

*One*, on or about the dates alleged with regard to each specific count stated below, the defendant conducted a financial transaction which in any way or degree affected interstate or foreign commerce, that is, the deposit of the following checks from third-party entities into a depository account at Decorah Bank and Trust Company:

Count 62:    the deposit on August 9, 2007 of check numbers 2371 ($42,240.86) and 2372 ($48,685.03) from Kosher Community Grocery;

Count 63:    the deposit on September 19, 2007 of check numbers 3274 ($38,464.92) and 3299 ($18,768.46) from Torah Education of Northeast Iowa;

Count 64:    the deposit on October 17, 2007 of check numbers 2506 ($41,066.57) and 2507 ($42,525.56) from Kosher Community Grocery;

Count 65:    the deposit on November 14, 2007 of check numbers 3344 ($32,300.86) and 3349 ($35,362.44) from Torah Education of Northeast Iowa

Count 66:    the deposit on December 11, 2007 of check numbers 2744 ($42,899.56), 2745 ($43,888.99) and 2746 ($38,848.92) from Kosher Community Grocery;

Count 67:    the deposit on January 15, 2008 of check numbers 3378 ($34,897.55) and 3379 ($32,586.58) from Torah Education of Northeast Iowa;

Count 68:    the deposit on February 26, 2008 of check numbers 3069 ($78,890.14), 3070 ($88,593.45), 3071 ($79,222.48) and 3072 ($88,259.26) from Kosher Community Grocery;

35

Count 69: the deposit on March 18, 2008 of check number 3365 ($48,660.88) and 3366 ($38,982.46) from Torah Education of Northeast Iowa;

Count 70: the deposit on April 15, 2008 of check numbers 3632 ($78,888.56), 3668 ($78,458.55) and 3692 ($98,458.48) from Torah Education of Northeast Iowa;

Count 71: the deposit on May 13, 2008 of check numbers 3435 ($88,958.26), 3436 ($59,158.25), 3437 ($97,859.28) and 3438 ($60,259.36) from Torah Education of Northeast Iowa

*Two*, the defendant conducted the financial transaction with money that involved the proceeds of specified unlawful activity, that is, bank fraud, making false statements and reports to a bank, wire fraud or mail fraud;

*Three*, at the time the defendant conducted the financial transaction, the defendant knew the money represented the proceeds of some form of unlawful activity; and

*Four*, the defendant conducted the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity.

Final Jury Instruction no. 20 (docket no. 742), *see also* 8th Cir. Model Instr. No. 6.18.1956A (same); *United States v. Awada*, 425 F.3d 552, 524 (8th Cir. 2005) (setting forth the elements of money laundering under 18 U.S.C. § 1956).

The second alternative charges Defendant with aiding and abetting an illegal financial transaction. In order to have aided and abetted the commission of an illegal financial transaction, Defendant must:

*One*, have known that the crime of conducting an illegal financial transaction was being committed or was going to be committed by depositing the following checks from third party

36

entities into a depository account at Decorah Bank and Trust Company:

Count 62: the deposit on August 9, 2007 of check numbers 2371 ($42,240.86) and 2372 ($48,685.03) from Kosher Community Grocery;

Count 63: the deposit on September 19, 2007 of check numbers 3274 ($38,464.92) and 3299 ($18,768.46) from Torah Education of Northeast Iowa;

Count 64: the deposit on October 17, 2007 of check numbers 2506 ($41,066.57) and 2507 ($42,525.56) from Kosher Community Grocery;

Count 65: the deposit on November 14, 2007 of check numbers 3344 ($32,300.86) and 3349 ($35,362.44) from Torah Education of Northeast Iowa

Count 66: the deposit on December 11, 2007 of check numbers 2744 ($42,899.56), 2745 ($43,888.99) and 2746 ($38,848.92) from Kosher Community Grocery;

Count 67: the deposit on January 15, 2008 of check numbers 3378 ($34,897.55) and 3379 ($32,586.58) from Torah Education of Northeast Iowa;

Count 68: the deposit on February 26, 2008 of check numbers 3069 ($78,890.14), 3070 ($88,593.45), 307 ($79,222.48) and 3072 ($88,259.26) from Kosher Community Grocery;

Count 69: the deposit on March 18, 2008 of check number 3365 ($48,660.88) and 3366 ($38,982.46) from Torah Education of Northeast Iowa;

Count 70: the deposit on April 15, 2008 of check numbers 3632 ($78,888.56), 3668 ($78,458.55) and 3692 ($98,458.48) from Torah Education of Northeast Iowa;

> Count 71: the deposit on May 13, 2008 of check numbers 3435 ($88,958.26), 3436 ($59,158.25), 3437 ($97,859.28) and 3438 ($60,259.36) from Torah Education of Northeast Iowa;
>
> **Two**, have knowingly acted in some way for the purpose of causing, encouraging or aiding the commission of the crime of conducting an illegal financial transaction; and
>
> **Three**, have acted knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity.

Final Jury Instruction no. 20 (docket no. 742), *see also* 8th Cir. Model Instr. No. 6.18.1956A (same); *Awada*, 425 F.3d at 524 (setting forth the elements of money laundering under 18 U.S.C. § 1956).

Bensasson testified that Defendant directed him and other Agriprocessors employees to divert customer payments into Agriprocessors' General Operating Account at Citizens State Bank instead of the Decorah Bank and Trust Account, contrary to the loan agreement. Then, Defendant deposited checks from the Citizens State Bank account into either the Torah Education account at Citizens State Bank or the Kosher Community Grocery account at Freedom Bank.

Hamilton testified about Defendant's pattern of behavior regarding checks that Agriprocessors received and wrote. Hamilton testified that Defendant provided her with customer payment checks, and he would either give her a check or ask her to write a check from "Agri New York" and deposit the whole amount into Agriprocessors' General Operating Account at Citizens State Bank, despite the fact that the customer payments were supposed to go to the Decorah Bank & Trust account. Defendant asked Hamilton to obtain checks from Torah Education or Kosher Community Grocery and make "win checks"

payable to Agriprocessors.[7]  No documentation shows that Torah Education or Kosher Community Grocery made payments to Agriprocessors.  According to her testimony, Defendant directed Hamilton to arrive at a round dollar amount, and Hamilton was responsible for creating checks for smaller, odd-numbered amounts to total that round amount.  This process made the checks deposited into the Decorah Bank & Trust account appear to be customer payments.  The court admitted checks written to Agriprocessors from Kosher Community Grocery and Torah Education into evidence.  The court finds that this evidence is sufficient to sustain a conviction on the Money Laundering Counts.

### ii.    Profits/proceeds

Defendant argues that the court must grant the First and Second Motions to the extent they seek a judgment of acquittal on the Money Laundering Counts, because "[t]he financial transaction allegedly constituting 'laundering' must involve the 'profits,' not merely the 'receipts,' of a 'specified unlawful activity.'" Def. First  Brief at 24 (citing United States v. Santos, 128 S.Ct. 2020, 2025 (2008)).[8]  A four-Justice plurality in United States v. Santos held that the term "proceeds" in 18 U.S.C. § 1956 (the statute criminalizing money laundering) always means profits derived from the illegal activity and not simply the gross receipts derived from the activity.  Santos, 128 S.Ct. at 2025.  Justice Stevens concurred in the judgment, but "rejected the always-the-one or always-the-other approaches offered by his colleagues." United States v. Kratt, 579 F.3d 558, 561 (6th Cir. 2009).  According to Justice Stevens, the question of whether the government must prove

_____

[7] Win checks are computer-generated checks that do not require a signature.

[8] The interrogatory forms for the Money Laundering Counts asked the jury to select the unlawful activity involved in the commission of the Money Laundering Counts (docket no. 736), at 113-142.  The jury selected bank fraud and making false statements or reports to a bank on every interrogatory form.  The jury did not select wire fraud or mail fraud. Therefore, the court limits its analysis on the Money Laundering Counts to the unlawful activities of bank fraud and making false statements and reports to a bank.

39

that a defendant derived profits from the unlawful activity depends on the underlying predicate offense. *Id.*

The predicate offense in *Santos* was operating an illegal gambling business. *Santos*, 128 S.Ct. at 2032-33. In deciding whether that predicate offense required the government to prove profits, Justice Stevens considered what he called a "merger problem." *Id.* Justice Stevens agreed with the plurality that the government must prove profits when the underlying offense is operating an illegal gambling business: "Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business." *Id.* at 2033.

"Because no opinion in *Santos* attracted a majority of Justices, the 'position taken by those [Justices] who concurred in the judgment[] on the narrowest grounds' represents its holding." *Kratt*, 579 F.3d at 562 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). Therefore, the court engages in Justice Stevens's analysis as applied to the predicate offenses of bank fraud and making false statements or reports to a bank. The "merger problem" that concerned Justice Stevens is not present in this case. "[A] § 1956 . . . conviction [does not] radically increase[] the statutory maximum sentence when the predicate offense is bank fraud or making false statements. Far from it: . . . Section 1956 . . . impose[s] [a] *lower* statutory maximum[] than bank fraud and false-statement offenses." *Id.* at 563 (citing 18 U.S.C. § 1956(a)(1)). "*Santos* thus does not require [the court] to apply a profits definition of proceeds to [bank fraud and making false statements and reports to a bank]." *Id.*

### iii. Summary

In light of the foregoing, the court finds that there is sufficient evidence to support the verdicts on Counts 62 through 71 and that Defendant's other arguments for judgment

of acquittal are without merit. Accordingly, the court shall deny the First and Second Motions to the extent they seek a judgment of acquittal on Counts 62 through 71.

### f. Packers and Stockyards Act Counts

Defendant moves for a judgment of acquittal on Counts 72 through 91. Defendant argues that there is insufficient evidence to sustain the jury's verdicts on Counts 73, 74, 75, 76, 77, 78, 79, 80, 84, 85, 86, 87, 88, 89 and 91 and that Defendant's conviction under 7 U.S.C. § 195 violates the Fifth and Eighth Amendments to the United States Constitution.

### i. Sufficiency of the Evidence on Counts 72-91[9]

The crime of Willful Violation of an Order of the Secretary of Agriculture, as charged in Counts 72 through 91, has four essential elements, which are:

> *One*, the defendant was an officer, director, agent or employee of a packer;

> *Two*, the Secretary of Agriculture issued an order to the packer to cease the forbidden practice of failing to pay livestock suppliers in a timely manner as required by law;

> *Three*, the defendant knew of the Secretary of Agriculture's order; and

> *Four*, on or about the dates alleged with regard to each specific count, the defendant knowingly failed to obey the Secretary of Agriculture's order by failing to pay, or by voluntarily and intentionally causing another to fail to pay, the following livestock suppliers in a timely manner as required by law:

> [. . .]

---

[9] The court need not consider Counts 72, 81, 82, 83 and 90. The jury returned not guilty verdicts on those Counts.

Count 73:     failing to timely provide a payment for livestock due on February 12, 2008 to a cattle supplier in Chicago, Illinois;

Count 74:     failing to timely provide a payment for livestock due on February 14, 2008 to a cattle supplier in Marshalltown, Iowa;

Count 75:     failing to timely provide a payment for livestock due on February 15, 2008 to a cattle supplier in Minnesota;

Count 76:     failing to timely provide a payment for livestock due on February 15, 2008 to a cattle supplier in Waukon, Iowa;

Count 77:     failing to timely provide a payment for livestock due on February 15, 2008 to a cattle supplier in Walnut, Illinois;

Count 78:     failing to timely provide a payment for livestock due on February 22, 2008 to a cattle supplier in Waukon, Iowa;

Count 79:     failing to timely provide a payment for livestock due on February 28, 2008 to a cattle supplier in Waukon, Iowa;

Count 80:     failing to timely provide a payment for livestock due on February 29, 2008 to a cattle supplier in Waukon, Iowa;

[. . .]

Count 84:     failing to timely provide a payment for livestock due on March 5, 2008 to a cattle supplier in Waverly, Iowa;

Count 85:     failing to timely provide a payment for livestock due on March 21, 2008 to a cattle supplier in Waukon, Iowa;

Count 86:     failing to timely provide a payment for livestock
due on March 28, 2008 to a cattle supplier in Waukon, Iowa;

Count 87:     failing to timely provide a payment for livestock
due on March 29, 2008 to a cattle supplier in Aplington, Iowa;

Count 88:     failing to timely provide a payment for livestock
due on April 1, 2008 to a cattle supplier in Waukon, Iowa;

Count 89:     failing to timely provide a payment for livestock
due on April 4, 2008 to a cattle supplier in Waukon, Iowa;

[. . .]

Count 91:     failing to timely provide a payment for livestock
due on April 16, 2008 to a cattle supplier in Waverly, Iowa.

Final Jury Instruction no. 22 (docket no.742); 7 U.S.C. §§ 195, 191 and 2286.

The court finds that the government produced sufficient evidence for a reasonable jury to find that Defendant was an officer, director or employer of a "packer;" that he knew of the Order directing Agriprocessors to timely pay cattle suppliers; and that he failed to obey the Order. Chiu testified that Defendant gave her directions as to when to release checks to cattle suppliers. Fast's testimony established that Agriprocessors was a "packer." Exhibit 3000 contained the March 7, 2002 Order in which the Secretary of Agriculture directed Agriprocessors to cease and desist violating the Packers and Stockyards Act. Exhibit 3007 contains an affidavit dated March 22, 2006, in which Defendant acknowledges that he is aware of the requirements of the Packers and Stockyards Act. With respect to the specific late payments for which the jury convicted Defendant, the government introduced signed checks and postmarked envelopes as exhibits to establish the date of payment, as well as testimony of producers who supplied livestock to Agriprocessors. The court finds that this evidence is sufficient to sustain the jury's guilty verdicts on Counts 73, 74, 75, 76, 77, 78, 79, 80, 84, 85, 86, 87, 88, 89 and 91.

43

## ii.    *Fifth and Eighth Amendment challenges*

Defendant "renew[s] his Sixth and Eighth Amendment challenges to 7 U.S.C. [§] 195." Def. First Brief at 28. Although Defendant refers to the Sixth Amendment, Defendant's prior arguments referenced the Fifth and Eighth Amendments.[10] The court assumes that Defendant renews his prior arguments under the Fifth and Eighth Amendments. The court relies on its previous Order (docket no. 575) with respect to the Fifth Amendment argument. In that Order, the court found that the charges under 7 U.S.C. § 195 do not violate the Fifth Amendment.

In the Order, the court reserved ruling on Defendant's Eighth Amendment argument, because the argument was not yet ripe. It is now appropriate for the court to address Defendant's Eighth Amendment argument, because he is "about to suffer [] punishment." *United States v. Williams*, 128 F.3d 1239, 1242 (8th Cir. 1997). In his brief, Defendant argued that criminal penalty under 7 U.S.C. § 195 violates the Eighth Amendment, because it "is defective insofar as it purports to punish the mere 'status' of individuals." Defendant's Brief on Motion to Dismiss Counts 60 through 79 (docket no. 439-1), at 8. Defendant relies on *Robinson v. State of California*, 370 U.S. 660, 667 (1962), for his assertion that 7 U.S.C. § 195 punishes him for his "status." In *Robinson*, the Supreme Court held that "a state law which imprisons [a narcotics addict] as a criminal, even though he has never touched any narcotic drug in the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment." *Robinson*, 370 U.S. at 667.

Defendant argues that 7 U.S.C. § 195 allows punishment for simply having the status of "officer, director, agent, or employee of a packer or swine contractor." 7 U.S.C. § 195. The court disagrees. In *Powell v. State of Texas*, 392 U.S. 514, 532 (1968), a

---

[10] The Sixth Amendment guarantees the accused a speedy trial, a trial by jury, a right to confront witnesses against him or her and the right to assistance of counsel. U.S. Const. amend VI.

defendant challenged his punishment under a state law prohibiting public intoxication. The defendant argued that, as in *Robinson*, the statute punished a status, namely, the defendant's alcoholism. *Powell*, 392 U.S. at 532. The Supreme Court disagreed and found that *Robinson* interpreted the Eighth Amendment as requiring an act before criminal punishment may be imposed: "criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some actus reus." *Id.* at 533. In this case, Defendant is not subject to criminal penalty simply for being an employee of a packer. He is subject to criminal penalty because the evidence at trial showed that the Secretary of Agriculture issued an order to Agriprocessors to cease and desist violating the Packers and Stockyards Act, that Defendant knew about this order and that Defendant continued to violate the order. 7 U.S.C. §§ 195, 191 and 2286. Accordingly, the court finds that Defendant's conviction on the Packers and Stockyards Act Counts does not violate the Eighth Amendment.

### iii. Summary

In light of the foregoing, the court finds that there is sufficient evidence to support the verdicts on Counts 73, 74, 75, 76, 77, 78, 79, 80, 84, 85, 86, 87, 88, 89 and 91 and that Defendant's other arguments for judgment of acquittal are without merit. Accordingly, the court shall deny the First and Second Motions to the extent they seek a judgment of acquittal on Counts 73, 74, 75, 76, 77, 78, 79, 80, 84, 85, 86, 87, 88, 89 and 91.

## C. Summary

In light of the foregoing, the court finds that a reasonable-minded jury could have found Defendant guilty on all counts of conviction beyond a reasonable doubt. Accordingly, the court shall deny the First and Second Motions to the extent they seek a judgment of acquittal on any count of conviction.

## V.  MOTION FOR NEW TRIAL

### A.  Legal Standard

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if justice so requires." Fed. R. Crim. P. 33(a).  A district court is granted broad discretion in considering a motion for a new trial.  *Peters*, 462 F.3d at 957.  A district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (citation omitted).  However, the court "should grant a new trial only if 'the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.'" *Peters,* 462 F.3d at 957 (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)).

A district court enjoys more latitude in granting new trials under Rule 33 than in granting motions for judgment of acquittal under Rule 29; however, "[m]otions for new trials based on the weight of the evidence are generally disfavored." *Campos*, 306 F.3d at 579.  District courts "must exercise the Rule 33 authority 'sparingly and with caution.'" *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)); *see also* Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 553 (3d ed. 2004) (stating that granting a new trial under Rule 33 is an unusual remedy reserved for "exceptional cases in which the evidence preponderates heavily against the verdict").

The court's standard of review differs from the standard that is applied to a motion for judgment of acquittal.

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal.  The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial.  The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and

> in so doing evaluate for itself the credibility of the witnesses.
> If the court concludes that, despite the abstract sufficiency of
> the evidence to sustain the verdict, the evidence preponderates
> sufficiently heavily against the verdict that a serious
> miscarriage of justice may have occurred, it may set aside the
> verdict, grant a new trial, and submit the issues for
> determination by another jury.

*Lincoln*, 630 F.2d at 1319; *see also United States v. Johnson*, 474 F.3d 1044, 1051 (8th Cir. 2007).

### B. Analysis

Defendant moves for a new trial on four grounds. The court considers each of these grounds, in turn.

### 1. Exclusion of defense witnesses

Defendant argues that the court's "exclusion of defense witnesses" requires the court to grant a new trial. Def. Second Brief at 13. Defendant argues that the testimony of Nota Feinstein, Stan Martin, Neil Westin, Jim Smith and Abe Roth was improperly excluded.

### a. Nota Feinstein and Stan Martin

Defendant argues that the testimony of Nota Feinstein and Stan Martin was improperly excluded. These witnesses would have testified about Defendant's charitable donations and good works. As stated in the court's order on the government's motion in limine, "[t]his evidence is not relevant to the charges at issue and is not admissible character evidence. Even if this evidence were relevant, its probative value would be substantially outweighed by the considerations set forth in Federal Rule of Evidence 403." Order (docket no. 677), at 4. Accordingly, the court denies the Second Motion to the extent it seeks a new trial based upon the exclusion of Nota Feinstein and Stan Martin's testimony.

47

### b.    Neil Westin

Defendant argues that attorney Neil Westin improperly asserted the attorney-client privilege. Defendant claims that "Westin did not have an attorney-client privilege to assert in this instance. The attorney-client privilege is no longer viable after a corporate entity ceases to function." Def. Second Brief at 14.

The court finds that only Agriprocessors' trustee in bankruptcy has the authority to waive Agriprocessors' attorney-client privilege. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 358 (1985) (holding that "the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege. . ."). The trustee for Agriprocessors did not waive its attorney-client privilege. Therefore, the court finds that Neil Westin properly asserted the privilege.

Additionally, the court finds that the subject of Westin's testimony would have been largely identical to Billmeyer's testimony. Billmeyer testified that she met with Westin on the morning of the enforcement action. Defendant had the opportunity to cross-examine Billmeyer and ask her specific questions about this meeting. On this basis, the court finds that even if the testimony of Neil Westin was admissible, it was insufficiently probative under Federal Rule of Evidence 403. This testimony would have also been a "needless presentation of cumulative evidence." Fed. R. Evid. 403. Accordingly, the court denies the Second Motion to the extent it asks for a new trial based upon the exclusion of Neil Westin's testimony.

### c.    Jim Smith and Abe Roth

Defendant argues that "the [c]ourt erred in failing to permit each expert to testify as to matters within their professional knowledge that bore directly upon the issues of 'materiality' of any falsehoods. . . ." Def. Second Brief at 15. The court finds that the testimony of these witnesses would have suggested that the bank had a duty or obligation to discover the alleged fraud. For the reasons stated it its September 23, 2009 Order (docket no. 677), the court finds that this evidence is inadmissible. Defendant was

48

permitted to present evidence detailing FBBC's reactions to learning about Defendant's acts, however Smith and Roth's testimony would not have been related to this issue. Neither Jim Smith nor Abe Roth was in a position to testify as to what FBBC knew or when FBBC knew it. Accordingly, the court denies the Second Motion to the extent it asks for a new trial due to the exclusion of Jim Smith and Abe Roth's testimony.

### 2. Jury Instructions

Defendant argues that a number of the jury instructions contained one or more defects that warrant a new trial. The court addresses each of these alleged defects, in turn.

### a. Instruction on money laundering

Defendant argues that "[t]he [c]ourt erred in not giving the *Santos* definition of 'proceeds.'" *Id.* The court addressed this issue in Section IV.B.2.e.ii, *supra*. Accordingly, the court denies the Second Motion to the extent it asks for a new trial due to a defective jury instruction on money laundering.

### b. Instruction on FDIC insurance

Defendant argues that "the fourth element of bank fraud should have been interpreted so as to require proof that Defendant Rubashkin knew FBBC or [First Bank] was FDIC insured." *Id.* The court addressed this issue in Section IV.B.2.a.ii, *supra*. Accordingly, the court denies the Second Motion to the extent it asks for a new trial due to a defective jury instruction on bank fraud.

### c. Instruction on the law of no-match letters

Defendant argues that the court must grant the Motion for a New Trial, because "[t]he court[] fail[ed] to give jury instructions on the legal import of no-match letters." *Id.* at 13. The court notes that the rules regarding "safe harbor" procedures for employers who receive a no-match letter are currently in flux. The United States District Court for the Northern District of California entered a preliminary injunction in *AFL-CIO v. Chertoff*, enjoining the Department of Homeland Security ("DHS") and the Social Security Administration from enforcing a final rule entitled "Safe-Harbor Procedures for Employers

49

who Receive a No-Match Letter." 552 F.Supp.2d 999, 1015 (N.D.Cal. 2007). The rule at issue in *Chertoff* describes three steps that a "reasonable employer may take" to prevent a DHS finding that the employer had "constructive knowledge that [an] employee was not authorized to work in the United States." Safe Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34281 (proposed June 14, 2006) (to be codified at 8 C.F.R. pt. 2).

The first step calls on a reasonable employer to, within fourteen days, "check its records promptly after receiving a no-match letter, to determine whether the discrepancy results from a typographical . . . or clerical error in the employer's records . . . . If there is such an error, the employer [should] correct its records [and] inform the relevant agencies." *Id.* If the first step fails to resolve the issue, the second step calls on the reasonable employer to "promptly request the employee to confirm that the employer's records are correct. If they are not correct, the employer [should] take the actions needed to correct them." *Id.* The third step describes a "verification procedure that the employer may follow if the discrepancy is not resolved within 60 days of receipt of the no-match letter." *Id.* If the employer follows this procedure, DHS will not regard the employer as having constructive knowledge, even if the employee at issue is an undocumented immigrant. *Id.*

The court finds that an instruction regarding this procedure would be inappropriate. The rule is not yet finalized and is the subject of litigation. In addition, Defendant presented no specific evidence that he performed the steps set forth in the rule. Furthermore, the jury heard evidence that a no-match letter, in and of itself, is not sufficient to find that an employer knowingly harbored undocumented workers. The face of the admitted no-match letters includes this information. The court finds that the government presented the large number of no-match letters as one piece of a collection of evidence detailing Defendant's harboring of undocumented workers. Accordingly, the

50

court denies the Second Motion to the extent it seeks a new trial due to the court's failure to provide a jury instruction on the law of no-match letters.

### d. Instruction on the Packers and Stockyards Act Counts

Defendant argues that "[t]he [c]ourt's substitution of the word willful with 'knowing' was erroneous and an incorrect interpretation of the statute." Def. Second Brief at 16. The court relies on its analysis on this issue previously set forth in its Order denying Defendant's Motion to Dismiss the Packers and Stockyards Act Counts (docket no. 575). In that Order, the court articulated its reasoning for a mens rea requirement of "knowingly" and not "willful:"

> [T]he court resorts to the "usual presumption that a defendant must know the facts that make his conduct illegal. [*Staples v. United States*, 511 U.S. 600, 619 (1994)]. A party "must have had knowledge of the facts, though not necessarily the law," that make an otherwise innocent act illegal. [*Morisette v. United States*, 342 U.S. 246, 271 (1952)]; *see also* [*United States v. Gypsum Co.*, 438 U.S. 422, 446 (1978)] (finding "knowledge of the anticipated consequences" as the proper mens rea for criminal violations stemming from business behavior).

Order (docket no. 575), at 29 n.12. Because the court finds that the jury was properly instructed as to the mens rea required for the Packers and Stockyards Act Counts, the court denies the Second Motion to the extent it asks for a new trial based on a defective jury instruction.

### 3. Variance of proof

Defendant argues that "[a] prejudicial variance occurred between Counts 1-61 of the Seventh Superseding Indictment. This variance affected the substantial rights of Defendant . . . because it exposed him to double jeopardy as discussed for multiple convictions for the same act." Def. Second Brief at 16. This argument is essentially the same as Defendant's previous multiplicity arguments. "Offenses are considered separate,

and therefore not multiplicitous, if each requires proof of a fact not common to the others." *DaMier v. United States*, 616 F. 2d 366, 370 (8th Cir. 1980) (citing *Ianelli v. United States*, 420 U.S. 770, 785, n. 17 (1975)). The court relies on its previous analysis on multiplicity in the instant Order, and finds that every count of conviction required proof of a fact or facts that the others did not require.

Although Defendant does not articulate the argument as such, the court understands "prejudicial variance" as a term used to describe an indictment that does not "fairly apprise[] the defendant of the charge he or she must meet at trial." *United States v. Begnaud*, 783 F.2d 144, 148 (8th Cir. 1986) (citing *Mathews v. United States*, 15 F.2d 139, 142-43 (8th Cir. 1926)). The court finds that the Indictment "fairly apprised [Defendant] of the charges" he met at trial. *Id.* Therefore, the court denies the Second Motion to the extent it asks for a new trial due to a "variance of proof."

### 4.     Motions for Mistrial

For the reasons stated at trial, the court finds that granting a mistrial would have been inappropriate. The court finds that the government's evidence on the harboring of undocumented workers was sufficient but not greater than necessary to establish the elements of bank fraud and making false statements to a bank. Accordingly, the court denies the Second Motion to the extent it asks for a new trial due to the court's failure to grant Defendant's multiple Motions for Mistrial.

### C. Summary

In conclusion, the court finds that none of the grounds discussed above warrant a new trial. Accordingly, the court shall deny the Second Motion to the extent it requests a new trial.

## VI.   CONCLUSION

In light of the foregoing, the First Motion (docket no. 721) and the Second Motion (docket no. 747) are **DENIED.**

**IT IS SO ORDERED.**

**DATED** this 1st day of March, 2010.

_Linda R. Reade_
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA