IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN/DUBUQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 08-1324 LRR |
| | ) | |
| vs. | ) | |
| | ) | |
| SHOLOM RUBASHKIN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States provides this Memorandum regarding sentencing.  The
sentencing hearing is scheduled for Wednesday, April 28, 2010, at 8:00 a.m.

**I.      INTRODUCTION AND OFFENSE SUMMARY**. . . . . . . . . . . . . . . . . . . . . . . . . 3

**II.     FACTUAL RECORD**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.      Defendant's Introductory Objections Should be Overruled. . . . . . . . . . . 7

      B.      Government's Proposed Sentencing Exhibit 5500. . . . . . . . . . . . . . . . 8

      C.      Defendant's Enumerated Factual Objections. . . . . . . . . . . . . . . . . . . . . 10

**III.    LOSS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.      Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      B.      Loss to the Banks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      C.      Loss to the Cattle Suppliers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      D.      Defendant's Objections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**IV.    NUMBER OF VICTIMS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1

**V.      SOPHISTICATED MEANS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**VI.     AGGRAVATING ROLE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    A.     Defendant's Section 2B1.1 Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . 37

        1.     Inflation of Accounts Receivable Collateral. . . . . . . . . . . . . . . 37

        2.     Alien Harboring and Document Fraud. . . . . . . . . . . . . . . . . . . 38

        3.     Packer's Act Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    B.     Defendant's Money Laundering Offenses. . . . . . . . . . . . . . . . . . . . . 41

**VII.    ABUSE OF POSITION OF TRUST.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    A.     Defendant Abused His Position as a Corporate Officer to
        Facilitate His Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    B.     Defendant Abused His Positions as a Corporate Officer of Kosher
        Community Grocery and a Corporate Officer of Torah Education. . . . . 49

    C.     The Assessment of Two Levels for Abuse of a Position of
        Trust Does not Constitute Impermissible Double Counting. . . . . . . . . 49

**VIII.   OBSTRUCTION OF JUSTICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    A.     Defendant Committed Perjury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    B.     Defendant Concealed and Destroyed Evidence. . . . . . . . . . . . . . . . . 53

    C.     Defendant Interfered with Material Witnesses. . . . . . . . . . . . . . . . . . 55

    D.     Obstruction of Justice Regarding Money Laundering. . . . . . . . . . . . . 57

**IX.     MONEY LAUNDERING.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**X.      SOPHISTICATED LAUNDERING.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**XI.     SUMMARY OF ADVISORY GUIDELINE RANGE.** . . . . . . . . . . . . . . . . . . . 62

**XII.    A GUIDELINE SENTENCE IS WARRANTED.** . . . . . . . . . . . . . . . . . . . . . 63

2

A.      The Court Should Reject Defendant's *Kimbrough* Challenge
        to the Loss Table.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.      Grounds for an Upward Departure. . . . . . . . . . . . . . . . . . . . . . . . . . . 69

        1.      Extraordinary Obstruction of Justice.. . . . . . . . . . . . . . . . . . . . 69

        2.      Other Criminal Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

XIII.   FINE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XIV.    RESTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

XV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## I.      INTRODUCTION AND OFFENSE SUMMARY

This case is ordinary in that it involves a common criminal.  This case is
extraordinary in that uncommon means were used to cheat a bank and others out of a
staggering amount of money – more than $26 million – and to commit a host of other
criminal offenses.

Defendant's charges followed a May 12, 2008, immigration raid that was in
response to defendant's persistent and pervasive use of underpaid, illegal labor.
Defendant was made personally aware three years before the raid  – through letters
from the Social Security Administration – that he was employing hundreds of
undocumented workers at Agriprocessors.  Rather than compromise his unlawful
business plan, defendant made every effort to maintain his illegal underpaid workforce.

An ICE Agent visited the plant in the Fall of 2007 and urged defendant's human
resources manager to stop hiring workers with bad documents.  She did so, but

defendant went behind her back to have the illegal workers placed on a separate payroll. Further, while defendant's attorneys were urging the government to hold off on its planned May 12th enforcement action, defendant was secretly funding the purchase of new, fake resident alien cards for dozens of his undocumented workers – personally inspecting the fake documents the day before the raid.

The charges against defendant were brought in several superseding indictments as a result of a criminal investigation that kept revealing more unlawful schemes. The more rocks overturned, the more crimes uncovered. When defendant was first charged with bank fraud in November 2008, his fraudulent scheme to hide millions of dollars in customer payments had just come to light. However, it was not until early 2009 – when a trustee was appointed to run Agriprocessors and after its creditors had injected new money into the business to try to salvage the value of their collateral – that defendant's creation of tens of millions of dollars in fake sales was first revealed. The creditors then too were victimized by defendant's unlawful actions. When creditors were forced to liquidate, no one wanted to buy Agriprocessors' accounts receivable – at least $10,000,000 of the amount shown on paper did not exist.

Defendant also defrauded the bank by falsely assuring the bank Agriprocessors was operating legally. In fact, this was far from the truth. At trial, the government introduced evidence of defendant's maintenance of an illegal workforce and his practice of illegally using his livestock suppliers as unwilling banks. Defendant's lies to his bank about these unlawful practices were proven beyond a reasonable doubt at trial because

4

they went to the heart of the bank's victimization.  When the truth behind defendant's lies was finally made known, Agriprocessors was revealed to be all but worthless to the bank and others as a going concern.  This was due, in part, to the fact defendant had been running the business with illegal workers earning below-market wages.  It was also due, in part, to the fact defendant had, in essence, been unlawfully extracting credit from Agriprocessors' captive cattle and poultry suppliers.

Defendant's violations of the Packer's Act were a particularly significant part of the case against defendant because of the substantial financial harm the violations ultimately caused.  Approximately $5,000,000 was taken out of the bank's recovery in the bankruptcy because defendant had not paid his cattle and poultry suppliers as required by law.  This figure added to the already tremendous bank loss caused by defendant's creation of false invoices and diversion of income.

The government's investigation did not slow defendant's criminal conduct.  In November 2009, the government sought defendant's detention because, in addition to making apparent plans to flee, defendant had been covering his tracks by destroying evidence of his guilt.  While the extent of defendant's obstruction of justice would not be known until much later, just before Agriprocessors was to be turned over to a receiver, defendant managed to destroy or hide copies of diverted checks, computer records of diverted payments, hard copies of fake invoices, and customer statements that were inconsistent with what the bank had been told.  He had previously destroyed or hidden

copies of I-9s for the illegal workers he had placed on a separate payroll and assisted two witnesses to his crimes in leaving the country.[1]

Now, at sentencing, defendant raises 134 objections to the presentence investigation report and contests all but a handful of the U.S. Probation Office's sentencing guideline calculations. By this sentencing memorandum, the government shows the U.S. Probation Office's recommendations are well-founded and defendant's numerous challenges should be overruled.

The government asks that defendant be treated the same as any other defendant brought before the Court for sentencing. After calculating defendant's proper guideline range, the Court will consider all relevant factors under 18 U.S.C. § 3553(a), and impose sentence. Defense counsel has notified the government defendant will seek a variance from the advisory guidelines range established by Congress and the United States Sentencing Commission. The government will respond to that request[2] when it receives defendant's filing.

---

[1]The Court had previously determined defendant to be a flight risk but found there were conditions of release that would adequately assure his appearance for trial. Once defendant was convicted by an unbiased jury aware of all the facts, his likelihood of flight increased substantially because of the potential penalties he faced for his crimes proven beyond a reasonable doubt. Defendant's detention was more than justified by his proven disregard for the law, and should be continued after sentencing if defendant is sentenced to a term of incarceration.

[2]The government addresses herein one purported ground for variance which defendant identified in his objection. That is, the government addresses defendant's *Kimbrough* challenge to the loss table in USSG §2B1.1.

## II.  FACTUAL RECORD

### A.  Defendant's Introductory Objections Should be Overruled

In his objections to the PSR[3], defendant begins by purporting to object "to the entirety of the statement of the offense conduct contained in the presentence report." (Defendant's Objections p. 1).  In conclusory terms, defendant claims the PSR "contains so many material inaccuracies that it does not present a reasonable basis for sentencing."  (Id.)  Defendant also objects to the PSR on, what appears to be, hearsay grounds.  (Id.)  Defendant's generalized objection to the PSR should be overruled.

"[U]nless a defendant objects to a specific factual allegation contained in the PSR, the court may accept that fact as true for sentencing purposes."  *United States v. Razo-Guerra*, 534 F.3d 970, 975 (8th Cir. 2008).

> We have never recognized implied objections to factual statements contained in a PSR.  Rather, we require that objections to the PSR be made with specificity and clarity before a district court is precluded from relying on the factual

---

[3]"PSR" refers to the draft Presentence Investigation Report disclosed on February 22, 2101 (document #845).  "Defendant's Objection" refers to defendant's March 8, 2010, Objections to the draft PSR (document #860).  "[Last Name] TT" refers to witness trial testimony and is followed by the applicable transcript date and page reference, where available.  "[Last Name] DHT" refers to testimony from the November 18, 2009, detention hearing and is followed by the applicable page reference.  "Gov. T Exb." refers to government exhibits received at trial and is followed by the exhibit number assigned at trial.  "Gov. S Exb." refers to the government's proposed sentencing exhibits and is followed by the proposed exhibit number.

Certain proposed sentencing exhibits were received into the record during hearings other than trial.  Such exhibits have been renumbered for sentencing purposes.  Courtesy copies of government trial exhibits specifically cited herein (which have not been renumbered) are being provided to the Court and counsel along with the government's proposed sentencing exhibits.

statements contained in the PSR.  The purpose of the objection is to put the
Government on notice of the challenged facts . . .

Id. at 976 (citations and internal quotation marks omitted).

Defendant's generalized claims regarding the accuracy of the statement of

offense conduct as a whole provide no assistance to the Court with regard to

sentencing and are insufficient as a matter of law to call any specific factual matters into

question.  Accordingly, the Court should overrule defendant's generalized objection and

rely upon the PSR's statement of offense conduct except where defendant has

otherwise lodged a factual objection with "specificity and clarity."  Id.

As to defendant's hearsay objection, the Federal Rules of Evidence do not apply

at a sentencing hearing.  Nor does a criminal defendant have a Sixth Amendment right

of confrontation at a sentencing hearing.  See United States v. Brown, 430 F.3d 942,

943-44 (8th Cir. 2005).  The Court may rely upon hearsay in making factual

determinations at sentencing, including with regard to the application of the advisory

sentencing guidelines.  See id. at 944.

Accordingly, the Court should overrule defendant's introductory objections the

offense conduct portion of the PSR.

B.      Government's Proposed Sentencing Exhibit 5500

There has been a month-long jury trial in this case and an extensive factual

record has been developed.  Mindful that a sentencing hearing is not an opportunity for

the parties to retry the case, the government believes that the Court may rely almost

entirely upon the trial record in resolving the factual disputes attendant to the

8

calculation of the advisory guidelines and other issues for determination by the Court at sentencing. Despite defendant purporting to object to all of his offense conduct, and despite defendant's objections to all but a handful of the advisory calculations made by the U.S. Probation Office, the government intends to make a very limited factual presentation at sentencing. However, in order to establish some additional record with regard to many of the details set forth in the statement of the offense conduct portion of the PSR, the government has compiled an indexed compendium of witness statements and reports of interviews as Gov. S Exb. 5500.[4] It remains the government's intention that the Court rely primarily upon the trial record in resolving issue-specific factual disputes. However, particularly in view of defendant's generalized introductory objection (discussed above), the government intends to offer proposed exhibit 5500, under seal[5], in support of the more subordinate details in the PSR.

---

[4]The compendium is indexed according to PSR paragraph number, and portions of the included statements and interview reports have been highlighted in correspondence with the index. While government's Gov. S Exb. 5500 is not intended to support every detail of the offense conduct portion of the PSR, it is the government's hope that it will be useful to the Court for the purposes of sentencing and considered for whatever weight the Court deems appropriate.

[5]The exhibit contains grand jury testimony. In addition, given the fact certain defendants have yet to be apprehended, the government believes sealing is appropriate.

C.    Defendant's Enumerated Factual Objections

Regarding defendant's enumerated objections to the factual matters in the PSR, the government relies primarily upon the established trial record.[6]  The government directs the Court's attention as follows:

Defendant's Objection 1 (PSR ¶ 57) - The government directs the Court's attention to trial evidence regarding the false nature of the purported accounts receivable.

Defendant's Objection 3 (PSR ¶ 106) - The government directs the Court's attention to trial evidence showing defendant did conspire with others to harbor illegal aliens and defraud MBFB.  (See e.g. Lykens TT 10/20/09 p. 54 (representative from MBFB was present at the meeting shortly after the raid when defendant made the false statements forming the basis for his conviction on Count 101)).

Defendant's Objections 4-6 (PSR ¶¶ 107-110) - The government directs the Court's attention to trial evidence regarding defendant's role at Agriprocessors.  The government did not concede at trial "that operations were not subject to [defendant's] control."

---

[6]Many of defendant's assertions and purported clarifications set forth in his objections are inconsequential, lack foundation, and do not otherwise warrant specific discussion here.  The government's failure to address each factual assertion made by defendant in his objections should not be deemed an acknowledgment that such factual assertions are accurate.  Rather, the government leaves to the defendant whether or not to produce evidence in support of such assertions.

Defendant's Objections 7 and 8 (PSR ¶¶ 111 and 112) - The government directs the Court's attention to trial evidence, including the testimony of Bensasson, regarding defendant's exercise of authority over Bensasson and others.[7]

Defendant's Objection 9 (PSR ¶¶ 114 and 115) - The government directs the Court's attention to trial evidence regarding defendant's harboring of undocumented aliens and the jury's findings that he made false statements to the bank regarding his knowledge of harboring at Agriprocessors. Regarding payments to Garnavillo Gospel so that undocumented workers could be paid in cash, although the Court need not reach the issue, the government has included grand jury testimony of Ron Wahls and a report of Bensasson's April 1, 2010, interview in Gov. S Exb. 5500 at p. 65.

Defendant's Objections 10-12 (PSR ¶¶ 116 and 165-179) - The government directs the Court's attention to trial evidence regarding defendant's misuse of the Hunt payroll to harbor illegal workers. Such evidence included the testimony of Billmeyer, Althouse and Judy Hunt and Billmeyer's "confused and befuddled" e-mail (Gov. T Exb. 1108).

Defendant's Objections 13-17 (PSR ¶¶ 118-124) - Regarding working conditions at Agriprocessors, the government has included the search warrant application and affidavit in support in Gov. S Exb. 5500 at p. 459. In addition, regarding information from the CI, the government directs the Court's attention to trial testimony from SA

---

[7]The government has included an FBI 302 regarding an April 1, 2010, interview of Bensasson in Gov. S Exb. 5500 at p. 65. In the interview, Bensasson addresses some of the factual assertions made in defendant's objections.

Fischels in this regard.  (See Fischels TT (after defendant started putting undocumented workers on the Hunt payroll after hours, the CI could not gain employment with fake documents by applying during regular business hours)).

Defendant's Objection 18 (PSR ¶ 128) - The government directs the Court's attention to Billmeyer's trial testimony regarding her understanding of defendant's role at Agriprocessors.

Defendant's Objections 19-21 (PSR ¶¶ 133-134, 139-140) - The government directs the Court's attention to Billmeyer and Althouse's trial testimony and Gov. T Exb. 1108 (the "confused and befuddled" e-mail) regarding SA Spaulding's visit and defendant's actions with regard to the hiring process and I-9s.  The government also directs the Court's attention to SA Spaulding's trial testimony regarding his visit.

Defendant's Objections 23-29, 31-33 (PSR ¶ 142-148, 152-154) - The government directs the Court's attention to Billmeyer's trial testimony regarding Agriprocessors' receipt of no-match letters, her creation of the no-match spreadsheet at defendant's direction, and defendant's acts and omissions in relation thereto.  The government also directs the Court's attention to the no-match letters entered into evidence.  The government notes there was no evidence at trial or anywhere in the record that defendant's unlawful efforts to maintain an undocumented workforce were done at the direction of counsel.

Defendant's Objection 30 (PSR ¶ 150) - The government directs the Court's attention to Billmeyer's trial testimony regarding the meeting between defendant and Brent Beebe in the parking lot.

Defendant's Objections 34-40 (PSR ¶¶ 158-164) - The government directs the Court's attention to Billmeyer's trial testimony regarding the circumstances surrounding the May 2007 walkout. Although not presented at trial, additional information regarding the walkout is included in statements and reports of interviews of Luis Eduardo Ixen-Tzuquen, Althouse, Billmeyer, Karina Freund, Nichole Caguach Hernandez, Shawn Meyer, Martin De La Rosa, and Carlos Guerrero-Espinoza (included as part of Gov. S Exb. 5500).

Defendant's Objections 41-52 (PSR ¶¶ 165-179) - The government directs the Court's attention to Billmeyer, Althouse and Judy Hunt's trial testimony regarding the Hunt payroll scheme, as well as Billmeyer's "confused and befuddled" e-mail (Gov. T Exb. 1108). Although not presented at trial, additional information regarding the scheme is included in statements and reports of interviews of Althouse, Billmeyer, Karina Freund, Nichole Caguach Hernandez, and Shawn Meyer (included as part of Gov. S Exb. 5500).

Defendant's Objections 53-66 (PSR ¶¶ 180-200) - The government directs the Court's attention to Billmeyer's trial testimony (and e-mails and other documents entered into evidence) regarding the poultry re-identification scheme and defendant's involvement therewith. Other information related to the scheme that was not introduced

at trial is included in statements and reports of interviews of Alisha Arias, Martin De La Rosa, and Billmeyer (included as part of Gov. S Exb. 5500).

Defendant's Objections 67-76 (PSR ¶¶ 201-226) - Regarding the beef re-identification scheme and defendant's involvement, the government directs the Court's attention to the trial testimony of Billmeyer, Althouse and Guerrero-Espinoza (and e-mails and other documents entered into evidence), as well as fake resident alien cards and application paperwork seized on May 12, 2008 (also entered into evidence). Other information related to the scheme is included in statements and reports of interviews of Guerrero-Espinoza, Billmeyer, Althouse and Shawn Meyer (included as part of Gov. S Exb. 5500).

Defendant's Objection 77 (PSR ¶ 230) - Regarding defendant's laptop computer, the government directs the Court's attention to trial evidence that defendant maintained detailed financial records on his laptop computer. Although the Court need not address the issue, the government reserves the option of presenting evidence at sentencing regarding the location of the laptop during the May 12, 2008, search.

Defendant's Objection 78 (PSR ¶ 231) - The government directs the Court's attention to Guerrero-Espinoza's trial testimony regarding defendant sending him to St. Bridget's church to try to get workers to return to work (and Hosam Amara's actions and statements regarding the same).

Defendant's Objections 80-81 (PSR ¶¶ 233-234) - Regarding defendant causing the unavailability of Amara and Ben Chaim, the government directs the Court's

14

attention to evidence presented at the November 18, 2009, detention hearing (and government exhibits entered into the record).[8]

Defendant's Objection 82 (PSR ¶ 235) - The government directs the Court's attention to the trial testimony of Laura Althouse regarding defendant's promise to pay Althouse, Billmeyer and Beebe during any time they spent in prison.  The government also relies upon the Employee Status Forms themselves.  (See Gov. T Exbs. 1314, 1315 and 1316).

Defendant's Objection 84 (PSR ¶ 240) - Regarding defendant's false assertion that "trial testimony indicated or suggested" that FBBC was "aware of the money deposited by AGRI from its customers," the government directs the Court's attention to the trial record as a whole, including the testimony of Phil Lykens, Shane May and Gary Pratt.  There was no evidence at trial to suggest the bank was aware defendant was diverting customer payments until the returned checks in October 2008.

Defendant's Objection 85 (PSR ¶ 241) - The government directs the Court's attention to the trial testimony of Phil Lykens, Shane May and Gary Pratt regarding the bank's knowledge with regard to Agriprocessors' capitalization.  In this regard, the government also directs the Court's attention to the testimony of Bensasson and

---

[8]The government has re-marked the following items, received into the record at the November 18, 2009, hearing, as sentencing exhibits: Gov. S Exbs. 5504 (detention hearing exhibit 1319); Gov. S Exb. 5505 (detention hearing exhibit 1300); Gov. S Exbs. 5506 (detention hearing exhibit 6); Gov. S Exbs. 5507 (detention hearing exhibit 7); and Gov. S Exbs. 5508 (detention hearing exhibit 1301).

Meltzer that defendant consistently manipulated monthly financial statements sent to the bank to falsely state what defendant wanted them to say.

Defendant's Objection 86 (PSR ¶ 243) - The government directs the Court's attention to the jury's guilty verdict on Count 101 of the Indictment establishing, beyond a reasonable doubt, that defendant falsely stated to bank representatives that, "during the time period leading up to the arrests of approximately 389 undocumented alien workers at Agriprocessors, Inc. on May 12, 2008, the defendant had been unaware that such alien workers were undocumented." (See Final Jury Instruction 14 and Verdict Form (renumbered Count 29)).  As noted above, according to the trial testimony of Phil Lykens, representatives of MBFB were present during the meeting where the statement was made.

Defendant's Objection 87 (PSR ¶ 244) - The government directs the Court's attention to the trial evidence and the jury's guilty verdicts and findings demonstrating defendant caused false statements to be made to the bank regarding Agriprocessors' compliance with the law, including the Packer's Act.

Defendant's Objection 88 (PSR ¶ 247) - The government directs the Court's attention to the trial testimony of April Hamilton regarding defendant's directions to separately maintain records of diverted customer payments.

Defendant's Objections 89-90 (PSR ¶¶ 244 and 245) - The government directs the Court's attention to the trial testimony of April Hamilton that defendant directed her to cut Kosher Community Grocery (KCG) and Torah Education of Northeast Iowa (TE)

16

Chax checks in seemingly random amounts, as well as the trial testimony of Kerry Bolt and checks and check summaries entered into evidence. (See Gov. T Exb. 2021 (summary of Agriprocessors money flowing through KCG and into the depository account in the form of Chax checks); Gov. Exb. 2027 (summary of Agriprocessors money flowing through TE and into the depository account in the form of Chax checks). The government also directs the Court's attention to the jury's guilty verdicts on the money laundering counts establishing, beyond a reasonable doubt, defendant did use Chax checks for concealment.

Defendant's Objection 91 (PSR ¶ 252) - Defendant's claim that he lacked the intent to deceive is inconsistent with the jury's verdicts on each and every fraud count. The government directs the Court's attention to the trial record in this regard as well.

Defendant's Objection 92 (PSR ¶ 254) - The government directs the Court's attention to the trial testimony of Darlis Hendry that defendant acknowledged taking the fake invoices. (Hendry TT 10/15/09 pp. 44-45).

Defendant's Objection 93 (PSR ¶ 256) - The government directs the Court's attention to all of the trial evidence and the jury's verdicts determining, beyond a reasonable doubt, that defendant committed fraud by means of the advance requests.

Defendant's Objection 99 (PSR ¶ 265) - The government directs the Court's attention to the trial testimony of Darlis Hendry and April Hamilton (among other evidence) that defendant directed both of them to take actions which fraudulently manipulated APGEN data.

Defendant's Objection 102 (PSR ¶ 271) - The government directs the Court's attention to the trial testimony of Bensasson and Hendry, as well as Judy Meyer's "blue folder" (Gov. T Exb. 2096). There was no trial evidence to support defendant's claim that "Bensasson and Meyer engaged in this conduct for years before defendant was involved." Both Bensasson[9] and Hendry testified that Bensasson never asked Hendry to create a fake invoice.

Defendant's Objection 103 (PSR ¶ 272) - The government directs the Court's attention to the trial testimony of Darlis Hendry and Bensasson regarding defendant's responsibility for the fake invoices.

Defendant's Objection 104 (PSR ¶ 273) - The government directs the Court's attention to the trial testimony of Darlis Hendry and Bensasson that Bensasson never asked Hendry to create a fake invoice.

Defendant's Objection 109 (PSR ¶ 282) - As with Defendant's Objection 102 (regarding PSR ¶ 271), the government directs the Court's attention to the trial testimony of Bensasson and Hendry and Judy Meyer's "blue folder" (Gov. T Exb. 2096). There was no trial evidence to support defendant's claim that he "was not involved for many years." Both Bensasson and Hendry testified that Bensasson never asked Hendry to create a fake invoice.

---

[9]Many details from PSR ¶¶ 258-302 are taken from reports of Bensasson's interviews included as part of Gov. S Exb. 5500 at pp. 65-139. The most pertinent portions are supported by the trial testimony of Bensasson and others.

18

Defendant's Objection 110 (PSR ¶ 291) - As with Defendant's Objections 89 and 90 (regarding ¶¶ 244 and 245), the government directs the Court's attention to the trial evidence regarding defendant's fraudulent manipulation of check amounts going to and from KCG and TE and the jury's guilty verdicts on the money laundering counts.

Defendant's Objection 114 (PSR ¶ 297) - The government directs the Court's attention to the trial testimony of Phil Lykens that the checks were returned for insufficient funds (as wells as the returned checks themselves, Gov. T Exb. 123).

Defendant's Objection 116 and 118 (PSR ¶¶ 299 and 306) - The government directs the Court's attention to the trial testimony of Bensasson and Kerry Bolt regarding over $1.5 million in Agriprocessors money that was used to cover defendant's personal bank accounts.  See also Gov. T. Exb. 114 (excessive compensation summary)).

Defendant's Objection 117 (PSR ¶ 305) - The government directs the Court's attention to the trial testimony of Bensasson and Meltzer that the fraudulent manipulation of monthly financial statements was done at defendant's direction.

Defendant's Objection 124 (PSR ¶ 323) - The government directs the Court's attention to the trial testimony of Laura Althouse that defendant gathered copies of the Hunt I-9s from her either right before or right after the raid.  (Althouse TT 10/29/09 p. 65).

Defendant's Objection 126 (PSR ¶ 325) - The government directs the Court's attention to the trial testimony of April Hamilton, Darlis Hendry, and Wendy Torson regarding defendant's destruction and concealment of evidence of defendant's fraud.

<u>Defendant's Objection 127 and 128 (PSR ¶¶ 307-315 and 316)</u> - Although defendant refers to PSR ¶¶ 307-316 in Defendant's Objections 127 and 128, the body of the objections refer only to a $1.2 million account at Luana Bank as security for cattle suppliers and an unspecified reference to other objections. Defendant does not make any specific objection to the factual matters set forth in paragraphs 314, 315 and 316 regarding the loss figures reported by MBFB and FBBC representatives. Because defendant has not made a specific objections to these loss figures, the Court may rely upon the figures for sentencing purposes.[10] The government understands defendant is pursuing a legal objection to the foreseeability of the actual loss represented by those figures.

<u>Defendant's Objection 133 (PSR ¶¶ 361-364)</u> - Regarding information that defendant provided approximately $15,000 to $20,000 in illicit cash payments to the former mayor of Postville during the time the mayor was in office, this information was not received at trial. The government has included reports of interviews of the former mayor in Gov. S Exb. at pp. 411-429 which detail the circumstances of the payments.[11]

---

[10]"[U]nless a defendant objects to a specific factual allegation contained in the PSR, the court may accept that fact as true for sentencing purposes." *United States v. Moser,* 168 F.3d 1130, 1132 (8th Cir.1999).

[11]This information should be considered by the Court generally at sentencing and, as discussed below, would provide a potential basis for an upward departure. However, given the U.S. Probation Office's recommendation regarding the calculation of the advisory guideline range, and depending upon the Court's ultimate calculation of the guidelines, a departure may well be unnecessary to achieve an adequate sentence in this matter.

## III. LOSS

### A. Legal Standards

The burden is on the government to prove by the preponderance of the evidence the amount of loss. See *United States v. Staples*, 410 F.3d 484, 490 (8th Cir. 2005).

"Loss is a proxy for the seriousness of the offense." *United States v. Parsons*, 141 F.3d 386, 392-93 (1st Cir. 1998). In determining loss amount, the Court should consider relevant conduct that was part of the scheme to defraud. Relevant conduct is comprised of (1) "all acts and omissions committed, aided, abetted, counseled commanded, induced, procured, or willfully caused by the defendant," (2) "all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction" if "the offenses are of a character for which §3D1.2(d) would require grouping," and (3) "all harm that resulted from acts and omission specified in subdivisions (a)(1) and (a)(2) above," and "all harm that was the object of such acts and omissions." USSG §1B1.3(a).[12]

Loss is the greater of either actual loss or intended loss. USSG §2B1.1, comment (n. 3(A)). Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1, comment (n.3(A)(I)). "Intended loss" includes "the pecuniary harm that was intended to result from the offense." USSG §2B1.1, comment (n.3(A)(ii)).

---

[12]In determining the loss amount for the purposes of the advisory guidelines, the Court should consider as part of relevant conduct the losses caused to both FBBC and MBFB.

"The court only needs to make a reasonable estimate of the loss." USSG §2B1.1, comment (n.3(c)). See also *United States v. Waldner*, 580 F.3d 699, 705 (8th Cir. 2009) ("Because the loss caused by fraud is often difficult to determine precisely, 'a district court is charged only with making a reasonable estimate of the loss.'"), quoting *United States v. Parrish*, 565 F.3d 528, 534 (8th Cir. 2009); *United States v. Boesen*, 541 F.3d 838, 850 (8th Cir. 2008) (the court need only make a reasonable estimate of the loss and can base it on reasonable extrapolation from known facts); *United States v. Erhart*, 415 F.3d 965, 971 (8th Cir. 2005) (court's determination of loss need not be precise, although it must reflect a reasonable estimate of the loss); *United States v. Agboola*, 41 F.3d 860, 863 (8th Cir. 2005) (applying loss provision in §2F1.1, and finding loss amount need not be determined precisely)[13]; *United States v. Wells*, 127 F.3d 739, 748 (8th Cir. 1997) ("The court need not determine the value of the loss with any degree of precision; a reasonable estimate of the loss based on available evidence will suffice").

The commentary to USSG §2B1.1 provides special instructions regarding how loss is to be calculated in cases involving pledged collateral. Application note 3(E)(ii) provides:

> *(E)* <u>*Credits Against Loss*</u>. – *Loss shall be reduced by the following:*
>
> \* \* \* \*

---

[13] USSG § 2F1.1 has been consolidated into 2B1.1. <u>See</u> *United States v. Edelmann*, 485 F.3d 791, 814 (n.5) (8th Cir. 2006).

> (ii)    In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

USSG §2B1.1, comment (n.3(E)(ii)).  Thus, in the case of a fraudulent loan, available collateral and proceeds from the sale of collateral are accounted for by offsetting the principal balance on the loan.  See *Parish,* 565 F.3d at 535 ("the equation used to calculate actual loss to the lenders is the amount of the fraudulently obtained mortgage loans minus any payments made on the loan principal and the value of the collateral at the time of sentencing"); *United States v. Erpenbeck*, 532 F.3d 423, 431 (6th Cir. 2008) (actual loss is to be reduced by "the amount of collateral that has been collected *at the time of sentencing*" (emphasis in original)); *United States v. James*, 592 F.3d 1109, 1114 (10th Cir. 2010) (In cases of pledged collateral, "loss is calculated by subtracting the value of the collateral – or, if the lender has foreclosed on and sold the collateral, the amount of the sales price – from the amount of the outstanding balance on the loan").

B.    Loss to the Banks

For the purposes of USSG §2B1.1(b)(2), the Court should find the actual loss in this case to be between $20,000,000 and $50,000,000 in accordance with the recommendation of the United States Probation Office.  While loss under the advisory guidelines is sometimes difficult to calculate, this is not such a case.  Rather, where funds have been loaned on the basis of fraudulently inflated collateral, Application Note

23

3(E) to USSG §2B1.1 provides a relatively simple roadmap.  The outstanding principal

on the loan is reduced by any recoveries from the sale of collateral and the value of any

unsold collateral.  The resulting figure is the actual loss amount for the purposes of

USSG §2B1.1(b)(2).

Here, based upon most recent information[14] from FBBC and MBFB, the

outstanding principal balance on the loan is $29,944,981.  This figure accounts for the

proceeds from the sale of collateral. (PSR ¶ 315).  When the principal balance is further

reduced by the fair market value of remaining unsold collateral and other unapplied

credits (see PSR ¶ 315)[15], the total becomes $26,944,981 – still well above the

$20,000,000 threshold.

C.    Loss to the Cattle Suppliers

In addition, although it does not change the enhancement level[16], all of the

victims of the Packer's Act violations committed by defendant suffered actual loss which

would qualify for inclusion in the USSG §2B1.1(b)(2) analysis.  (See PSR ¶¶ 319 and

---

[14]See PSR ¶¶ 314-316.

[15]As indicated in PSR ¶ 315, these amounts are  $254,888 (to account for unapplied cash which has been collected from the sale of pledged collateral had not yet been applied to the principal balance stated above); $186,674 (to account for the maximum amount of anticipated recovery on remaining accounts receivable collateral); $200,000 (to account for the estimated fair market value of certain collateral equipment obtained from a facility in Gordon, Nebraska); $1,984,000 (to account for tax refunds which the Trustee filed for and the bank hopes to obtain, in the event such refunds are allowed by the IRS and State of Iowa); and $400,000 (to account for the amount of proceeds reasonably attributable to the sale of the banks' interest in Agriprocessors' trademarks to SHF).

[16]The next threshold for an enhancement under USSG § 2B1.1(b)(2) is $50,000,000.  (USSG § 2B1.1(b)(2)(M) (calling for a 24 level enhancement)).

320 (listing 31 victims of defendant's Packer's Act violations)).  These include victims of

relevant and acquitted conduct.  (See PSR ¶ 320).[17]  The actual loss to each Packer's

Act victim is attributable to the fact that they all lost the time value of their money while

they were waiting for payment.  Waverly Sales, Inc. has quantified the amount of their

actual loss to be $3,800.51.  This is based upon the amount of interest Waverly paid on

a mortgage loan it took out on its property in order to cover the cost of the cattle sold to

Agriprocessors while it was waiting for payment through the Packer's trust.

    D.    <u>Defendant's Objections</u>

Defendant does not lodge any specific objections to the factual matters

underlying the PSR's loss calculation for the purposes of USSG § 2B1.1(b)(2).  (See

PSR ¶¶ 314-318).  Rather, defendant appears to claim the banks' loss amount should

be less than $7,000,000[18] because any additional loss was not reasonably foreseeable.

Defendant's arguments should be rejected.  Because defendant caused the bank to

loan against approximately $10 million in fake invoices and diverted millions of dollars in

---

[17]All victims of relevant conduct, including acquitted conduct, are to be considered for the purposes of specific offense characteristics under USSG § 2B1.1.  <u>See</u> USSG §1B1.3(a); *United States v. Watts*, 519 U.S. 148, 157 (1997).

[18]Defendant's objections in this regard are internally inconsistent.  At pages 30-31 of Defendant's Objections, defendant proposes a flawed calculation which would result in a loss total of $4.5 million.  At page 33, defendant proposes a 20 level enhancement and, again, states the loss should be less than $7,000,000.  USSG § 2B1.1(b)(2)(K) calls for a 20 level enhancement where the loss is *more* than $7,000,000.  In any event, for the reasons discussed below, defendant's objections to the loss calculation should be overruled, and the Court should determine a 22 level enhancement applies pursuant to USSG § 2B1.1(b)(2) as recommended by the U.S. Probation Office.

bank collateral which further undermined the value of the banks collateral, a loss of more than $20,000,000 was reasonably foreseeable.

Defendant first claims the victim bank's own conduct caused the actual loss to exceed a reasonably foreseeable amount. Specifically, defendant suggests the bank should have accepted a purported offer from Mordechai Korf. As a factual matter, the government understands the purported offer to have been a verbal offer to buy out the bank's position with regard to Agriprocessors, at a significant discount, and <u>on the express condition that a trustee not maintain control of the company.</u>[19] Not knowing anything about fake invoices and the true scope of the fraud in this case, the bank did not pursue the offer - electing instead to proceed with a trustee.[20] Defendant's argument is flawed in that it fails to account for the fact that the bulk of the fraud had yet to be discovered. The evidence at trial established that, in November 2008, the bank was aware of a diversion of approximately $1.4 million. (Lykens TT 10/21/09 pp. 38-39). Defendant's fake invoice scheme was not discovered until Marc Ross and Alan

---

[19]<u>See</u> April 7, 2010, interview of Phil Lykens (included as part of Gov. S Exb. 5500 at 346).

[20]Tellingly, in his objections to the PSR, defendant states, "[a]t the time, the generally accepted value of Agriprocessors was approximately $40,000,000." (Defendant's Objections p. 28). Assuming this was the generally accepted view, it would have only been due to the fact that defendant's fraudulent inflation of Agriprocessors' sales was not yet known. If the company was thought to be worth so much - it would have been foolish for the bank to sell its position at a loss rather than to support Agriprocessors' sale as a going concern.

Rice started having trouble collecting accounts receivable in approximately January 2009.  (See Ross TT 10/14/09 p. 21, and Rice TT 10/14/09 137).

Moreover, even assuming defendant could prove (he cannot) the bank acted unreasonably with regard to mitigation of its loss, defendant's argument still fails.  "A victim's failure to mitigate or the negligence of intervening actors does not prevent attributing to the defendant[] the full amount of loss."  *United States v. Miller*, 962 F.2d 739, 744 (7th Cir. 1992); accord *United States v. Kopp*, 951 F.2d 521, 531 (3[d] Cir. 1991) (Guidelines "definitely reject[] adjusting the 'loss' itself downward to reflect other causes beyond the defendant's control"; rather "actual loss was how much better the victim would have been but for the defendant's fraud").

Defendant also claims the government caused the actual loss to exceed a reasonably foreseeable amount by pursuing potential criminal forfeiture of assets which were used to facilitate wholesale alien harboring at Agriprocessors.  This argument fails as well.  Defendant was convicted beyond a reasonable doubt at trial of defrauding FBBC by lying to it about alien harboring Agriprocessors.  In addition, the trial evidence firmly established that it was defendant who was primarily responsible for the harboring that took place.  That the bank's collateral might be substantially compromised by the company's criminal conduct is *precisely why* it was criminal for defendant to lie to the bank about it.  Thus, any actual loss attributable to the criminal alien harboring at Agriprocessors was a direct and foreseeable loss resulting from defendant's criminal conduct.

Insisting that the actual loss in this case was not reasonably foreseeable, defendant suggests the loss be calculated on the basis of the principal attributed to the fake collateral supporting the loan.  That is, defendant argues, "a reasonable estimate of the loss stemming from the defendant's conduct is 85% of the fraudulent invoices or approximately $8.5 million."   (Defendant's Objections pp. 30-31)).[21]   In essence, defendant appears to want full credit for the face value of all actual accounts receivable which supported the loan – regardless of their actual value to the victims banks upon liquidation.  Defendant's argument misapplies the law with regard to the calculation of actual loss.

As noted above, the proper method for taking into account actual pledged collateral is set forth in Application Note 3(E)(ii) to USSG §2B1.1.  That is, the *actual value* of the collateral to the bank is deducted from the total principal owing on the loan.  The result of the calculation is reflective of the actual loss because it takes into account the actual position of the victim (at least with regard to principal).  In contrast, defendant's proposal ignores the actual position of the victim.  Rather, defendant's

---

[21]Incredibly, defendant suggests the $8.5 million figure should be further reduced by $4 million - purporting to be the amount of interest the bank earned due to the fraudulent invoices.  (Id.). This suggested reduction should be rejected out of hand. First, there is no legal basis for reducing a § 2B2.1(b)(2) loss amount on the basis of revenue earned by the victim bank pursuant to its loan agreement.  Interest is earned in nearly every case involving fraudulent conduct with regard to a loan, and the amount of interest earned has no bearing upon the seriousness of the defendant's conduct.  Cf. *Parsons*, 141 F.3d at 392-93 ("Loss is a proxy for the seriousness of the offense").  The guidelines simply do not call for a corresponding reduction.  In addition, as Gary Pratte testified at trial - the bank does not get its money for free – it has to pay interest on the money it loans.  (Pratt TT 10/20/09 p. 92).

proposal employs a false presumption – contrary to the facts – that, in the wake of the failure of a loan due to a massive fraud, every nickle of every real account receivable will be recovered.[22]  Although defendant's proposal would still result in a loss figure of in excess of $7,000,000, it does not even approximate the actual loss to the victim banks. Therefore, it does not adequately reflect the seriousness of the offense.

In cases involving misrepresentations in connection with loans, there are cases which support the calculation of *intended loss* in accordance with the additional amount of money lent due to the fraud.  See *United States v. Miller*, 588 F.3d 560 (8th Cir. 2009) ("Here, the amount of intended loss attributable to Miller is the amount by which the fraudulent loans purchased by the financial institutions exceeded the amount that those institutions would have paid had they known the truth"); *United States v. Carter*, 412 F.3d 864, 869 (8th Cir. 2005) ("even though Carter testified that he thought the loans would be repaid, Carter intended to leave the lenders with loans that were riskier and less valuable than the lenders thought"); *Kok v. United States*, 17 F.3d 247, 250 (8th Cir. 1994) ("the measure of loss that Kok intended to inflict is the difference between the amount of credit the bank extended based upon the false representations and the amount of credit the bank would have extended had it known the company's true

---

[22]In a related sense, defendant's argument employs a false presumption that the victim banks would lend on actual collateral regardless of whether their customer was, at the same time, lying to them about the value of other collateral.  In reality, false statements on the scale of those made in this case imperil the entire position of the lending institution. As was demonstrated in this case, where a business engages in wholesale fraud, the overall value of the entire business (and all of its assets) is compromised.

financial condition"). However, in this case, the actual loss is far greater. Thus, defendant's argument is contrary to the plain directive in the guidelines that "loss is the greater of actual loss or intended loss." USSG §2B1.1, comment (n. 3(A)). For the reasons previously submitted, the actual loss in this case far exceeds $20,000,000. Any lesser calculation based upon *intended* loss is trumped by the actual loss.

Because the actual loss in this case is more than $20,000,000, a 22-level enhancement should apply under USSG §2B1.1(b)(2)(L).

## IV.    NUMBER OF VICTIMS

The United States Probation Office properly found defendant's sentence should be increased two levels, pursuant to USSG §2B1.1(b)(2)(A), because defendant's offense involved more than 10 victims. (PSR ¶ 335). The Sentencing Guidelines provide for a two level increase "[i]f the offense . . . involved 10 or more victims." USSG §2B1.1(2)(A). "'Victim' means (A) any person who sustained any part of the actual loss determined under subsection (b)(1)." Id., comment (n.1); accord United States v. Icaza, 492 F.3d 967, 969 (8th Cir. 2007). "'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." USSG §2B1.1, comment (n.1). To summarize, a victim must be an individual, corporation or company of some type that sustained part of the actual loss determined by the district court." *Icaza*, 492 F.3d at 969.

Here, as discussed above with regard to loss, each and every victim of a Packer's Act violation by Agriprocessors suffered an actual pecuniary loss with regard

to the time value of their money.  Waverly Sales, Inc. has quantified the amount of their actual loss to be $3,800.51 based upon the amount of interest Waverly paid on a mortgage loan it took out on its property in order to cover the cost of the cattle sold to Agriprocessors while it was waiting for payment through the Packer's trust.  While other Packer's Act victims may or may not be able to similarly quantify their loss, there is no doubt that each and every such victim suffered an actual loss.  Regarding the number of victims, the U.S. Probation Office has identified 31 victims of Pacer's Act violations committed as part of the same course of conduct or common scheme or plan as defendant's offenses of conviction.  (PSR ¶ 336).  When added to the two banks[23], the total number of victims is 33.  (Id.).

Defendant inaccurately claims the Packer's Act victims did not suffer any pecuniary harm.  (Defendant's Objections p. 25).  Of course they did.  The fact that they were ultimately paid is completely beside the point when the essence of the criminal offense is the failure to timely pay providers of livestock.  The 31 victims of defendant's

---

[23]Defendant provides no support for his argument that MBFB should not be considered a victim under USSG § 2B1.1(b)(2)(A) because MBFB "was not in privity of contract with Agri."  (Defendant's Objections p. 25).  The fact remains that defendant knew that MBFB was a participant in the revolving loan and defendant's crimes caused over $8,000,000 in loss to MBFB.  In addition, according to the trial testimony of Phil Lykens, at least one representative of MBFB was present at the meeting shortly after the raid when defendant falsely and fraudulently claimed that he was unaware that the workers arrested during the raid were undocumented.  (Lykens TT 10/20/09 p. 54).  As with all specific offense characteristics under USSG § 2B1.1, the number of victims is to be determined on the basis of defendant's broader course of conduct and common scheme or plan.  The loss to MBFB certainly falls within this framework.

Packer's Act violations take the total number of victims well above the threshold of 10, and a two-level enhancement was properly applied under USSG § 2B1.1(b)(2)(A).

## V.    SOPHISTICATED MEANS

The United States Probation Office properly found defendant's offense conduct involved sophisticated means, pursuant to USSG §2B1.1(b)(8)(C), resulting in a two-level increase in defendant's offense level.  (PSR ¶ 337).  A sentence should be enhanced by two levels if "the offense otherwise involved sophisticated means."  USSG 2B1.1(b)(8)(C).  The government must show that the offense involved "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  Id., comment (n.8(B)).  In other words, the government must show defendant's conduct was "notably more intricate than the garden variety" fraud.  *United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007) ("the government must show that Hance's mail fraud, when viewed as a whole, was notably more intricate than that of the garden-variety mail fraud scheme").  "Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme."  *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005); accord, *Edelmann*, 458 F.3d at 816 ("A district court commits no error in applying the two-point enhancement for sophisticated means where the defendant's 'total scheme was undoubtably sophisticated'"); *United States v. Halloran*, 415 F.3d 940, 945 (8th Cir. 2005) (same).

32

"Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." USSG §2B1.1, comment (n.8(B)); accord *United States v. Huber*, 462 F.3d 945, 951 (8th Cir. 2006) (holding a sophisticated means increase was not proper when the defendant "did not use shell corporations, offshore accounts, or 'layer' transactions). The use of layer transactions, corporate shells, and fictitious documents in order to perpetrate a fraud have been found to be sufficient to justify a sophisticated means enactment under §2B1.1(b)(8)(C). *Halloran*, 415 F.3d at 945 ("To accomplish his multi-layered plot, Halloran required the use of a corporate entity, numerous fraudulent documents and forged notary stamps").

Here, defendant's fraudulent scheme was notably more sophisticated than the typical fraud. Defendant did not simply lie to the bank about the value of Agriprocessors' accounts receivable collateral. Rather, in order for the fraud to be effective and sustainable for years, the lies and false documents involved the customer service, shipping, and accounting departments (both accounts payable and accounts receivable) and the all-around manipulation of a substantially integrated computer accounting system.

- To initiate the false sales part of the scheme, defendant caused the customer service department to create fake invoices in the APGEN system. The fabricated sales involved not only actual Agriprocessors customers, but they also involved straw customers such as The Right Place and House of Glatt.

- To back up the fake invoices, defendant directed fake bills of lading (normally created in the shipping department) to be created. Since bills of lading were

normally signed by truck drivers, the fakes needed to have forged signatures of drivers from logical routes on them.

- To initiate the diverted income portion of the scheme, defendant caused customer payments not to be entered into the APGEN accounting system. Generally, such payments were accounted for in the "1510 Rubashkin Loan Payable account." Because the 1510 account was a liability account, it was not likely to be reviewed in detail by the bank or its examiners.

- At defendant's direction, "round-up checks" were added to the diverted income deposits so that they looked like loans or transfers on Agriprocessors' bank statements. Without the round-up checks, bank statements would reflect deposits in random amounts. This would tip off the bank or investigators that the deposits consisted of customer checks. (See Bolt TT 10/29/09 pp. 213-214 (the diversion of customer payments went unnoticed for a substantial period of time due to the even amounts of the deposits)).

- At defendant's direction, actual customer payment information was maintained in a separate set of books - consisting of copies of diverted checks, a thumb drive containing a spreadsheet of the diverted payments, and APGEN entries that were mis-dated. Hamilton mis-dated the customer payments to prevent them from posting to customer accounts and reducing the borrowing base. The sophistication of this part of the scheme allowed defendant to, effectively, defraud the bank twice using the same, carefully timed set of transactions.

- In order to accommodate the customers that paid off of statements, defendant caused completely new customer statements to be generated outside of the APGEN system. This was part of a separate set of records that had to be hand-crafted whenever the customer needed a statement.

- As the inflated figures from both parts of the scheme were merged into the APGEN accounting system – the inflated APGEN numbers became the basis for false borrowing base certificates which were sent to the bank almost daily by the accounting department. Because the APGEN system was integrated, and it would require numerous fake entries from different parts of the business in order to falsify the information, the bank did not suspect the APGEN numbers were fraudulent.

- In order to back up the false borrowing base certificates, false monthly accounts receivable aging reports (also generated by APGEN) were sent to the bank.

- Due, in part, to all of the manipulation of the APGEN system (including the 1510 account), monthly financial figures from APGEN grossly distorted the actual financial condition of Agriprocessors.  At defendant's direction, Bensasson and Meltzer fabricated entries into the financial statements to hide the manipulation that had taken place (and to otherwise make the financial statements look like defendant wanted them to look).

- In order to pay down the revolving loan in a manner that would not reveal the diversion of customer payments and creation of fake sales, defendant executed a complex money-laundering scheme which included the use of straw customers (including KCG and TE), layered transactions (with money going to and from the straw customers in differing amounts), and the use of "no-signature" checks.[24]

- As part of his fraudulent scheme, and in an attempt to conceal his offenses, defendant gathered up and either hid or destroyed the hard copies of the fake invoices and fake bills of lading, the copies of the diverted checks, the thumb drive, and the customer statements.  He also directed April Hamilton to destroy evidence in APGEN of the mis-dated payments.

Thus, defendant's scheme to defraud involved all of the hallmarks of a sophisticated scheme – fake transactional records (both computer and hard copies), fake financial records (both computer and hard copies), the use of straw companies (as purported customers), and multi-layered transactions (including the manipulation of dollar amounts to conceal the nature of the transactions).[25]  Defendant's objection to

---

[24]The complexities of defendant's money laundering scheme are discussed in more detail below regarding the U.S. Probation Office's recommended application of a two-level enhancement under USSG § 2S1.1(b)(3) for sophisticated laundering.

[25]In addition, although the Court need not address the issue, the manner of defendant's harboring of undocumented aliens and his Packer's Act violations were unusually sophisticated.  The underlying crimes are part of defendant's relevant conduct in that they were necessary parts of defendant's fraudulent scheme as found by the jury.  Accordingly, defendant's conduct in committing the harboring and Packer's Act offenses is to be considered in determining the application of specific offense characteristics.  See USSG §1B1.3(a) (here, relevant conduct includes acts committed "during the commission of the offense of conviction" and "acts that were part of the same course of conduct or

35

the scoring of a two-level enhancement for sophisticated means, pursuant to USSG

§2B1.1(b)(8)(C), should be overruled.

## VI.   AGGRAVATING ROLE

The sentencing guidelines provide for a four-level enhancement where "the

defendant was an organizer or leader of a criminal activity that involved five or more

participants or was otherwise extensive."  USSG §3B1.1(a).  Generally[26], all of

defendant's relevant conduct is to be considered in determining defendant's role.

> *The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction.*

USSG §3B1.1, introductory commentary.  The terms "organizer" and "leader" are

broadly interpreted.  See *United States v. Miller*, 91 F.3d 1160, 1162 (8th Cir. 1996). A

defendant need not "directly control his intermediaries." Id. at 1164 (quoting *United*

*States v. Maxwell*, 25 F.3d 1389, 1399 (8th Cir. 1994)).

---

common scheme or plan as the offense of conviction").  Regarding harboring, defendant used a straw employer (Hunt Enterprises) to employ undocumented workers.  Defendant offense also involved an array of false documents such as Hunt I-9s, Agriprocessors I-9s and other records, and, of course, the fake resident alien cards financed by defendant. Similarly, defendant's Packer's Act violations consisted of more than simply late payments. Defendant signed checks that appeared to be timely and then held them.  He also had some payments run through Agriprocessors' postage meter and then held.  Given the relative simplicity of a run-of-the-mill Packer's Act violation, these characteristics of defendant's Packer's Act offenses could be readily characterized as unusually sophisticated.

[26]For the purposes of money laundering scored under USSG § 2S1.1, Chapter Three adjustments are to be determined based upon the covered offense.  USSG §2S1.1, comment. n.2.

36

Factors the court should consider in determining whether a defendant was an "organizer" or "leader" include the defendant's exercise of decision making authority, the nature of the defendant's participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree to which the defendant participated in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority the defendant exercised over others.

*United States v. Mickle,* 464 F.3d 804, 807 (8th Cir. 2006) (citations omitted).  More than one participant in criminal activity can qualify as an "organizer" or "leader."  Id.

A.  Defendant's Section 2B1.1 Offenses

For all of the reasons set forth in PSR paragraphs 339-340, defendant was an "organizer or leader" of the criminal activity covered by section 2B1.1.  Defendant does not dispute his section 2B1.1 offenses involved five or more participants or were otherwise extensive.[27]  Rather, defendant argues a three-level role enhancement applies, maintaining he was a mere manager or supervisor.   To the contrary, regarding the following portions of defendant's fraudulent schemes, defendant acted as an organizer or leader in, at least, the following ways.

1.  Inflation of Accounts Receivable Collateral

●  Defendant directed Judy Meyer and Darlis Hendry to create fake invoices and bills of lading.  At trial, Hendry testified that only defendant asked her to do so. (See Hendry TT 10/15/09 pp. 33-36).

●  Defendant directed April Hamilton to divert customer payments to different accounts and to not post the payments to customer accounts.  When Hamilton was gone, defendant asked Wendy Torson to pull the checks.  At trial, Hamilton

---

[27]See Defendant's Objections p. 26 ("Defendant agrees that he was a manager or supervisors [sic] involving five or more participants for purposes of the three point enhacement"); see id. at p. 33 ("ROLE IN THE OFFENSE: +3 (Manager or Supervisor)").

testified that only defendant asked her to do so.  (Hamilton TT 10/22/09 pp. 33-36, 58; Torson TT 10/22/09 pp. 12-14).

- Defendant directed Hamilton to maintain a separate set of books in order to keep track of actual accounts receivable and post customer payments as the accounts were close to becoming ineligible.  (Hamilton TT 10/22/09 pp. 16-17, 66-67).

- Defendant directed Hamilton to add "round-up" checks to the deposits containing diverted checks in order to conceal the nature of the deposits.  (Hamilton TT 10/22/09 pp. 48-49).

- Defendant directed Mitch Meltzer to write a personal check - with the notation "meat" on the subject line – for use as a "round up" check.  (See Hamilton TT 10/22/09 pp. 53-54; Meltzer TT 10/26/09 pp. 37-38).

- Defendant directed Debbie Preusser to cut checks to Kosher Community Grocery and Torah Education (money that was ultimately used to pay down the revolving loan), breaking up large amounts into smaller, seemingly random amounts.  At trial, Preusser testified that only defendant asked her to do so. (Preusser TT 10/26/09 pp. 89-91).

- Defendant directed Hamilton to cut Chax checks from KCG and TE to Agriprocessors for deposit into the depository account.  At trial, Hamilton testified that it was defendant that asked her to do so.  (Hamilton TT 10/22/09 pp. 68-87).

- Defendant directed Toby Bensasson to submit fraudulent advance requests and borrowing base certificates to the bank.  (Bensasson TT 10/21/09 p. 64).  Mitch Meltzer would submit the fraudulent advance requests and borrowing based certificates to the bank in Bensasson's absence.  (See Meltzer TT 10/26/09 p. 22).

- Defendant directed Bensasson and Meltzer to fraudulently manipulate monthly financial statements.  (Bensasson TT 10/21/09 pp. 119-122; Meltzer TT 10/26/09 pp. 44-45).

- Defendant directed Hamilton and Torson to either turn over or destroy evidence of the fraud.  (Hamilton TT 10/22/09 pp. 88-91; Torson TT 10/22/09 pp. 30-31).

    2.    Alien Harboring and Document Fraud

- Defendant directed Elizabeth Billmeyer to create a spreadsheet of no-match employees at Agriprocessors, and then prevented her from taking any effective

action regarding the listed employees.  Penny Hanson assisted Billmeyer in the creation of the spreadsheet, and Hanson, Karina Freund and others assisted Billmeyer in the maintenance of the undocumented workforce.

- Defendant directed Laura Althouse, Karina Freund, and Hosam Amara to place workers with bad identification documents on the Hunt payroll behind Billmeyer's back (Nicole Miller Caguach and Shlomo Ben Chaim assisted in the Hunt payroll scheme).  Defendant later directed Althouse to give him the copies of the Hunt I-9s.  (Althouse TT 10/29/09 p. 65).

- Defendant financed a scheme to obtain dozens of new, fake, resident alien cards for Agriprocessors workers the week before the May 12, 2008, immigration raid. At least Brent Beebe, Carlos Guererro-Espinoza, Antolin Trinidad, and every worker who obtained a new, fake resident alien card participated in the scheme.[28]  (Guererro-Espinoza TT).

- Days before the raid, defendant directed Althouse to gain access to Billmeyer's locked office to obtain a list of remaining no-match employees.  He directed her to put letters in the listed employees' Friday paychecks and then report to work on Sunday because there would be a lot of "hiring" to do.  Defendant personally inspected the new fake documents on Sunday as the purported "hiring" was taking place.  Beebe, Guererro-Espinoza and Shawn Meyer participated in the fraudulent "re-hiring" process.  (Althouse TT 10/28/09 pp. 81, 90).

  3.    Packer's Act Offenses

- Defendant fraudulently manipulated the timing of cattle payments at Agriprocessors.  In doing so, defendant directed Shella Chiu to mail payments after they were due, and run payments through a postage meter for defendant to hold.  (Chiu TT 10/22/09 pp. 90-92).

---

[28]While Application Note 2 to USSG §2L1.1 (the harboring guideline) states *"the aliens smuggled, transported, or harbored are not considered participants unless they actively assisted in the smuggling, transporting, or harboring of others,"* the directive would seem to have limited application where, as here, the aliens *also* committed document fraud.  Such a reading is supported by the Introductory Commentary to USSG §3B1.1 which makes clear that an aggravating role enhancement is to be determined by reference to all relevant conduct, not just the offense of conviction.  USSG §3B1.1, introductory commentary.

With regard to all of the above schemes, defendant alone made the initial
decisions to commit the offenses and provided the direction to others to effectuate the
crimes.  See United States v. Williams, 97 F.3d 240, 242 (8th Cir. 1996) (finding
defendant was an organizer where the defendant "directed or procured the aid of
underlings," and was responsible for organizing others for purposes of carrying out
crimes).  The above crimes simply would not have been occurred but for defendant
organizing and leading the offenses.  See Mickle, 464 F.3d at 807 ("defendant's
exercise of decision making authority" and role in "planning or organizing the offense"
are factors).   Defendant used his position of authority at Agriprocessors to direct the
actions of other Agriprocessors personnel, including criminal participants, in aid of the
offenses.  Contrary to defendant's assertions, the trial evidence clearly established
Bensasson acted at defendant's direction; not the other way around.  (See Bensasson
TT 10/21/09 p. 64); see Mickle, 464 F.3d at 807 ("the degree of control and authority
the defendant exercised over others" is a factor).  Defendant chose the persons who
would assist him in his crimes.  For example, after Judy Meyer died, it was defendant
who recruited Darlis Hendry to create fake invoices going forward.  (Hendry TT
10/14/09 p. 222; see Bensasson TT 10/21/09 p. 56); see Mickle, 464 F.3d at 807 ("the
recruitment of accomplices" is a factor).  Despite his relatively high level of authority
over others, defendant also participated in the execution of the fraudulent schemes in
an extraordinarily personal way.  For example, he personally contacted Darlis Hendry
and told her which customers and amounts to use for fake invoices. (Hendry TT

10/14/09 p. 226).  He personally directed April Hamilton to divert customer payments -

sometimes sorting through customer checks to pick the ones he wanted diverted.

(Hamilton TT 10/22/09 p. 37).  He also personally inspected new, fake resident alien

cards the day before the raid.  (Lopez-Nunez  TT 10/29/09 p. 19); see Mickle, 464 F.3d

at 807 ("the nature of the defendant's participation in the commission of the offense" is

a factor).  He also involved several participants in the cover-up – that is, gathering up

incriminating evidence and having others shred and delete other evidence.

Finally, it was the defendant who caused over $1.5 million - money that came

through Agriprocessors but originated, almost daily, from fraudulently obtained

advances – to be transferred to cover his personal bank accounts.  (Bolt TT 11/2/09 p.

47; Gov. T Exb. 114).  Thus, defendant "claimed right to a larger share of the fruits of

the crime." Mickle, 464 F.3d at 807.

B.    Defendant's Money Laundering Offenses

Similarly, defendant was an organizer or leader with regard to his money

laundering offenses.  As with his section 2B1.1 offenses, defendant does not dispute

his money laundering offenses involved five or more participants or was otherwise

extensive, but maintains he was a mere manager or supervisor.[29]

For all of the reasons set forth in PSR paragraph 348, defendant was an

organizer or leader with regard to his money laundering offenses scored under USSG

---

[29]See Defendant's Objections p. 34 ("ROLE IN THE OFFENSE: +3 (Manager or
Supervisor)").

§2S1.1.  According to the evidence at trial , defendant initiated the scheme to run

Agriprocessors money through KCG and TE in order to pay down the revolving loan in a

manner that concealed the source of the funds.  April Hamilton testified that the

defendant - and the defendant alone - directed her to cut Chax checks from KCG and

TE bank accounts and deposit them in the depository account.  Similarly, Wendy

Torson testified defendant would have her cut the checks when Hamilton was gone.  In

total, over $10,000,000 was run through KCG (see Gov. Ex. 2021), and over

$9,000,000 was run through TE (see Gov. Ex. 2027).  There was no evidence that

Bensasson or anyone else ever directed such checks to be cut.

Similarly, with regard to the replacement checks[30] , Debbie Preusser testified

that, in early February 2008 - about the time defendant switched from using KCG to TE

– defendant started having the replacement checks to the straw customers broken up

and cut in seemingly random amounts.  Preusser specifically testified that it was the

defendant who had her break up large round checks into seemingly random amounts -

not Bensasson or anyone else.  (Preusser TT 10/26/09 pp. 89-91).

Defendant was more than a manager or supervisor with regard to the money

laundering scheme.  This was the defendant's scheme - initiated by him and conducted

at his direction.  While others participated in the scheme, they did so only to assist

defendant in a scheme which he devised.  Defendant alone directed April Hamilton to

---

[30]The "replacement checks" were the checks written from Agriprocessors to the
straw customer accounts to cover the Chax checks that defendant had deposited into the
depository account.

42

cut the Chax checks which became the bases for the money laundering counts of conviction - clearly establishing defendant as the one ultimately responsible for the criminal conduct.

For the above reasons, a four-level role enhancement should apply under USSG §3B1.1(a) with regard to defendant's section 2B1.1 offenses and his money laundering offenses scored under section 2S1.1.

## VII.    ABUSE OF POSITION OF TRUST

The United States Probation Office properly found, pursuant to USSG §3B1.3, that defendant abused a position of trust, requiring a two level increase in defendant's offense level.  This is true with regard to both his section 2B1.1 offenses and his money laundering offenses scored under section 2S1.1.  (See PSR ¶¶ 342 and 349).

Section 3B1.3 of the advisory guidelines provides: "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," the defendant's sentence should be increased by two levels.  "This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime.... Such persons generally are viewed as more culpable." USSG § 3B1.3, comment (background).

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some

43

significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

USSG §3B1.3, comment (n.1).

The government must show two elements, by a preponderance of the evidence, in order for a sentence to be enhanced for abuse of position of trust: "defendant '(1) occupied a position of private [or public] trust and (2) used [the] position in a manner [that] significantly facilitated the commission or concealment of [the] offense.'" *United States v. Olson*, 22 F.3d 783, 786 (8th Cir. 1994) (quoting *United States v. Brelsford*, 982 F.2d 269, 271 (8th Cir. 1992)).

Regarding whether a person occupies a position of trust, the Third Circuit has said:

in considering whether a position constitutes a position of trust for purposes of § 3B1.3, a court must consider: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position. These factors should be considered in light of the guiding rationale of the section-to punish "insiders" who abuse their positions rather than those who take advantage of an available opportunity.

*United States v. Pardo*, 25 F.3d 1187, 1192 (3[d] Cir. 1994).

A.     Defendant Abused His Position as a Corporate Officer to Facilitate His
       Offenses

Here, because of his position as a corporate officer and the day-to-day manager,

defendant occupied a position of trust to the creditors and shareholder of

Agriprocessors.  Defendant was not only a vice-president, but he occupied the highest

managerial position at Agriprocessors.  He was regarded by others as the "boss of

Agriprocessors" and the "CEO."  For example, Kari Kime testified defendant was in

charge of Agriprocessors and understood his position to be "CEO."  (Kime TT 10/15/09

pp. 300, 315).  Bernard Feldman testified that, when he was named as the purported

new CEO of Agriprocessors in late September 2008, he understood he would be

performing most of the functions defendant had performed in the past.  (Feldman TT

10/21/09 p. 7).  It was also clear from the evidence defendant made the day-to-day

financial decisions of the company.  The testimony from several employees from

customer service to accounting was clear in this regard.  According to Bensasson and

Meltzer, defendant exercised so much control over Agriprocessors' finances that he

was able to manipulate monthly financial statements at will (Bensasson TT 10/21/09 pp.

119-122; Meltzer TT 10/26/09 pp. 44-45) and pay himself approximately $1,500,000 in

extra compensation[31] over a two year period.  In contrast, Agriprocessors' owner was

an elderly man who did not work or reside in Postville.  (A. Rubashkin TT).

---

[31]See Gov. Ex. 114 (summary of non-payroll transfers to defendant's personal bank
accounts).

Positions of private trust are positions that involve "professional and managerial discretion" and "are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."  USSG §3B1.3, comment (n.1); *United States v. Erhart*, 415 F.3d 965, 972 (8th Cir. 2005).  Corporate officers have been held to be in positions of private trust to persons whom they owe fiduciary duties to in their corporate capacity.  See *United States v. Waldner*, 580 F.3d 699, 707 (8th Cir. 2009); *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir. 1997).[32]

In *Waldner*, the Eighth Circuit affirmed a determination by this Court that the defendant, as the CEO and owner of a bankrupt corporation, abused a position of private trust when he made fraudulent statements during a creditor's meeting. *Waldner*, 580 F.3d at 707.  Although Waldner was both a corporate officer and the owner of the business at issue, the Court of Appeals noted that his status as the owner arguably undermined the significance of his position because "there were no other shareholders to whom he owed fiduciary duties."  Id. at 707 (n.5).  Here, although the victims of defendant's offenses were all creditors, defendant nonetheless "occupied a position of private trust" vis-a-vis Agriprocessors' shareholder.  In addition, as the person interacting with creditors on behalf of Agriprocessors, defendant owed a private

---

[32]The Eighth Circuit has found that other similar fiduciary relationships constitute positions of private trust.  See e.g., *United States v. Fazio*, 487 F.3d 646, 659 (8th Cir. 2007) (realtor-client); *United States v. Gjerde*, 110 F.3d 595, 605 (8th Cir.1997) (bank vice president); *United States v. Anderson*, 349 F.3d 568, 574 (8th Cir. 2003) (investment advisor-client); *United States v. Baker*, 200 F.3d 558, 564 (8th Cir. 2000) (licenced insurance agent-client); *United States v. Morris*, 18 F.3d 562, 568 (8th Cir. 1994) (chief officer of a bank).

duty of trust to those creditors similar to the duty in *Waldner.* As a corporation

approaches insolvency, the fiduciary duties officers and directors normally owe

shareholders extends to creditors.  See *Waldner*, 580 F.3d at 707 ("Waldner abused

the trust of H & W's creditors when he committed fraud at the Section 341 creditor's

meeting"); *In re Tri-River Trading, LLC*, 329 B.R. 252, (B.A.P. 8th Cir.  2005) ("When a

corporation becomes insolvent, 'the fiduciary duty of directors shifts from the

stockholders to the creditors'").

As a corporate officer of Agriprocessors, defendant had the authority and the

ability to act on its behalf to the detriment of others.  In this case, Agriprocessors had an

obligation – a trust agreement with the bank – that defendant abused in his capacity as

a corporate officer.

> Agriprocessors' revolving loan agreement with FBBC provided as follows:
>
> (b)  The Borrowers agree to deposit in a Collateral Account or, at the Lender's option, to deliver to the Lender all collections on Accounts, contract rights, chattel paper and other rights to payment constituting Collateral, and all other proceeds of Collateral, which the Borrowers receive directly, immediately upon receipt thereof, in the form received, except for the applicable Borrower's endorsement when deemed necessary.  Until delivered to the Lender or deposited in a Collateral Account, all proceeds or collections of Collateral shall be held in trust by the applicable Borrower for and as the property of the Lender and shall not be commingled with any funds or property of any Borrower.

(Gov. T Exb. 2000 pp. 30-31 (emphasis added)).  Phil Lykens testified this was an

important provision of the agreement because payments on accounts receivable were

considered the property of the bank.  (Lykens TT 10/20/09 p. 23).  Defendant's

diversion of customer payments was in direct violation of the trust arrangement with

47

FBBC.  Thus, acting on behalf of Agriprocessors, defendant violated an express position of trust with the victim bank.

Similarly, as Agriprocessors approached insolvency, and his fiduciary duties shifted to the bank, he continued to abuse his position by committing fraud.  At the meeting with the bank shortly after the raid, defendant lied about his knowledge of undocumented workers.  As revenue diminished, defendant increased the creation of fraudulent sales.  (Bensasson TT 10/21/09 pp. 131-31).  He continued to divert income — in direct violation of the trust provision of the loan agreement.  And, when he was caught, in October 2008, diverting $1,400,000 in customer payments, he fraudulently assured the bank that was it.  (Lykens TT 10/21/09 pp. 38-39).  While the bank refused to lend him anymore money, it advanced millions more to the trustee not knowing defendant had grossly minimized the extent of the fraud.

Defendant's position of trust at Agriprocessors armed defendant with the authority to commit and conceal an array of offenses, including his offenses of conviction.  Defendant "used that position [of trust] in a manner that significantly facilitated the commission" of his offenses.  *Olson*, 22 F.3d at 786.  Defendant's abuse "contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."  *United States v. Jankowski,* 194 F.3d 878, 884 (8th Cir. 1999).

### B. Defendant Abused His Positions as a Corporate Officer of Kosher Community Grocery and a Corporate Officer of Torah Education

Defendant also abused his positions as a corporate officer of both KCG[33] and TE,[34] in committing his money laundering and other offenses.  Thus, defendant caused approximately $10,000,000 in proceeds of bank fraud to be run through bank accounts of both entities opened on his authority.  In the case of the TE account, defendant abused his position as a corporate officer of a non-profit educational institution to create a secret bank account for his illicit use.  The TE account used by defendant was unknown to even TE's accountant, Christina Drahos.  (See Drahos TT 10/26/09 pp. 136-37).

### C. The Assessment of Two Levels for Abuse of a Position of Trust Does not Constitute Impermissible Double Counting

Accessing the defendant two additional levels for abuse of position of trust would not be double counting because his abuse of trust or skill is not included in the base offense level or other specific offense characteristics.  The abuse of position of trust adjustment "may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."  USSG § 3B1.3.  Courts have nearly universally held that fraud and false statement offenses do not include abuses of trust

---

[33]See Gov. T Exb. 2085 (KCG account agreement listing defendant as "President, Signer & Secretary" of KCG).

[34]See Gov. T Exb. 2086 (TE signature card and depositor agreement listing defendant as an "Authorized Signer"); Gov. S Exb. 5501 (TE Minutes of Special Board Meeting "ratify[ing] and confirm[ing] defendant as the sole officer of the corporation acting as President, Secretary and Treasurer").

or skill in the base level offense.  See e.g., *Bhagavan*, 116 F.3d at 193; *United States v. Buck*, 324 F.3d 786, 793 (5th Cir. 2003); *United States v. Liss*, 265 F.3d 1220, 1229-30 (11th Cir. 2001); *United States v. Hussey*, 254 F.3d 428, 431-33 (2nd Cir. 2001); but see, *United States v. Broderson*, 67 F.3d 452, 456 (2nd Cir. 1995).  While the Eighth Circuit has not specifically held that fraud or misrepresentation offenses do not include within their base offense level abuses of trust or skill, it has upheld a number of adjustments under  §3B1.3 for such offenses.  See e.g., *Morris*, 18 F.3d 562, 568 (bank fraud); *Baker*, 200 F.3d at 564 (mail fraud and making false statement to the government); *Gjerde*, 110 F.3d at 605 (federal agency fraud).  An offense incorporates an abuse of trust within the base offense only when the misrepresentation is not independently criminal without the abuse of the position of trust.  *Broderson*,  67 F.3d at 456.

Therefore, the U.S. Probation Office properly found defendant abused a position of trust and a two-level enhancement should be imposed under 3B1.3.

## VIII.   OBSTRUCTION OF JUSTICE

For all of the reasons set forth in PSR ¶¶ 321-327, defendant obstructed justice with regard to his section 2B1.1 offenses and his money laundering offenses scored under section 2S1.1.

When a defendant (1) "willfully obstruct[s] or impede[s] . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense" and (2) "the obstructive conduct is related to the defendant's offense of conviction" his offense level should be increased two-levels.  USSG § 3C1.1.  Under

this section, "a defendant is accountable for his own conduct and for conduct that he

aided or abetted, counseled, commanded, induced, procured, or wilfully caused."

USSG §3C1.1, comment (n.9).

  A. <u>Defendant Committed Perjury</u>

  Application Note 4 to USSG § 3C1.1 sets forth a non-exhaustive list of conduct

which qualifies as obstruction of justice.  Included in the list is "committing, suborning,

or attempting to suborn perjury."  "Lying under oath certainly impedes the

administration of justice during the prosecution of a case." *United States v. Has No*

*Horse*, 42 F.3d 1158, 1159 (8th Cir. 1994).  A witness commits perjury "if [he] gives

false testimony concerning a material matter with the willful intent to provide false

testimony, rather than as a result of confusion, mistake, or faulty memory." *United*

*States v. Taylor*, 207 F.3d 452, 454-55 (8th Cir. 2000) (quoting *United States v.*

*Dunnigan*, 507 U.S. 87, 94 (1993)).  Where a defendant falsely denies under oath that

he engaged in criminal conduct, the adjustment is properly imposed. <u>See, e.g.</u>, *United*

*States v. Brown*, 311 F.3d 886, 889-90 (8th Cir. 2002) (false denials of knowledge and

of material aspects of key prosecution witness testimony); *United States v. Titlbach*,

300 F.3d 919, 923-24 (8th Cir. 2002) (false denials of "involvement in the

methamphetamine manufacturing activities that other witnesses said she participated

in"); *United States v Berndt*, 86 F.3d 803, 810 (8th Cir. 1996) (adjustment based upon

defendant's false claim of any knowledge of odometer fraud of which he was

convicted).

51

Defendant's false testimony at trial included, but was not limited to: (1) claiming he never asked Darlis Hendry to create bills-of-lading to go with the false invoices (Defendant TT 11/5/09 p. 120); and (2) claiming he did not ask April Hamilton to add "round-up" checks to the deposits containing diverted customer checks (Defendant TT 11/5/09 p. 123). Defendant's testimony regarding bills-of-lading was contradicted by Hendry's testimony that defendant asked her to create bills of lading to back up the invoices. (Hendry TT 10/15/09 pp. 21-23). The fact that there were fake invoices and bills of lading in Judy Meyer's "blue folder" (Gov. Ex. 2096) – the folder being labeled "Sholom" – supports Hendry's version of the facts.[35] Indeed, other than defendant's false testimony, there was no evidence at trial that anyone other than defendant was responsible for the fake bills of lading. Defendant's claim that he never asked Hamilton to add round-up checks to deposits of diverted customer payments was contradicted by Hamilton's testimony. (Hamilton TT 10/22/09 pp. 48-49). As with bills of lading, other than defendant's false testimony, there was no evidence that anyone other than defendant directed Hamilton to divert customer payments and add round-up checks. With regard to both the bills of lading and the round-up checks, as implausible as defendant's denial appears, defendant had a strong incentive to make the denials anyway. There is simply no innocent explanation for either the bills of lading or the round-up checks.

---

[35]Heather Bissell testified she created fake bills of lading for Judy Meyer and Meyer would sign a truck driver's name to the documents. (Bissell TT 10/29/09 pp. 103-105).

At defendant's November 18, 2009, detention hearing, defendant's false
testimony included, but was not limited to, his claim that he had approximately 86
employees placed on the Hunt payroll in the Fall of 2007 for purely religious purposes
and not because he knew they had bad documents.  (Defendant's DHT pp. 37-38).
Defendant's testimony was contradicted by the trial testimony of Laura Althouse as well
as Billmeyer's "confused and befuddled" e-mail (Gov. Ex. 1108).  The fact that Hunt
payroll was originally established for religious reasons did not support defendant's
testimony.

The Court should reject defendant's baseless claim that his testimony
"constituted a good faith recollection of complicated events, and was neither directed to
a material issue or knowingly false."  (Defendant's Objections p. 21).  These were
bold-faced lies by defendant regarding matters that were simply too incriminating for
him to admit.  They were material in that they went to the heart of defendant's
involvement in the crimes charged.  <u>See</u> <u>United States v. Cox</u>, 985 F.2d 427, 432 (8th
Cir. 1993) ("there may be situations in which the materiality of false testimony is virtually
self-evident – for example, when a defendant gives false testimony during his or her
own trial").

B.     <u>Defendant Concealed and Destroyed Evidence</u>

Application Note 4 also lists "destroying or concealing or directing or procuring
another person to destroy or conceal evidence that is material to an official investigation
or judicial proceeding (<u>e.g.</u>, shredding a document or destroying ledgers upon learning

53

that an official investigation has commenced or is about to commence . . . " USSG

§3C1.1, comment (n.4(d)).  To be subject to an enhancement under USSG § 3C1.1,

"[A] defendant must have "willfully" obstructed justice, which requires that he knew that

he was under investigation or had "'a correct belief that an investigation [was] probably

underway. "'  *Brown v. United States*. 169 F.3d 531, 536 (8th Cir. 1999) (quoting *United*

*States v. Oppedahl*, 998 F.2d 584, 586 (8th Cir. 1993)).

Here, defendant was aware he was under investigation at least as early as the

May 12, 2008, immigration raid.[36]  As established at trial, in an attempt to conceal his

offenses, defendant gathered up and either hid or destroyed (1) the hard copies of the

fake invoices and fake bills of lading created by Darlis Hendry, (2) the hard copies of

customer checks diverted by Hamilton, (3) Hamilton's thumb drive containing a

spreadsheet of diverted customer payments, and (4) the customer statements which

were inconsistent with the APGEN figures sent to the bank.  He also, (5) directed April

Hamilton to destroy evidence in APGEN of the mis-dated payments.[37]  In addition,

---

[36]In addition, soon after the raid, defendant received two target letters from the government and was subpoenaed to the grand jury to submit to a photograph. See Gov. S Exb. 5502 (May 20, 2008, target letter notifying defendant he was a target of an investigation involving alien harboring and related offenses including "money laundering" (previously in the record as November 18, 2009, detention hearing Exhibit 6561 p. 3)) and Gov. S. Exb. 5503 (May 21, 2008, target letter notifying defendant he was a target of an investigation involving bank fraud and related offenses including "money laundering" (previously in the record as November 18, 2009, detention hearing Exhibit 6561 p. 5)).

[37]At trial, Hamilton testified that defendant asked her for the thumb drive and related documents, and asked her to delete the APGEN evidence, around the time he went to court.  (Hamilton TT 10/22/09 pp. 88-90).  Torson testified defendant had her shred the customer statements the day after a search warrant was executed at Agriprocessors.

around the time of the raid, defendant gathered from Althouse the immigration forms I-9

for the employees with the obviously fake identification documents whom he had placed

on the Hunt payroll.  (Althouse TT 10/28/09 p. 65).  Those forms were never seen

again.

All of this conduct was intended to obstruct or impede the government's

investigation, and falls within the application of section 3C1.1.

C.    Defendant Interfered with Material Witnesses

Defendant also "unlawfully influenced . . . co-defendant[s] [and] witness[es] . . .

or attempt[ed] to do so."  USSG § 3C1.1, comment (n.4(a)).

> [T]he obstruction of justice enhancement is designed "not just to prevent
> miscarriages of justice but also to reduce the burden on the justice system."
> *United States v. Buckley*, 192 F.3d 708, 710 (7th Cir.1999). The enhancement
> thus covers not only threats or intimidation but also "otherwise unlawfully
> influencing" a witness. *United States v. Johnson*, 46 F.3d 636, 638 (7th Cir.1995).
> This circuit has previously held that "unlawfully influencing" a witness means
> intentionally engaging in conduct "having a natural tendency to suppress or
> interfere with the discovery of truth." [*United States v. Wright*, 37 F.3d 358, 362
> (7th Cir.1994)].

*United States v. House*, 551 F.3d 694, 699 (7th Cir. 2008).

On approximately May 29, 2008, defendant's company credit card was used to

buy one-way airline tickets to Israel for Shlomo Ben Chaim, the employee who certified

the I-9s for the undocumented aliens placed on the separate payroll.  (Gov. S Exb.

_____

(Torson TT 10/22/09 pp. 30-31).   In the Court's January 28, 2009, Order granting
defendant's appeal of Magistrate Judge Scoles' order of detention, the Court found "there
is probable cause to believe Defendant committed a federal crime, Bank Fraud, while on
pretrial release."  (Document #199, p. 16).

5504).  The card was used to purchase tickets for seven of Ben Chaims's family members as well.  (Id.).  Ben Chaim and his family then fled to Israel, where they remain.  (Gov. S Exb. 5505).  Defendant also took over Ben Chaim's real property in Iowa.  (Fischels DHT pp. 105-108).

Also in late May 2008, defendant became aware Agriprocessors manager and coconspirator Hosam Amara was a target of the government's criminal investigation into alien harboring.  On June 3, 2008, defendant gave Amara $4,000 for airline tickets and told him it would be better if he just left and forgot about what had happened at Agriprocessors.  (Fischels DHT pp. 96-103; Gov. T Exbs. 1302, 1303 and 1304; Gov. S Exbs. 5506 (transcript of March 5, 2009, recorded conversation with Amara); Gov. S Exb. 5507 (transcript of March 10, 2009, recorded conversation with Amara).  Amara then fled to Israel, where he remains pending extradition.  (Fischels DHT pp. 103-104; Gov. S. Exb. 5508).[38]

As defendant became aware that Agriprocessors employees were identified as targets and potential cooperators in the government's alien harboring investigation, defendant promised those targets to continue to pay their salaries during any time they spent in prison.  Defendant directed Agriprocessors human resources assistant and defendant's coconspirator Laura Althouse to draft "employee status forms" for her, human resources manager and defendant's coconspirator Elizabeth Billmeyer, and

---

[38]Gov. S Exbs. 5504-5508 were previously admitted into the record at defendant's November 18, 2009, detention hearing as government exhibits 1319, 1300, 6, 7 and 1301, respectively.

operations manager and alleged coconspirator Brent Beebe.  The forms each set forth

an annual salary and included a blank space where the years in prison was to be filled

in once it was known.  (Althouse TT 10/28/09 pp. 34-38; Gov. T Exbs.1314 (Billmeyer

form); 1315 (Beebe form); 1316 (Althouse form)).  Defendant used his brother's

signature stamp to "sign" the forms in a vain attempt to distance himself from this

obstructive conduct.

All of the above steps were taken by defendant at a time when defendant knew

he was being investigated for a host of criminal activity, and were intended to "interfere

with the discovery of the truth." *Wright*, 37 F.3d at 362.

D.    Obstruction of Justice Regarding Money Laundering

Defendant's efforts to obstruct justice included the obstruction (and attempted

obstruction) of the government's money laundering investigation.  As noted above,

shortly before and after a records search at Agriprocessors, defendant gathered up and

either hid or destroyed key financial documents that would have constituted clearly

incriminating evidence of money laundering.  These included the hard copies of

diverted customer checks, the thumb drive containing a spreadsheet of diverted

customer payments, and customer statements showing customer payments that had

been omitted from APGEN and the reports to the bank.  Had the government obtained

these items, it could have compared the dollar amounts of the diverted payments and,

by comparison to the dollar amounts of the Chax checks to Kosher and Torah, learned

that the amounts of the checks from Kosher and Torah were clearly manipulated with

intent to deceive. Thus, the missing records would have constituted damaging evidence that money had been flowing through Kosher Community Grocery and Torah Education for the purpose of concealing unlawful activity.

In addition, by testifying falsely at trial that he did not direct April Hamilton to add round-up checks to the deposits containing diverted payments, defendant attempted to obstruct justice with regard to money laundering. Although the money laundering counts of conviction were specifically based upon Chax checks from Kosher and Torah, the round-up checks were nonetheless part of the scheme to conceal the source of the laundered funds. Thus, the fact that, at the time of the diversion, defendant manipulated the deposits to conceal the source of the funds, was directly relevant to the money laundering counts of conviction. Defendant's false testimony obstructed justice with regard to the prosecution of those counts.

For the above reasons, the U.S. Probation Office properly scored two-level enhancements for obstruction of justice regarding defendant's USSG § 2B1.1 offenses and his money laundering offenses scored under USSG § 2S1.1.

## IX. MONEY LAUNDERING

Defendant's sole challenge to the application of the money laundering guideline (USSG § 2S1.1) is premised upon his legal challenges to money laundering counts of conviction themselves. (See Defendant's Objections p. 27). For the same reasons urged by the government in resistance to defendant's arguments, and for the additional reasons set forth in the Court's March 1, 2010, Order regarding defendant's motions for

judgment of acquittal and new trial (document #854), the money laundering guideline properly applies.

## X.    SOPHISTICATED LAUNDERING

Under USSG § 2S1.1(b)(3), a two level enhancement applies "[i]f (A) subsection (b)(2)(B) applies; and (B) the offense involved sophisticated laundering . . .."  Because defendant was "convicted under 18 U.S.C. § 1956," subsection (b)(2)(B) applies. Because defendant's offense involved sophisticated laundering, the U.S. Probation Office properly scored a two level enhancement.  (See PSR ¶ 347).

Application Note 5(A) discusses the applicability of the sophisticated laundering enhancement.

(A)    *Sophisticated Laundering under Subsection (b)(3). – For purposes of subsection (b)(3), "sophisticated laundering" means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense.*

*Sophisticated laundering typically involves the use of –*

(i)     *fictitious entities;*

(ii)    *shell corporations;*

(iii)   *two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or*

(iv)    *offshore financial accounts.*

(B)    *Non-Applicability of Enhancement. – If subsection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the*

> basis for application of subsection (b)(3) of this guideline, do not apply
> subsection (b)(3) of this guideline.

USSG § 2S1.1, comment (n.5).

Here, defendant's money laundering offenses were sufficiently sophisticated to warrant an enhancement. The goal of the money laundering offenses was to pay down the revolving loan in a manner that made the funds look like they were coming directly from customers. Defendant could have committed money laundering by simply writing checks from Agriprocessors' accounts in random amounts and depositing them into the depository account. He did more than that. In his offenses of conviction, defendant ran the money through the accounts of straw customers – KCG and TE. Thus, while the entities were not "fictitious," they functioned as "shell corporations" for the purpose of defendant's money laundering scheme. Particularly with regard to Torah Education, defendant managed to run the money through a bank account that TE's accountant did not even know existed. (See Gov. T Exbs. 2101 and 2102; Drahos TT 10/26/09 pp. 136-37). Defendant's use of a dedicated, secret bank account in the name of TE was sophisticated to a comparable degree as the use of shell or fictitious entities.

Defendant's use of actual business entities as straw customers was actually more sophisticated than if he had used truly fictitious or shell corporations. Defendant's use of actual businesses allowed defendant to better hide his money laundering offenses and conceal the proceeds of his crimes. The actual business conducted KCG and TE provided additional cover for defendant's money laundering.

60

Similarly, the deposits of the Chax checks from KCG and TE were accompanied by other transactions designed to do nothing more than aid in the laundering of the funds.  Thus, defendant's money laundering offenses "two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate."  USSG §2S1.1, comment (n.5(A)(iii)). First, defendant added round-up checks to each batch of deposited diverted customer checks in order to make the deposits "look legitimate."  (See Gov. T Exb. 2011).  At times, these additions to the deposits were only a few dollars and cents - "intricate" transactions when compared to the tens of millions of dollars that defendant laundered. Second, when accounts were about to go ineligible and needed to be paid down, defendant caused Chax checks to be deposited into the depository account – cut in random amounts to make the deposits "look legitimate."  Third, when back-filling the KCG or TE accounts with Agriprocessors checks, rather than write a large check in an even dollar amount, defendant asked accounts payable clerk Debbie Preuser to break the checks into smaller, seemingly random amounts to make them "look legitimate." (See Preuser TT; Gov. T Exb. 2021 pp. 6-7).  All told, defendant manipulated bank transactions at three separate levels – each in a manner to make the transactions look legitimate.

The Eighth Circuit has determined "[u]nder the plain language of § 2S1.1, layering constitutes sophisticated laundering. ... The guideline does not require a finding that each layer was composed of a complex transaction." *United States v. Pizano*, 421

F.3d 707, 731 (8th Cir. 2005); accord *United States v. Miles*, 360 F.3d 472, 482 (5th Cir.

2004) ("When an individual attempts to launder money through 'two or more levels of

transactions,' the commentary clearly subjects an individual to the sophisticated

laundering enhancement").  For these reasons, defendant's money laundering

transactions were sufficiently sophisticated and a two-level enhancement is appropriate

under USSG § 2S1.1(b)(3).

## XI.    SUMMARY OF ADVISORY GUIDELINE RANGE

In accordance with the above, defendant's objections to the U.S. Probation

Office's scoring of the U.S. Sentencing Guidelines should be overruled, and

defendant's guideline sentence should be calculated as follows:

**Bank Fraud, False Statements, Wire Fraud, Mail Fraud and Packers Act Counts**

A.    Pursuant to USSG §2B1.1(a)(1), defendant's base offense level is 7.

B.    Pursuant to USSG §2B1.1(b)(1)(L), an enhancement of 22 levels should apply based upon a loss of more than $20,000,000.

C.    Pursuant to USSG §2B1.1(b)(2)(A), a 2-level upward adjustment applies based upon the offense involving 10 or more victims.

D.    Pursuant to USSG §2B1.1(b)(9)(C), a 2-level upward adjustment applies based upon the offense involving sophisticated means.

E.    Pursuant to USSG §3B1.1(b), a 4-level upward adjustment should be applied based upon defendant's role as a organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

F.    Pursuant to USSG §3B1.3, a 2-level upward adjustment should be applied based upon defendant abusing a position of trust in a manner that significantly facilitated the commission or concealment of the offense.

G. Pursuant to USSG §3C1.1, a 2-level upward adjustment should be applied based upon defendant's obstruction of justice and attempts to obstruct justice.

**Money Laundering Counts**

A. Pursuant to USSG §2S1.1(a)(1), defendant's base offense level is 33.

B. Pursuant to USSG §2S1.1(b)(2)(b), a 2-level upward adjustment applies based upon defendant's convictions under 18 U.S.C. § 1956.

C. Pursuant to USSG §2S1.1(b)(3), a 2-level upward adjustment applies based upon the offense involving sophisticated laundering.

D. Pursuant to USSG §3B1.1(b), a 4-level upward adjustment should be applied based upon defendant's role as a organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

E. Pursuant to USSG §3B1.3, a 2-level upward adjustment should be applied based upon defendant abusing a position of trust in a manner that significantly facilitated the commission or concealment of the offense.

F. Pursuant to USSG §3C1.1, a 2-level upward adjustment should be applied based upon defendant's obstruction of justice and attempts to obstruct justice.

## XII.  A GUIDELINE SENTENCE IS WARRANTED

As noted above, the government asks that defendant be treated no differently than other defendants sentenced by the Court.  Defendant should be sentenced consistent with the advisory guideline range calculated by the U.S. Probation Office unless compelling grounds for a variance are shown.  Although the government anticipates a separately filed motion for variance by defendant, the government responds as follows to the *Kimbrough* set forth in defendant's objections.

A.     The Court Should Reject Defendant's *Kimbrough* Challenge to the Loss
       Table

Defendant argues "the loss table overstates the seriousness of the offense."

(Defendant's Objections at 31).  Defendant asserts the "loss table is irrational and

unsupported by empirical evidence."  Id.  Citing *Kimbrough v. United States*, 552 U.S.

85 (2008), defendant asserts a sentence consistent with the loss table would result in a

sentence inconsistent with 18 U.S.C. § 3553(a).  Defendant is wrong.  The loss table

was based on empirical evidence and as a result of Congressional directives.  A

variance from the guideline sentence here would be inconsistent with the holding in

*Kimbrough*.  Finally, even if the Court had the authority to vary downward under a

*Kimbrough* theory, it should not do so in this case.

Pre-guidelines, "[m]ost judges believe[d] that the suffering experience by a white-

collar person as a result of apprehension, public indictment, and conviction as well as

the collateral disabilities incident to each – loss of job, revocation of a professional

license, diminishment of status in the community – [was] itself a kind of punishment."

Wheeler, Mann, and Sarat, *Sitting in Judgment: The Sentencing of White collar*

*Criminals*, at 144-45 (1988).  Congress, and the Federal Sentencing Guidelines

Commission, disagreed.

"Congress viewed deterrence as 'particularly important in the area of white collar

crime.'"  *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989) (citing S.Rep. No.98-

225, at 76 (1983)).  "Congress was especially concerned that prior to the Sentencing

Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little

or no imprisonment." Id. The Senate Report on the Sentencing Reform Act "gave specific examples of areas in which the prevailing sentences might be too lenient, including the treatment of major white-collar criminals." Id. Accord, *United States v. Ebbers*, 458 F.3d 110, 129 (2nd Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes . . .." ); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses.").

In conducting its empirical analysis, the Federal Sentencing Guidelines Commission found a significant discrepancy in the way in which white-collar versus blue-collar criminals were treated.

> The commission found in its data significant discrepancies between the pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.

Breyer, *The Federal Sentencing Guidelines and the Key Compromises on Which They Rest*, 17 Hofstra L. Rev. 1, 19 (1988).

Although the commission found the sentences for white-collar crime significantly more lenient, its "'[e]mpirical analysis of pre-guidelines practice'" showed that loss amount was one of the two most important factors that determined sentence length. See, e.g., *United States v. Hoffecker*, 530 F.3d 137, 200-201 (3rd Cir. 2008) (quoting background comment to USSG §2F1.1); *United States v. Achiekwelu*, 112 F.3d 747,

65

757 (4th Cir. 1997) (same); *United States v. Akindele*, 84 F.3d 948, 953-54 (7th Cir.

1996) (same); *United States v. Alpert*, 28 F.3d 1104, 1109 (11th Cir. 1994) (same);

*United States v. Gregorio*, 956 F.2d 341, 347 (1st Cir. 1992); *United States v. Benskin*,

926 F.2d 562, 566 (6th Cir. 1991) (same). To reflect the empirical findings that loss

amount was a key determinant of pre-guideline sentencing, the Commission created a

"dollar loss table that substitutes an objective and quantifiable measure of loss in place

of a district court's subjective determinations." *Alpert*, 28 F.3d at 1109. Over the years

since adoption of the Guidelines, the Commission has periodically adjusted the loss

table based on direction from Congress. See, e.g., USSG App. C. amends 596

(amending USSG §2B1.1 in response to directive in Pub. L. 105-318 and 105-172); 637

(amending USSG §2B1.1 in response to directive in the USA Patriot Act, Pub. L. 107-

56); 647 (amending USSG §2B1.1 in response to directive in the Sarbanes-Oxley Act of

2002, Pub. L. 107-204); 653 (same); 654 (amending USSG §2B1.1 in response to

directive in the Homeland Security Act of 2002, Pub. L. 107-296); 655 (amending

USSG §2B1.1 in response to directive in *inter alia* the USA Patriot Act, Pub. L. 107-56);

665 (amending USSG §2B1.1 in response to directive in Pub. L. 108-29).

In *Kimbrough* and *Spears v. United States*, --- U.S. ----, 129 S. Ct. 840 (2009),

the Supreme Court established that district courts' disagreements with, and variance

from, the crack cocaine guidelines on pure policy grounds were "not suspect" on

appellate review because the crack cocaine guidelines did "not exemplify the

Commission's exercise of its characteristic institutional role" in establishing guidelines

66

based on empirical study. *Spears*, --- U.S. ----, 129 S. Ct. at 842-43. Where, however, the guidelines are based on such empirical study, they are due greater deference. *Kimbrough*, 552 U.S. at 107-108. Moreover, the language of *Kimbrough* suggests where the guidelines were promulgated in response to Congressional directive, district court's have less discretion to vary. *Kimbrough*, 552 U.S. at 102-103 (finding no "implicit directive" by Congress regarding the crack guidelines in the 1986 Anti-Drug Abuse Act).

Defendant's argument that the loss guidelines lack empirical support, similar to the crack cocaine guidelines, is wrong. (Defendant's Objections p. 31). As explained above, the loss guidelines were the result of empirical study by the Commission, reflective of the exercise of its "characteristic institutional role." As such, they may not be lightly swept aside, to be substituted with a district court's subjective determination. Moreover, the loss guidelines have been adjusted in response to Congressional directives. Accordingly, unlike the crack cocaine guidelines, the loss guidelines are due greater deference.

Defendant argues the loss guidelines are "irrational." (Defendant's Objections, at 31). Again, defendant is wrong. Unlike drug quantity, loss amount was found by the Commission's empirical study to be one the primary basis upon which pre-Guideline sentences were determined. There is rational reason for this. There is a logical tie between the amount of loss suffered by a victim in a white-collar case, and the criminal culpability of the defendant. Drug quantity, in contrast, has a more attenuated

connection to a victim's suffering.  Nor is drug quantity as logically tied to the scope of

the criminal conduct, particularly where, as with crack cocaine, the offense levels for

drug quantity differed so dramatically based on drug type.  The amount of loss suffered

by a victim as a result of a fraud bears a realistic and logical relationship to the scope of

a defendant's criminal conduct.

Regardless, it is abundantly clear the *Kimbrough* does "not hold that a district

court must disagree with any sentencing guideline, whether it reflects a policy judgment

of Congress or the Commission's 'characteristic' empirical approach."  *United States v.

O'Connor*, 567 F.3d 395, 398 (8th Cir. 2009) (citing *United States v. Barron*, 557 F.3d

866, 871 (8th Cir. 2009), and *United States v. Battiest*, 553 F.3d 1132, 1136-37 (8th Cir.

2009).  Thus, assuming the Court has the authority to vary from the Guidelines under a

*Kimbrough* theory, it should not do so here.  The loss amount in this case accurately

reflects the scope of defendant's criminal culpability.  The loss suffered here was not

the result of an arbitrary calculation or an accidental event, but, rather, the direct result

of years of systemic falsification of invoices, the diversion of funds, the laundering of

proceeds, and obfuscation by fabrication of false financial statements and reports.

Therefore, even if the Court has the authority to vary from the loss guidelines, it should

not do so in this case because the loss guidelines accurately reflects the extent and

nature of defendant's criminal culpability.

B.    <u>Grounds for an Upward Departure</u>

      In the event the Court calculates the advisory guidelines in substantially the same manner as done so by the U.S. Probation Office and urged by the government, the government anticipates no upward departure would be necessary to achieve an adequate sentence in this matter.  However, it bears noting there are several grounds which would justify an upward departure in this case.  These would include a departure for extraordinary obstruction of justice not adequately taken into account by the guidelines (<u>see</u> §5K2.0(a)(3)), and a departure for criminal conduct which did not enter into the determination of the guideline range (<u>see</u> §5K2.21).

1.    <u>Extraordinary Obstruction of Justice</u>

USSG §5K2.0(a)(3) provides:

DEPARTURES BASED ON CIRCUMSTANCES PRESENT TO A DEGREE NOT ADEQUATELY TAKEN INTO CONSIDERATION. – A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

In this case, defendant repeatedly obstructed justice.  Yet the guidelines only allow for a single, two-level enhancement based upon a single instance of obstruction.  Thus, defendant's obstructive conduct was "present in the offense to a degree substantially in excess of" the norm and should otherwise be taken into account at sentencing.  Indeed, defendant had already earned an obstruction of justice enhancement well before taking the stand and giving false testimony at trial.  His obstruction actually began long before

69

his arrest.  Some additional sanction would seem appropriate to punish defendant for

his relentless obstructive behavior.[39]

### 2. Other Criminal Conduct

With regard to criminal conduct which did not enter into the determination of the

guideline range, section 5K2.21 states:

> The court may depart upward to reflect the actual seriousness of the offense
> based on conduct (1) underlying a charge dismissed as part of a plea agreement
> in the case, or underlying a potential charge not pursued in the case as part of a
> plea agreement or for any other reason; and (2) that did not enter into the
> determination of the applicable guideline range.

USSG § 2K2.21.  Here, the record establishes defendant committed an unprecedented

amount of criminal conduct which has not entered into the determination of the advisory

guidelines.  For example, defendant led one of the most extensive alien harboring

conspiracies in the history of the Northern District of Iowa.  Defendant financed an effort

to obtain fake resident alien cards for dozens of illegal workers.  Defendant regularly

paid employees in cash and under the table.  And defendant made illicit cash payments

to the former mayor of Postville.[40]  While the guidelines certainly call for a lengthy

---

[39]In a similar sense, the Court should consider the jury's findings that defendant
committed bank fraud four different ways – and one of which would have supported his
convictions.

[40]Defendant boldly asserts in his objections that, "[w]hile defendant does not deny
that he loaned [the former mayor] money, he believed initially the loans were made in good
faith and were legitimate.  Later, [the mayor] extorted additional 'loans' from
Agriprocessors."  (Defendant's Objections p. 24).  Based upon defendant's objections,
there does not appear to be any dispute that these so-called "loans" (which were never
repaid) were not legitimate.  While defendant characterizes the payments as extortion, they
were, regardless, improper payments to a local government official – payments defendant

70

sentence, this case is extraordinary in view of the amount of criminal conduct not taken into account.  The Court should consider these extraordinary circumstances in fashioning an appropriate sentence.

## XIII.   FINE

The PSR at ¶¶ 398 to 406 calculates the guideline fine range for the defendant as between $25,000 and $366,349,686.  The advisory guidelines require imposition of a fine in all cases unless "defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  USSG §5E1.2(a); see also United States v. Berndt, 86 F.3d 803, 808 (8th Cir. 1996) ("The defendant has the burden of proving that he cannot pay the fine.").  Section 5E1.2, lists the following eight factors for the Court to evaluate in assessing a fine:

(1)    the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant) to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2)    any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3)    the burden that the fine places on the defendant and his dependants relative to alternative punishments;

(4)    any restitution or reparation that the defendant has made or is obligated to make;

---

never reported to law enforcement.   Whether characterized as extortion or bribes, defendant made the payments to curry favor with an elected public official.  The payments constitute yet one more example of the depth of defendant's corrupt business practices.

71

(5)     any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

(6)     whether the defendant previously had been fined for a similar offense;

(7)     the expected costs to the government of any term of probation, or term of imprisonment, and term of supervised release imposed; and

(8)     any other pertinent equitable considerations.

The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive.  USSG §5E1.2.

At the sentencing hearing, as discussed below, the United States will request a restitution obligation in excess of $20,000,000.  In addition, the United States will request that the restitution obligation be made due and payable immediately as defendant has failed to disclose any financial information which would demonstrate he does not have the ability to pay the full amount immediately.  If the Court were to only order a portion of the amount due and payable immediately, the government would request that it be allowed to pursue all other reasonable means pursuant to 18 U.S.C. § 3664(m)(1)(A) to collect the entire restitution amount.  Assuming the Court orders the requested restitution obligation, then the government acknowledges the restitution order may impact what fine amount the Court may choose to impose.  However, since defendant refuses to provide financial information and has otherwise failed to meet his burden of demonstrating that he cannot pay a fine, a fine should be imposed.

## XIV.   RESTITUTION

Pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii), restitution in this case is mandatory.

The total amount of restitution to the victim banks[41] should be $26,919,419.  The

restitution should be apportioned between FBBC and MBFB according to their

respective positions with regard to the loan (69% for First Bank and 31% for MB

Financial).   Accordingly, the total restitution to First Bank would be $18,574,399, and

the total restitution to MB Financial would be $8,345,020.

Defendant contends MBFB is not a victim under 18 U.S.C. § 3663A as

Agriprocessors was not in privity of contract with MBFB and did not borrow money

directly from MBFB.  Defendant's argument fails.

This Court has wide discretion in ordering restitution.  *United States v. Ross*, 210

F.3d 916, 923-24 (8th Cir. 2000).  Section 3663A(a)(2) defines a victim as:

> a person directly and proximately harmed as a result of the commission of an
> offense for which restitution may be ordered including, in the case of an offense
> that involves as a element a scheme, conspiracy or patter of criminal activity, any
> person directly harmed by the defendant's criminal conduct in the course of the
> scheme, conspiracy, or pattern.

In this case, MBFB was directly and proximately harmed by defendant's fraud in

excess of $8,000,000.  Defendant was aware that MBFB was a participant in the loan

and even made false statements to MBFB as part of his offense conduct.  Phil Lykens

testified that a representative of MBFB was present when defendant made the

---

[41]In addition, the government will be seeking restitution for Waverly Sales, Inc. in the
amount of $3,800.51, and for any other Packer's Act victim who submits an allowable
claim.

statements leading to his conviction on Count 101 of the Indictment.  (Lykens TT

10/20/09 p. 54; see also Gov. T Exb. 2000 p. 44 (discussion of participants at section

9.9 of the loan agreement)).

Because MBFB was directly and proximately harmed by defendant's crimes,

defendant's objection should be overruled, and defendant should be ordered to pay

restitution directly to MBFB.  Alternatively, MBFB's portion of the restitution should be

order payable to FBBC for distribution to MBFB.

## XV.    CONCLUSION

For the above reasons, defendant should be sentenced consistent with the

recommendations of the U.S. Probation Department and any additional record made by

the government at sentencing.

Respectfully Submitted,

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on April 9, 2010.

UNITED STATES ATTORNEY

BY:   s/S. Van Weelden

COPIES TO: Counsel of Record

STEPHANIE M. ROSE
United States Attorney

By: s/ PETER E. DEEGAN, JR.

PETER E. DEEGAN, JR.
Assistant United States Attorney
401 1st Street SE, Suite 400
Cedar Rapids, Iowa 52401
319-363-6333; 319-363-1990 (Fax)
Peter.deegan@usdoj.gov