**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

SHOLOM RUBASHKIN,

        Defendant.

No. 08-CR-1324-LRR

**SENTENCING MEMORANDUM**

---

*TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.     **RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . **3**

III.    **SENTENCING FRAMEWORK** . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

IV.    **EVIDENTIARY RULES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

V.     **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
       *A.*    *Defendant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
       *B.*    *Loan Agreement.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
       *C.*    *Sale of Portion of Interest in Credit Agreement.* . . . . . . . . . . . . . . . **9**
       *D.*    *Harboring Undocumented Workers.* . . . . . . . . . . . . . . . . . . . . **10**
           *1.*    *Hunt Payroll scheme.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
           *2.*    *Facts leading up to enforcement action.* . . . . . . . . . . . . . . **11**
       *E.*    *Agriprocessors and Defendant Defraud FBBC* . . . . . . . . . . . . . . **12**
           *1.*    *Falsely represented Agriprocessors was in compliance with*
               *all laws* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
           *2.*    *Falsified collateral certificates* . . . . . . . . . . . . . . . . . . . . **12**
           *3.*    *Diversion of customer payments* . . . . . . . . . . . . . . . . . . . **13**
           *4.*    *Illegal financial transactions* . . . . . . . . . . . . . . . . . . . . **13**
           *5.*    *Packers Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
       *F.*    *FBBC Suffers Monetary Loss Due to Defendant's Fraud* . . . . . . . . **15**
       *G.*    *Mordechai Korf Offers to Purchase FBBC's Interest* . . . . . . . . . . **17**

VI.    **ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

VII.   **CHAPTER TWO: SPECIFIC OFFENSE CHARACTERISTICS** . . . . . . . **19**

A.     Bank Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     1.     Amount of Loss: §2B1.1(b) . . . . . . . . . . . . . . . . . . . . . 20
        a.     Amount of loss: victim banks . . . . . . . . . . . . . . . 21
           i.     Foreseeability . . . . . . . . . . . . . . . . . . . . . 23
           ii.     Intervening cause . . . . . . . . . . . . . . . . . . . 24
           iii.     Defendant's calculation of actual loss . . . . . . 26
        b.     Losses suffered by livestock suppliers . . . . . . . . . . 26
        c.     Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     2.     Number of victims: USSG §2B1.1(b)(1)(A)(i) . . . . . . . . . . 28
     3.     Sophisticated means: USSG §2B1.1(b)(9)(c) . . . . . . . . . . 29
        a.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        b.     Application . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     4.     Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
B.     Money Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     1.     Sophisticated laundering: USSG §2S1.1(b)(3) . . . . . . . . . . 32
        a.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        b.     Application . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     2.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VIII.     CHAPTER THREE ADJUSTMENTS . . . . . . . . . . . . . . . . . . . 34
A.     Organizer or Leader: USSG §3B1.1(a) . . . . . . . . . . . . . . . 34
     1.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     2.     Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
B.     Abuse of Position of Trust: USSG §3B1.3 . . . . . . . . . . . . . 37
     1.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     2.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
C.     Obstruction of Justice: USSG §3C1.1 . . . . . . . . . . . . . . . . 41
     1.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
     2.     Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

IX.     PRE-DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE . 43

X.     DEPARTURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
A.     Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
B.     Upward Departures . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
C.     Downward Departures . . . . . . . . . . . . . . . . . . . . . . . . . 46

XI.     VARIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

XII.     FACTORS IN 18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . 50

*XIII.  RESTITUTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**

*XIV . FINE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**

*XV.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**

## *I.  INTRODUCTION*

The matter before the court is the sentencing of Defendant Sholom Rubashkin.

## *II.  RELEVANT PRIOR PROCEEDINGS*

On July 16, 2009, a grand jury returned a 163-count Seventh Superseding Indictment (docket no. 544) against Defendant.[1]  Count 1 charged Defendant with Conspiracy to Harbor Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i).  Counts 2 through 70 charged Defendant with Harboring and Aiding and Abetting the Harboring of Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), 1324(a)(1)(A)(iv), 1324(a)(1)(A)(v)(II) and 1324(a)(1)(B)(i).  Count 71 charged Defendant with Conspiracy to Commit Document Fraud, in violation of 18 U.S.C. § 371.  Count 72 charged Defendant with Aiding and Abetting Document Fraud, in violation of 18 U.S.C. §§ 1546(a) and 2.  Counts 73 through 86 charged Defendant with Bank Fraud, in violation of 18 U.S.C. § 1344 ("Bank Fraud Counts").  Counts 87 through 110 charged Defendant with False Statements and Reports

---

[1] The Seventh Superseding Indictment was preceded by a great deal of procedure, the bulk of which the court need not include in the instant Sentencing Memorandum. Among other matters litigated prior to the Seventh Superseding Indictment was Defendant's pretrial release.  Initially, Defendant was on pretrial release.  On November 20, 2008, however, United States Magistrate Judge Jon Stuart Scoles revoked Defendant's pretrial release based in part on evidence that suggested that Defendant had committed bank fraud while on release.  Defendant asked the undersigned to review Judge Scoles's decision.  On January 28, 2009, the undersigned found that there was probable cause to believe that Defendant committed bank fraud while on pretrial release.  Order (docket no. 199), at 16.  However, the undersigned permitted Defendant to remain on release because there were "'conditions of release that [would] assure that [Defendant would] not flee or pose a danger to the safety of any other person or the community.'"  Order at 16 (quoting 18 U.S.C. § 3148).

to a Bank, in violation of 18 U.S.C. § 1014 ("False Statement Counts"). Counts 111 through 124 charged Defendant with Wire Fraud, in violation of 18 U.S.C. § 1343 ("Wire Fraud Counts"). Counts 125 through 133 charged Defendant with Mail Fraud, in violation of 18 U.S.C. § 1341 ("Mail Fraud Counts"). Counts 134 through 143 charged Defendant with Money Laundering and Aiding and Abetting Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2 ("Money Laundering Counts"). Counts 144 through 163 charged Defendant with Willful Violation of an Order of the Secretary of Agriculture and Aiding and Abetting a Willful Violation of an Order of the Secretary of Agriculture, in violation of 7 U.S.C. § 195 and 18 U.S.C. § 2 ("Packers and Stockyards Act Counts").

On June 25, 2009, the court granted Defendant's Motion for Separate Trial (docket no. 519). The court ordered separate trials on Counts 1 through 74 ("Immigration Counts") and Counts 75 through 143 ("Financial Counts").[2] From October 13, 2009 to November 12, 2009, the court held a jury trial on the Financial Counts, which the court renumbered as Counts 1 through 91. The renumbered Counts are as follows: Counts 73 through 86 became Counts 1 through 14, Counts 87 through 110 became Counts 15 through 38, Counts 111 through 124 became Counts 39 through 52, Counts 125 through 133 became Counts 53 through 61, Counts 134 through 143 became Counts 62 through 71 and Counts 144 through 163 became Counts 72 through 91.

From October 14, 2009 until November 12, 2009, the court held a jury trial on the Financial Counts. On November 12, 2009, the jury returned verdicts of guilty on Counts 1 through 71, 73 through 80, 84 through 89 and 91 (docket no. 736). The jury returned verdicts of not guilty on Counts 72, 81, 82, 83 and 90.

On November 19, 2009, the government filed a "Motion for Leave to Dismiss

---

[2] Counts 144 through 163 were charged after the court granted Defendant's Motion for Separate Trial. These counts were tried with the Financial Counts.

4

without Prejudice" ("Motion to Dismiss") (docket no. 745), which asked the court to dismiss the Immigration Counts without prejudice. On that same date, the court entered an Order (docket no. 746) granting the Motion to Dismiss.

On February 22, 2010, the United States Probation Office ("USPO") released a draft of Defendant's Presentence Investigation Report ("PSIR"). Both parties lodged objections to the PSIR. On April 14, 2010, the USPO released a revised PSIR.

On April 9, 2010, the government filed its Sentencing Memorandum ("Gov't. Sent. Mem.") (docket no. 883). That same date, Defendant filed his Sentencing Memorandum (docket no. 879) and a "Motion for Downward Departure and/or Variance" (docket no. 880). On April 21, 2010, Defendant filed an "Amended Sentencing Memorandum" (docket no. 895) (Def. Sent. Mem.) and an "Amended Motion for Downward Departure and/or Variance" (docket no. 896).

On April 28, 2010, the court commenced Defendant's sentencing hearing ("Hearing"). Assistant United States Attorneys Peter E. Deegan, Jr. and C.J. Williams represented the government. Attorneys F. Montgomery Brown, Guy Cook, Alan Ellis and Adam Zenor represented Defendant, who was personally present. At the Hearing, the court received evidence, heard argument and listened to Defendant's allocution. The court advised the parties that it would take the sentencing issues under advisement, issue a written opinion and then reconvene the Hearing to impose sentence.

All contested issues in Defendant's sentencing are now fully submitted and ready for decision. On June 22, 2010 at 3:30 p.m., the court shall reconvene the Hearing and impose sentence.

### III. SENTENCING FRAMEWORK

A "district court should begin [a sentencing proceeding] with a correct calculation of the [defendant's] advisory Sentencing Guidelines range." *United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008). A defendant's Guidelines range "is arrived at after

determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008).

"[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall v. United States*, 128 S. Ct. 586, 597 (2007)); *see, e.g.*, *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

The district court "has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("'[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable.'" (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Braggs*, 511 F.3d at 812 (quoting *Gall*, 128 S. Ct. at 597). "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.*

## IV. EVIDENTIARY RULES

The court makes findings of fact by a preponderance of the evidence. *See, e.g.*, *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing

Guidelines] are applied in an advisory manner."). The court considers a wide variety of evidence, including the undisputed portions of the PSIR, as well as the testimony and other evidence the parties introduced at the Trial and at the Hearing. The court does not "put on blinders" and only consider the evidence directly underlying Defendant's offenses of conviction. In calculating Defendant's Guidelines range, for example, the court applies the familiar doctrine of relevant conduct. *See* USSG §1B1.3 (2008). The Eighth Circuit Court of Appeals has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g.*, *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008). When relevant and "accompanied by sufficient indicia of reliability to support the conclusion that it [was] probably accurate," the court credits hearsay. *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005). The sentencing judge is afforded great discretion in determining the credibility of witnesses and making findings of fact. *United States v. Bridges*, 569 F.3d 374, 378 (8th Cir. 2009).

## *V. FACTS*

The court draws the following facts from the uncontested portions of the PSIR,[3] the trial, Defendant's detention hearings and the evidence presented at the Hearing:[4]

### *A. Defendant*

Defendant is 50 years old. Defendant was born in Brooklyn, New York. At all times relevant to the offenses of conviction, Defendant resided in Postville, Iowa with his wife and children. Defendant is the former Vice President of Agriprocessors, Inc.

---

[3] In other words, the court does not consider the objected-to portions of the PSIR that are unsupported by evidence presented at trial or the Hearing. For example, in this case, such portions of the PSIR not considered include, but are not limited to: Agriprocessors' treatment of workers, child labor violations, allegations of the mistreatment of animals, conduct related to unionization efforts and allegations of bribery.

[4] The court makes additional factual findings in conjunction with its conclusions of law.

Agriprocessors was an Iowa corporation based in Postville, Iowa that owned and operated a kosher meatpacking plant. Agriprocessors' founder and sole owner was Abraham Aaron Rubashkin, Defendant's father.

## B. Loan Agreement

On September 23, 1999, First Bank Business Capital ("FBBC") and Agriprocessors entered into a lending relationship pursuant to a Credit and Security Agreement ("Credit Agreement"). FBBC is a wholly-owned subsidiary of First Bank, a Missouri-based bank. FBBC is the lending group for First Bank and is primarily involved in commercial loans.

Pursuant to the Credit Agreement, FBBC agreed to lend Agriprocessors up to $35,000,000. FBBC and Agriprocessors also executed an "Exchange Revolving Note" ("Note") in the amount of $35,000,000 in connection with the Credit Agreement. Defendant executed the Note on behalf of Agriprocessors.[5] Defendant executed a $1,000,000 guaranty on the Note. Aaron Rubashkin executed an unlimited guaranty on the Note.

The Credit Agreement used a "borrowing base" formula to calculate Agriprocessors' available credit at any one time. The borrowing base was determined by calculating the current value of Agriprocessors' collateral, including its accounts receivable. Under this formula, Agriprocessors could borrow up to 85% of its "eligible" accounts receivable at a particular time. Agriprocessors' accounts receivable were "eligible" if they remained unpaid and were no more than 60 days old.

Each time Agriprocessors wanted an advance of funds, it was required to provide FBBC with a "Notice of Borrowing." A Notice of Borrowing required Agriprocessors to certify that certain conditions were met. These conditions included that: (1) no default or

---

[5] The court hereafter generally refers to FBBC's lending relationship with Agriprocessors, including both the Credit Agreement and Note, as the "loan" or the "loan agreement."

event of default existed under the Credit Agreement; (2) the representations and warranties of the Credit Agreement remained true; (3) the amount requested would not exceed the borrowing base; and (4) all conditions in the Credit Agreement required to obtain an advance on the loan were satisfied. *See* Tr. Ex. 2000 (docket no. 749-11), at pp. 12 & 21. Agriprocessors was always cash-starved and made frequent requests for advances on the loan. At trial, Senior Credit Officer of First Bank, Phil Lykens, testified that, pursuant to the loan agreement, Agriprocessors reaffirmed the loan agreement's warranties and representations each time it submitted an advance request. These warranties and representations included a warranty of compliance with all laws.

Pursuant to the Credit Agreement, Agriprocessors was required to deposit daily customer payments on accounts receivable into a designated account at Decorah Bank & Trust Company. All sale proceeds and collections from accounts receivable were to be held in trust for FBBC in the Decorah Bank & Trust account and were not to be commingled with Agriprocessors' other funds or property.

The Credit Agreement also required Agriprocessors to comply with certain covenants. One such covenant was an agreement to comply with the Packers & Stockyards Act of 1921 ("Packers Act"). Compliance with the Packers Act required Agriprocessors to promptly pay for livestock.

Other covenants included representations to FBBC that: (1) all accounts receivable were genuine and not subject to a Packers Act Trust; (2) Agriprocessors was not in violation of any law that would adversely affect the collateral or Agriprocessors' business, operations or condition; and (3) no document or statement that Agriprocessors furnished to FBBC contained any untrue statement of material fact or omitted facts necessary to make the statements not misleading.

### C. Sale of Portion of Interest in Credit Agreement

On September 14, 2007, FBBC sold a $10,000,000 portion of its interest in the

Credit Agreement to MB Financial Bank ("MBFB"). Consequently, FBBC maintained an interest in $25,000,000 of principal on the Credit Agreement.

### D. Harboring Undocumented Workers

Elizabeth Billmeyer, the former human resources manager for Agriprocessors, testified at trial that, beginning as early as May of 2002, Agriprocessors began receiving frequent "no-match" letters from the Social Security Administration for a number of Agriprocessors' employees. The "no-match" letters listed Social Security numbers that did not "match" the employee using the number at Agriprocessors. Billmeyer testified that she informed Defendant of the "no-match" problem, and he instructed her not to worry about it. Billmeyer created a list of more than 200 employees with questionable documentation. Additionally, Billmeyer testified that an Immigration and Customs Enforcement ("ICE") agent advised her to stop hiring workers that presented pink-colored Resident Alien Cards, because these cards were no longer valid. Billmeyer informed Defendant of this in an e-mail. In April and May of 2007, and in response to the no-match letters, Billmeyer notified a number of employees that they needed to fix the discrepancies with their social security numbers or be terminated. In response, a number of employees staged a walk-out during business hours. Defendant told these employees that their problems would be solved if they returned to work.

### 1. Hunt Payroll scheme

Defendant tried to conceal a number of Agriprocessors' undocumented workers by placing them on the Hunt Payroll. The Hunt Payroll was originally used to pay employees who were able to work on the Jewish Sabbath. At trial, Laura Althouse, a lower-level payroll employee, testified that Defendant instructed her to hire applicants who presented pink-colored Resident Alien Cards and add them to the Hunt Payroll. Defendant directed Althouse to conduct this hiring process after hours so Billmeyer would not discover it. Billmeyer testified that Althouse told her Defendant wanted to keep Billmeyer from

learning about the Hunt Payroll scheme because he did not want Billmeyer to know Agriprocessors was hiring these employees.

### 2. *Facts leading up to enforcement action*

Brent Beebe and Juan Carlos Guererro-Espinoza assisted certain Agriprocessors employees in obtaining fraudulent employment documents. Beebe was Agriprocessors' Beef Operations Manager. Guererro-Espinoza was Agriprocessors' Beef Shift Supervisor. On or about May 8, 2008, Althouse informed Guererro-Espinoza that some of his employees would be terminated because their employment documents were insufficient. Guererro-Espinoza met with a number of these employees. At this meeting, the employees created a plan to obtain new employment documents. According to the plan, the new employment documents would cost a total of $4,500.

On May 9, 2008, Guererro-Espinoza and Beebe spoke to Defendant about the cost for the new employment documents. Defendant agreed to loan $4,500 to the employees for new employment documents, provided that the money would be repaid. Guererro-Espinoza and Beebe promised they would reimburse Defendant for any amount that the beef kill employees failed to repay. Defendant gave Beebe $4,500, which Beebe gave to Guererro-Espinoza. Guererro-Espinoza gave part of the money to the beef kill employees in need of cash to pay for the new employment documents and kept the remainder. On May 11, 2008, two Agriprocessors employees returned from Minneapolis, Minnesota with new fake employment documents for a number of employees. Immediately thereafter, a group of employees reported to the Human Resources Department and completed new application paperwork using the names and information on the newly-acquired false alien cards. Guererro-Espinoza returned the remaining money to Beebe.

On May 12, 2008, ICE conducted an enforcement action at Agriprocessors. During the enforcement action, federal agents discovered evidence that Agriprocessors employed hundreds of illegal immigrants. Almost 400 undocumented workers were arrested,

charged and convicted of a variety of immigration-related criminal offenses.

### E. Agriprocessors and Defendant Defraud FBBC

Defendant defrauded FBBC in various ways. The court describes the various theories of fraud, in turn.

#### 1. Falsely represented that Agriprocessors was in compliance with all laws

First, in a large number of its advance requests, Agriprocessors misrepresented that it was in compliance with all laws when Defendant knew that Agriprocessors was harboring illegal immigrants in violation of federal law.

#### 2. Falsified collateral certificates

Second, Defendant directed Agriprocessors' former controller, Yomtov "Toby" Bensasson, and his colleague, Mitchell Meltzer, to falsify documents to overstate Agriprocessors' accounts receivable. Those overstatements had the effect of artificially increasing Agriprocessors' collateral, which allowed it to borrow more funds from FBBC. At trial, Bensasson testified that Agriprocessors did not submit any accurate collateral certificates to FBBC after September 4, 2007. Defendant directed Darlis Hendry, a former customer service representative at Agriprocessors, to create invoices showing that customers had purchased products that they had not, in fact, purchased. On numerous occasions, Defendant came to Hendry's office holding a piece of paper with a customer name and dollar amount written on it in Defendant's handwriting. Hendry would then create a fake invoice to reflect purchases consistent with the customer name and dollar amount written on the piece of paper. Hendry simply chose any product or combination of products to reach the desired dollar amount. Defendant asked Hendry to store these fake invoices separately from other invoices.

Defendant also directed the creation of false bills of lading to accompany the fake invoices. Defendant directed that the signature of a truck driver, likely to be assigned the route indicated on the false bill of lading, be forged. After Defendant had created a false

sale through a fake invoice and bill of lading, Defendant directed other Agriprocessors employees to manipulate Agriprocessors' internal accounting system, APGEN, to reflect the false sale.

### 3. *Diversion of customer payments*

Third, Defendant directed April Hamilton, a former accounts receivable employee at Agriprocessors, to divert customer payments from the Decorah Bank & Trust account to other accounts owned by Agriprocessors. At trial, Hamilton testified that Defendant occasionally directed her to refrain from crediting a customer account after receiving payment from the customer. In addition to his testimony on the creation of false collateral certificates, Bensasson testified that the diversion of customer payments into accounts other than the Decorah Bank & Trust account caused Agriprocessors' accounts receivable to appear higher than they actually were. This effectively inflated Agriprocessors' outstanding accounts receivable, which, in turn, gave Agriprocessors more collateral to borrow against.

### 4. *Illegal financial transactions*

At trial, Bensasson testified that Defendant directed him and other Agriprocessors employees to divert customer payments into Agriprocessors' General Operating Account at Citizens State Bank instead of the Decorah Bank and Trust Account, contrary to the loan agreement. Then, Defendant deposited checks from the Citizens State Bank account into either the Torah Education ("TE") account at Citizens State Bank or the Kosher Community Grocery ("KCG") account at Freedom Bank.

Hamilton testified about Defendant's pattern of behavior regarding checks that Agriprocessors received and wrote. Hamilton testified that Defendant provided her with customer payment checks, and he would either give her a check or ask her to write a check from "Agri New York" and deposit the whole amount into Agriprocessors' General Operating Account at Citizens State Bank, despite the fact that the customer payments were

supposed to go to the Decorah Bank & Trust account. Defendant asked Hamilton to obtain checks from Torah Education or Kosher Community Grocery and make "win checks" payable to Agriprocessors.[6] No documentation shows that TE or KCG purchased goods from Agriprocessors. According to Hamilton's testimony, Defendant directed Hamilton to arrive at a round dollar amount, and Hamilton was responsible for creating checks for smaller, odd-numbered amounts to total that round amount. This process made the checks deposited into the Decorah Bank & Trust account appear to be customer payments.

### 5. *Packers Act*

At trial, Adam Fast, a Senior Auditor for the United States Department of Agriculture's Packers and Stockyards Program, testified that Agriprocessors was a "packer" within the meaning of the Packers Act. Packers are required to pay for livestock by the close of the next business day following the day of the livestock purchase. Suppliers can waive the prompt payment requirement. However, to be effective, the waiver must be in writing and occur before the sale. On March 7, 2002, an Administrative Law Judge entered an order ("Order") finding that Agriprocessors had violated the Packers Act. The Order directed Agriprocessors and its agents and employees to cease and desist violating the Packers Act. On March 22, 2006, Defendant executed an affidavit in which he avers that he is aware of the Packers Act's requirements.

Shella Chiu, a former accounts payable employee at Agriprocessors, testified that Defendant gave her directions about when to release checks to cattle suppliers. Chiu would prepare a check to pay a supplier the day she received the invoice and wait for direction from Defendant on when to mail it. She placed the checks to the cattle suppliers in envelopes and ran the envelopes through a date-stamp machine. She placed the stamped envelopes on Defendant's desk and he decided when to mail them.

Trial exhibit 3002 contains a summary of checks from Agriprocessors to various

---

[6] Win checks are computer-generated checks that do not require a signature.

cattle suppliers. These checks are signed by Defendant, with the exception of the checks relevant to Counts 72, 81, 82, 83 and 90. The postmark and/or receipt dates on the envelopes are several days after the dates Agriprocessors purchased the cattle. Representatives of several entities involved in cattle sales to Agriprocessors testified that payments for cattle purchased by Agriprocessors were untimely under the Packers Act in 2007 through 2008. No evidence was presented that any seller waived its right to timely payments. Suppliers received no explanation from Agriprocessors for late payments.

At the Hearing, Casey Sturgill, a resident agent from the United States Department of Agriculture, Packers and Stockyards Program, testified about the impact certain livestock suppliers faced due to Defendant's violation of the Packers Act. Sturgill testified that one livestock supplier, Waverly Sales, Inc., suffered a loss of $3,800.51 in the time value of money it was owed by Agriprocessors. The government did not present any additional numeric estimation of actual loss suffered by the livestock suppliers.

### F. FBBC Suffers Monetary Loss Due to Defendant's Fraud

As a result of Defendant's fraud, FBBC loaned funds to Agriprocessors well in excess of the 85% eligibility formula provided in the loan agreement. In or around October of 2008, FBBC learned about part of Defendant's fraud before it filed a civil action against Agriprocessors for money damages arising out of Agriprocessors' diversion of collateral. *See First Bank Bus. Capital, Inc. v. Agriprocessors, Inc.*, No. 08-CV-1035-LRR (docket no. 1) (setting forth claim against Agriprocessors). At the time FBBC filed the civil action, it believed that Agriprocessors had diverted at least $1.3 million in funds.

On November 4, 2008, Agriprocessors filed a Chapter 11 petition for bankruptcy in the United States Bankruptcy Court for the Northern District of Iowa ("Bankruptcy Court"), case no. 08-2751 ("Bankruptcy Action"). On July 20, 2009, the Bankruptcy Court entered an Order (docket no. 873 in Bankruptcy Action) allowing SHF Industries, LLC ("SHF") to purchase all of Agriprocessors' assets for $8,500,000. On October 8,

2009, the Bankruptcy Action was converted from a Chapter 11 to a Chapter 7 proceeding. SHF changed the name of Agriprocessors to "Agri Star Meat & Poultry, LLC." On December 29, 2009, the Bankruptcy Court entered a Final Decree (docket no. 2071 in Bankruptcy Action).

At the Hearing, FBI Special Agent Randy Van Gent testified about a telephone conversation he had with Lykens and Brian Dickman several months prior to the Hearing.[7] Dickman is a special asset manager for FBBC. Dickman took responsibility for the loan during Lykens's absence from FBBC. Dickman stated that FBBC had calculated its actual loss on the loan to be $29,944,981. This amount reflected the principal balance due on the loan after offsetting it with proceeds from the loan collateral, including proceeds from the sale of accounts receivable, inventory and a certificate of deposit from Aaron Rubashkin. Of that amount, $20,650,966 was due and owing to FBBC and $9,294,015 was due and owing to MBFB. Although $2,600,000 in interest had accrued on the loan, this amount was not included in Dickman's calculation of the principal balance due and owing.

S/A Van Gent testified that, as of February 1, 2010, certain collateral had not yet been applied to the principal. This collateral included: (1) $254,888 in unapplied cash; (2) $186,674 in postdated checks on accounts receivable; (3) $200,000 from the sale of equipment from Agriprocessors' plant in Gordon, Nebraska; (4) $1,984,000 from potential tax refunds; and (5) $400,000 from the sale of Agriprocessors' trademarks. S/A Van Gent testified that, if these credits were applied to the outstanding principal, the outstanding principal amount would be $26,919,419. Of that amount, 69%, or $18,574,399.11, was attributable to FBBC, and 31%, or $8,345,019.89 was attributable to MBFB.

S/A Van Gent testified that he spoke to Lykens the day prior to the Hearing and received updated figures relevant to FBBC's losses. Lykens told S/A Van Gent that the

---

[7] S/A Van Gent testified that Lykens left FBBC in December of 2009 and returned to FBBC in March of 2010.

updated outstanding principal balance was $29,501,340. This figure included the $254,888 in previously unapplied cash and $136,674 in postdated checks on accounts receivable (leaving a balance of $50,000 on postdated checks). S/A Van Gent also learned that FBBC had received $10,679 in additional accounts receivable payments and that Agriprocessors' claimed tax refund had increased by $388 to $1,984,388. Figures related to the trademarks and equipment at the Gordon, Nebraska plant remained unchanged. S/A Van Gent testified that FBBC's loss was further offset by a $60,000 restitution payment from Bensasson, of which 69%, or $41,400, was paid to FBBC. Van Gent testified that this reduced the total amount of loss by $52,467. After these deductions, S/A Van Gent testified that the total amount of outstanding principal was approximately $26,866,952, which does not account for the portion of Bensasson's restitution payment presumably paid to MBFB, which the court calculates to be $18,600. This would bring the amount of actual loss to $26,848,352. According to the court's calculations, of this amount, $18,525,362.88 is attributed to FBBC and $8,322,989.12 is attributed to MBFB. These amounts exclude any debtor-in-possession ("DIP") financing FBBC extended to Agriprocessors during the Bankruptcy Action.

Abraham Roth, an accountant and friend of Defendant, testified as an "expert witness" at the Hearing. Roth testified that, based on his calculations, the total amount of loss was $4.5 million.

### G. Mordechai Korf Offers to Purchase FBBC's Position in Bankruptcy

In November of 2008, before the Bankruptcy Court appointed a trustee in the Bankruptcy, Mordechai Korf offered to purchase FBBC's position in the Bankruptcy Action for $21.5 million to $22 million, a significant discount from the amount Agriprocessors owed FBBC. Korf initially expressed his interest in purchasing Agriprocessors in or around October of 2008. Korf recalled that he had a difficult time arranging to meet with FBBC personnel to discuss the potential purchase. Eventually,

Korf met with Lykens and FBBC Chairman Dennis Herstein. Korf explained that he did not need any financing to complete this purchase. Korf also assumed that a substantial amount of accounts receivable collateral was unrecoverable. At the meeting, Lykens and Herstein stated that they believed FBBC had exposure in the amount of $27 to $29 million. Lykens and Herstein rejected Korf's offer without counteroffering and closed the negotiations. Korf did not participate in the subsequent auction of Agriprocessors.

## VI. ISSUES

The instant Sentencing Memorandum addresses the following contested Guidelines issues: (1) the amount of loss, as calculated pursuant to USSG §2B1.1(b)(1); (2) the number of victims, as calculated pursuant to §2B1.1(b)(2)(A); (3) whether Defendant used sophisticated means to commit bank fraud, pursuant to §2B1.1(b)(9)(C); (4) whether the court should apply the sophisticated money laundering enhancement in §2S1.1(b)(3); (5) whether Defendant had a supervisory role in the offense, pursuant to §3B1.1; (6) whether Defendant abused a "position of trust" as defined by §3B1.3; and (7) whether the court should assess a two-level upward adjustment for obstruction of justice, pursuant to §3C1.1. The government bears the burden of proof on all of these issues. *See United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2001) (stating that the government bears the burden to prove sentencing enhancements). The parties also make a number of arguments related to departures, variances, Defendant's ability to pay a fine and restitution. These arguments are also addressed in the instant Sentencing Memorandum.

The parties also contest a number of factual findings set forth in the PSIR.[8] To the

---

[8] In addition to various specific objections to the PSIR, Defendant lodges a categorical objection to the offense conduct discussed and described by the PSIR. The Eighth Circuit Court of Appeals "'require[s] that objections to the [PSIR] be made "with specificity and clarity" before a district court is precluded from relying on the factual statements contained in the [PSIR].'" *United States v. Davis*, 583 F.3d 1081, 1095 (8th Cir. 2009) (quoting *United States v. Razo-Guerra*, 534 F.3d 970, 975 (8th Cir. 2008)).

(continued...)

extent these factual disputes are relevant to the Guidelines analysis set forth below, the court makes findings on these objections in conjunction with its conclusions of law. Because the remaining factual objections are not relevant to the court's analysis of the Guidelines issues discussed below, the court declines to address them in the instant Sentencing Memorandum.

## VII.  CHAPTER 2: SPECIFIC OFFENSE CHARACTERISTICS

The parties agree that, in order to calculate Defendant's pre-departure adjusted offense level, the court must analyze Defendant's offense conduct pursuant to two Guidelines provisions: (1) USSG §2B1.1 (Bank Fraud); (2) and §2S1.1 (Money Laundering).   Because the Money Laundering provision requires a calculation of Defendant's offense level under the Bank Fraud provision as a prerequisite, the court begins its analysis by determining Defendant's offense level pursuant to the Bank Fraud provision.   Then, the court turns to calculate Defendant's offense level under the Money Laundering provision.

### A.  Bank Fraud

The parties agree that, pursuant to the Bank Fraud Guidelines provision in USSG §2B1.1(a)(1), Defendant's base offense level is **7**.   Defendant disputes the application of each specific offense characteristic advocated by the government:  (1) a **22**-level increase for an amount of loss between $20 million and $50 million, pursuant to §2B1.1(b)(1)(L); (2) a **2**-level enhancement because the offense involved 10 or more victims, pursuant to §2B1.1(b)(2)(A)(i);  and (3) a **2**-level enhancement because the offense involved sophisticated means, pursuant to §2B1.1(b)(9)(C).   The court discusses each specific

---

[8](…continued)
Specific objections are required because they "'put the [g]overnment on notice of the challenged facts' which the government will need to prove at the sentencing hearing." *Razo-Guerra*, 534 F.3d at 976.   Therefore, the court overrules Defendant's categorical objection to the offense conduct statement.

offense characteristic, in turn.

### 1.    *Amount of Loss: §2B1.1(b)*

The parties dispute the amount of loss.  The government advocates for a loss calculation between $20 million and $50 million.  This amount of loss would give rise to a **22**-level upward adjustment.  *See* USSG §2B1.1(b)(1)(L) & (M) (stating that the offense level should be increased by **22** for a loss between $20,000,000 and $50,000,000).  Defendant objects to this loss calculation.  Defendant argues that this amount of loss was not reasonably foreseeable and resulted from an independent intervening cause.  Defendant argues that the actual amount of loss is only $4,500,000, which merits an upward adjustment of **18**.  *See* USSG §2B1.1(b)(J) & (K) (providing for upward adjustment of 18 when amount of loss is between $2,500,000 and $7,000,000).

"As a general rule, 'loss is the greater of actual loss or intended loss.'"  *United States v. Waldner*, 580 F.3d 699, 705 (8th Cir. 2009) (quoting USSG §2B1.1, cmt. (n.3(A)).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense, while 'intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur."  *Id.* (citing USSG §2B1.1 cmt. (n.3(A)(i-ii)) (internal quotation marks omitted).  The government argues that the actual loss calculation governs the instant sentencing.  Defendant impliedly agrees; he argues that he did not intend or foresee that FBBC would suffer a loss in excess of $20 million.  Accordingly, the court focuses only on actual loss in this portion of the analysis.

"Because the loss caused by fraud is often difficult to determine precisely, 'a district court is charged only with making a reasonable estimate of the loss.'"  *Id.* (quoting *United States v. Parish*, 565 F.3d 528, 534 (8th Cir. 2009)).  In calculating the amount of loss, the court considers various credits against the loss, such as the sale of pledged collateral:

Credits Against Loss.—Loss shall be reduced by the following:

(i)    The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

(ii)    In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

USSG §2B1.1 cmt. (n.3(E)).

### a.    *Amount of loss: victim banks*

With respect to the victim banks, the court finds that the actual amount of loss is $26,848,352. The court arrives at this figure by relying on the facts discussed in § V.F. According to the court's calculations, of this amount, $18,525,362.88 is attributed to FBBC and $8,322,989.12 is attributed to MBFB. In arriving at this conclusion, the court finds that, while Defendant was a Vice President of Agriprocessors, Defendant directed Agriprocessors employees to create fraudulent invoices, divert customer accounts receivables and misrepresent Agriprocessors' compliance with various laws. As a result of Defendant's fraud, FBBC loaned Agriprocessors funds that it believed were adequately secured by collateral. Had FBBC known about the various misrepresentations by which Defendant was defrauding it, it would not have continued to loan Agriprocessors funds. In making this finding, the court considers the trial evidence and S/A Van Gent's testimony at the Hearing. This amount reflects all possible deductions and offsets against collateral as of the date of the Hearing. This amount excludes interest accrued and owing on the

principal balance.[9]

At the Hearing, Defendant argued that the government could not prove that Agriprocessors had inflated the value of its accounts receivables between September of 1999 and April of 2006. Defendant argued that, somehow, the first $20 million was not subject to inflated invoices, making it "pristine and clean." The evidence presented at trial clearly demonstrates otherwise. Bensasson testified that he became aware that Agriprocessors was inflating its sales figures and accounts receivables in 1997 or 1998.

Defendant also contended that the loss figures were inaccurate because they did not properly account for the reported $11 million in frozen and fresh meat inventory in Agriprocessors' warehouses at the time Agriprocessors filed for bankruptcy that has since been sold or otherwise disposed of. However, at trial, Bensasson and Meltzer testified that part of the fraud at Agriprocessors included Defendant's manipulation of Agriprocessors' inventory. Additionally, at the Hearing, S/A Van Gent testified that, typically, when assets are liquidated in a bankruptcy, they are worth far less than their actual value. Accordingly, the court finds that the amount of inventory Agriprocessors claimed to have when it filed for bankruptcy does not affect the court's calculation of the victim banks' actual loss.

Defendant argued that, in the Bankruptcy, the government took the position and presented testimony that no purchaser of Agriprocessors could have any involvement with Defendant or Defendant's family, resulting in a depressed sale price of Agriprocessors. However, the attorney for the Trustee in the Bankruptcy Action, Paula Roby, testified that there was no such condition attached to the sale of Agriprocessors. The court credits Roby's testimony and discredits testimony from Defendant's witnesses. Accordingly, the

---

[9] "Loss shall not include [. . .] [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." USSG §2B1.1 cmt. (n.3(D)(i)).

court declines to consider this theory in arriving at an actual loss calculation.

Below, the court considers the various other theories Defendant proffered at the Hearing in an effort to reduce the amount of actual loss. Defendant has insufficient evidence to support these theories. Additionally, many of these theories are fundamentally flawed in that they disregard the general effect a bankruptcy has on the value of assets of the estate. Accordingly, the court declines to consider them in arriving at the actual loss calculation.

### i.    Foreseeability

Defendant argues that a substantial amount of loss was not reasonably foreseeable. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.'" USSG §2B1.1 cmt. (n.3(A)(i)). "'Reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense." *Id.* at cmt. (n.3(A)(iv)).

Defendant argues the amount of pecuniary loss was not foreseeable to him because:

> a reasonable person would not foresee that, even with the revelation of false accounts receivable, a corporation with a $40,000,000 plus book value[] would be sold for pennies on the dollar and that FBBC would not make [a] substantial recovery from the assets on which it held the first secured interest.

Def. Sent. Mem. at 32.

Defendant's argument fails to consider the impact of a massive fraudulent scheme on the value of a company. The court agrees that it is not reasonable for a defendant to assume that, "in the wake of the failure of a loan due to a massive fraud, every nickle of every real account receivable will be recovered." Gov't Sent. Mem. at 29. Given the fact that Defendant knew he was causing FBBC to loan against approximately $10 million in fake invoices and was diverting millions of dollars of FBBC's collateral, a reasonable

person would have foreseen a loss well in excess of $20 million. Accordingly, the court finds that the amount of FBBC and MBFB's loss was reasonably foreseeable to Defendant.

## ii. *Intervening cause*

Defendant also argues that the amount of actual loss is well below $20 million due to intervening acts taken by FBBC that devalued the loan collateral. Specifically, Defendant argues that FBBC took an unreasonable position with respect to Korf's offer to purchase FBBC's position in the bankruptcy in November of 2008 and that its "greed" caused it to suffer more pecuniary loss than it would have suffered by Defendant's actions alone. Def. Sent. Mem. at 34. In support of this argument, Defendant cites *United States v. Rutkoske*, 506 F.3d 170, 178-79 (2d Cir. 2007) and *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005). *Rutkoske* and *Olis* are securities fraud cases and are materially distinguishable from the instant case. In *Rutkoske*, the Second Circuit Court of Appeals recognized that, in securities fraud cases, "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud." *Rutkoske*, 506 F.3d at 179. The Second Circuit Court of Appeals held that, in those cases, "'losses from causes other than the fraud must be excluded from the loss calculation.'" *Id.* (quoting *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006)). *Rutkoske* stressed the necessity to distinguish loss caused from fraud from loss caused by typical economic market factors. *Id.* *Olis* reached a similar conclusion. *Olis*, 429 F.3d at 546 (stating that "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines"). Both cases encouraged sentencing courts to apply the loss causation analysis employed in the civil arena pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b). *Id.*; *Rutkoske*, 506 F.3d at 179.

In the instant bank fraud action, "[t]he appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were

reasonably foreseeable." *Parish*, 565 F.3d at 535. Additionally, the victim banks are creditors of Agriprocessors—not shareholders. Therefore, the financial instrument at issue is the loan agreement—not a security. As a result, the amount of the victim banks' loss is based on the amount of money Agriprocessors owed them and failed to repay due to Defendant's fraud—not on any fluctuating market factors that affect the value of a security. Accordingly, the court conducts its loss analysis in a manner consistent with §2B1.1; that is, the court determines the amount of actual loss by calculating foreseeable pecuniary harm that resulted from the Defendant's offense conduct and offsetting it by certain credits designated in comment 3(E).

Even if the court assumes Defendant is correct and applies the rationale in *Rutkoske* and *Olis* by considering the impact of outside market factors on the amount the victim banks were able to recover from Agriprocessors, it makes no difference to the analysis. Korf's offer had no impact on the amount of money the victim banks recovered from Agriprocessors. Korf's offer was to buy out the bank's position with respect to Agriprocessors at a significant discount. Because Lykens and Herstein were unaware of the extent of Defendant's fraud at the time of the offer, they decided FBBC should not pursue the offer and chose to pursue Agriprocessors through the bankruptcy trustee. At the time of the offer, FBBC was only aware of approximately $1.4 million in diverted funds. The true scope of the fraud was not discovered until January of 2009, when the Trustee began having difficulty collecting on Agriprocessors' accounts receivables. In other words, FBBC's rejection of Korf's offer did not depreciate the value of Agriprocessors or otherwise cause any loss to the victim banks. Futher, if Korf was truly interested in pursing FBBC's position in the Bankruptcy Action, he could have participated in the auction to purchase Agriprocessors. In light of these facts, the court concludes that FBBC did not unreasonably decline Korf's offer and cause itself to incur substantial pecuniary losses.

### iii. *Defendant's calculation of actual loss of victim banks*

Defendant also asks that the court calculate the victim banks' actual loss in the following manner: (1) by "reasonabl[y] estimat[ing]" the loss caused by Defendant to be "85% of the fraudulent invoices, or approximately $8.5 million"; and (2) by further reducing this loss "by the amount of interest earned on the fraudulent invoices," which Roth has calculated to be approximately $4 million. Def. Sent. Mem. at 35. According to Defendant, this brings the actual loss to "approximately $4.5 million[.]" *Id.*

The court agrees that Defendant "appears to want full credit for the face value of all actual accounts receivable which supported the loan—regardless of their actual value to the victim[] banks upon liquidation." Gov't Sent. Mem. at 28. Defendant's calculation ignores the actual liquidated value of Agriprocessors. When offsetting the amount of actual loss, the court takes into account "the *amount the victim has recovered* at the time of sentencing from disposition of the collateral"—not the amount outstanding on the accounts receivable. USSG §2B1.1 cmt. (n.3(E)).

Further, the court notes that, among other questionable accounting methods, Defendant's witness, Abe Roth arrived at the $4.5 million loss figure by assuming that the victim banks should have unilaterally engaged in an investigation of Agriprocessors' fraud—the same fraud that Defendant took great pains to conceal. In other words, Roth argues that the victim banks' vulnerability to Defendant's fraud makes them responsible for their own loss. This argument is based on conjecture and a definition of "loss" so far removed from common sense and the advisory Sentencing Guidelines that the court declines to afford it any further consideration. Accordingly, the court completely disregards Roth's testimony.

### b. *Losses suffered by cattle suppliers*

Next, the court turns to consider the actual losses suffered by the cattle suppliers. The parties agree that Agriprocessors failed to pay more than twenty livestock suppliers

within the time mandated by the Packers Act. At trial, the government presented evidence that Defendant directed Agriprocessors employees to intentionally delay payment to these livestock suppliers. The trial evidence also showed that, although Agriprocessors failed to pay these suppliers on time, all of them eventually received payment for the livestock they sold to Agriprocessors.

Defendant argues that the livestock suppliers did not really suffer a loss because they were ultimately paid in full. The government argues that, as a result of Defendant's conduct, the livestock suppliers suffered an actual loss because "they all lost the time value of their money while they were waiting for payment." Gov't Sent. Mem. at 25. The government states that one livestock supplier, Waverly Sales, Inc., "quantified the amount of [its] loss to be $3,800.51." *Id.* However, the government did not provide any other quantifiable data from which the court can reasonably estimate actual loss for any other livestock supplier. The court acknowledges that Defendant likely caused the other livestock suppliers to lose the time value of money while they waited for their payment from Agriprocessors. However, without a basis for the court to approximate this loss, it is unable to make a finding on the amount of loss applicable to the other livestock suppliers. *See* USSG §2B1.1 cmt. (n.3(C)) (stating that the court needs to make at least a "reasonable estimate of the loss"). The court is unwilling to guess the amount of loss the other livestock suppliers suffered, particularly when the time value of money likely varied from one livestock supplier to another. The government has also failed to set forth the "average loss to each [livestock supplier]," which the court could have extrapolated to each supplier. USSG §2B1.1 cmt. (n.3(C)(iv)). Accordingly, the court is only able to find that one livestock supplier, Waverly Supplies, Inc., suffered an actual loss.

### c.    *Application*

In conclusion, the court finds that, after offsetting the amount of loss by the amounts recovered on the collateral, the government has satisfied its burden to show that

Defendant's conduct caused the victim banks to a suffer a combined loss of $26,848,352. The court also finds that Defendant's conduct caused Waverly Sales, Inc. to suffer an actual loss of $3,800.51. Because this combined amount falls between $20,000,000 and $50,000,000, the court shall increase Defendant's offense level by **22**. USSG §2B1.1(b)(1)(L). This brings Defendant's offense level to **29**.

### 2. Number of victims: USSG §2B1.1(b)(1)(A)(i)

The parties dispute whether the court should apply the upward adjustment in USSG §2B1.1(2)(A), which directs the court to apply a two-level upward adjustment if the offense involved 10 or more victims. A "victim" is "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." USSG §2B1.1 cmt. (n.1).

As previously stated, the court found that the victim banks, FBBC and MBFB, both suffered millions of dollars in actual loss. The court also found that Waverly Sales, Inc. suffered a loss due to the lost time value of the money Agriprocessors owed it. The government argues that the other livestock suppliers are victims. The court recognizes that Defendant's conduct subjected the other livestock suppliers to a genuine financial strain. However, because the government failed to present sufficient evidence for the court to determine the amount of loss that these other livestock suppliers suffered, these other livestock suppliers are not "victims" as defined by §2B1.1 cmt. (n.1). When an individual or entity has not suffered any part of the actual loss determined under §2B1.1(b)(1)(L) or bodily injury, that individual or entity cannot be considered a "victim" for purposes of §2B1.1(b)(2)(A). *See United States v. Miller*, 588 F.3d 560, 567-68 (8th Cir. 2009) ("We have already determined that the district court did not clearly err in determining that the government failed to prove any actual loss in this case. It necessarily follows that there were no 'victims' within the meaning of USSG §2B1.1(b)(2)(A)(i).").

Because the court declines to consider any livestock provider other than Waverly

Sales, Inc. as a "victim," there are only three victims at issue in this case: FBBC, MBFB and Waverly Sales, Inc. Therefore, the court shall not apply the **2**-level upward adjustment for 10 or more victims in USSG §2B1.1(b)(2)(A)(i).[10]

### 3. *Sophisticated means: USSG §2B1.1(b)(9)(C)*

The parties dispute whether the court should apply the upward adjustment in USSG §2B1.1(b)(8)(C), which directs the court to increase Defendant's offense level by **2** if the bank fraud involved "sophisticated means."[11] Defendant objects to the enhancement, arguing that "[t]he alleged commission of this offense was completed by submission of false borrowing base certificates to the lender. This is the most straightforward method by which a lendee may seek to obtain more monies from a[] lender under an asset-based loan." Objections to Draft Pre-Sentence Investigation Report (docket no. 86), at 26-27.

### a. *Analysis*

"The enhancement for sophisticated means applies when the offense involves 'especially complex or [. . .] intricate offense conduct pertaining to the execution or

---

[10] Defendant argues that this case only involved one victim, FBBC. Defendant contends that MBFB was not a victim because it was not in privity of contract with Agriprocessors. Defendant provides no legal support for this argument and the court shall disregard it. As previously stated, the basis for determining actual loss is whether Defendant caused a reasonably foreseeable pecuniary harm to an individual or entity. The court finds that it was reasonably foreseeable that Defendant's bank fraud would cause injury to MBFB. Defendant also argues that no livestock providers are victims because they were all repaid and suffered no loss. To the extent this argument relates to Waverly Sales, Inc., the court disagrees. The court finds that it was reasonably foreseeable that Defendant's intentional delay tactics with respect to its payments to Waverly Sales, Inc. would cause Waverly Sales, Inc. to suffer pecuniary harm in the amount of $3,800.51. In any event, Defendant's arguments related to these issues make no difference to the application of this enhancement because the court declines to apply the additional **2**-level increase for 10 or more victims.

[11] The government incorrectly cites the sophisticated means enhancement at §2B1.1(b)(8)(C) instead of §2B1.1(b)(9)(C).

concealment of an offense." *United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009) (citing USSG §2B1.1 cmt. 8(b)). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." USSG §2B1.1 cmt. 8(b). In addition to the examples enumerated by the Guidelines, courts have applied the enhancement when a defendant's scheme involved a "multi-layered plot," when a defendant "created and used numerous false documents," when a "defendant's scheme was not a single fraudulent act, but a complex series of fraudulent transactions" and when a defendant's scheme involved forged notary stamps. *United States v. Edelmann*, 458 F.3d 791, 816 (8th Cir. 2006) (internal quotation marks omitted).

The court finds that the USPO correctly scored the two-level upward adjustment for sophisticated bank fraud. Defendant mischaracterizes the manner in which he committed bank fraud. The offense conduct involved more than the simple "submission of false borrowing base certificates to the lender." Defendant's conduct constituted "a complex series of fraudulent transactions." *Id*. The sheer number of false documents created over a long period of time justifies the enhancement. *Id*. (upholding the sophisticated means enhancement when the defendant "created and used numerous false documents, including multiple years of federal tax returns, supporting federal tax documents, [. . .] bank statements[ . . .] , Articles of Incorporation [. . .] profit and loss statements, and a series of bank letters"). Over a period of many years, Defendant created numerous false invoices, bills of lading and collateral certificates.

Many of these documents contained forgeries. For instance, Defendant created false bills of lading to accompany the false invoices. In an effort to make the bills of lading look as legitimate as possible, Defendant directed that an Agriprocessors employee forge the signature of a truck driver likely to be assigned the route indicated on the false bill of lading. In another effort to appear legitimate, Defendant went to great lengths to

manipulate records in Agriprocessors' computer-based accounting system (APGEN) to reflect the number of false sales created by falsifying invoices and bills of lading so that the fraud would not be detected during routine audits. Defendant falsified the invoices and other documents and manipulated the accounting system in order to hide Agriprocessors' actual financial situation from FBBC. Accordingly, the court finds that Defendant committed bank fraud using sophisticated means.

### b.    Application

In light of the foregoing, the court shall apply the **2**-level enhancement in §2B1.1(b)(9)(C). This brings Defendant's offense level to **31**.

### 4.    Summary

In summary, the court finds that Defendant's base offense level for Bank Fraud under USSG §2B1.1 is **31**. The court now turns to determine Defendant's base offense level for Money Laundering under USSG §2S1.1.

## B.  Money Laundering[12]

Pursuant to the Money Laundering Guidelines provision in USSG §2S1.1(a)(2), Defendant's base offense level is **31**.[13] The parties agree that the court should apply a **2**-

---

[12] Defendant objects to the court's reliance on §2S1.1. Defendant argues that, because the government failed to prove that the money laundering offense involved "profits," his sentence cannot be based on this Guidelines provision. For the reasons stated in the Order (docket no. 854) in which the court denied Defendant's Motion for Directed Verdict, Motion for Judgment of Acquittal and Motion for New Trial, the court overrules this objection. Defendant also objects to the calculation of the Money Laundering base offense level to the extent it incorporates the base offense level calculated pursuant to §2B1.1. For the same reasons the court overruled the objections with respect to the amount of actual loss and sophisticated means, the court incorporates that analysis in the instant section and overrules Defendant's objection.

[13] Section 2S1.1 provides:

    (a)    Base Offense Level:

                                                    (continued...)

31

level increase because he "was convicted under 18 U.S.C. § 1956." *Id.* at §2S1.1(b)(2)(B). This brings Defendant's base offense level to **33**. Defendant disputes that the court should apply a **2**-level enhancement pursuant to §2S1.1(b)(3), which provides for a **2**-level increase "if (A) subsection (b)(2)(B) applies; and (B) the offense involved sophisticated laundering[.]" *Id.* at §2S1.1(b)(2)(C). Accordingly, the court turns to consider the sophisticated laundering enhancement.

### 1. *Sophisticated laundering: USSG §2S1.1(b)(3)*

According to the commentary, sophisticated laundering is "complex or intricate offense conduct." USSG §2S1.1, cmt 5(A). It "typically" involves "fictitious entities," "shell corporations," "two or more levels (i.e., layering) of transactions" or "offshore financial accounts." *Id.*

#### a. *Analysis*

The parties agree that Defendant's money laundering did not involve fictitious entities or offshore financial accounts. The government argues that "while [KCG and TE] were not fictitious, they functioned as shell corporations for the purpose of Defendant's money laundering scheme." Defendant asserts that KCG and TE were not shell corporations. "A shell corporation is a company that is incorporated, but has no significant assets or operations." *Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 737 (7th Cir. 2008) (internal quotation marks omitted). Shell corporations "typically have no physical

---

[13](…continued)

      (1)    The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense [. . .]; and (B) the offense level for that offense can be determined; or

      (2)    **8** plus the number of offense levels from the table in §2B1.1 [. . .] corresponding to the value of the laundered funds, otherwise.

presence (other than a mailing address) and generate little or no independent economic value." *Id.* (internal quotation marks omitted). The government has failed to present evidence that KCG and TE were shell corporations. Furthermore, the evidence presented at trial and the Hearing indicated that KCG and TE did have a physical presence, independent operations and independent economic value. Accordingly, the court finds that KCG and TE were not shell corporations.

The government also asserts that Defendant's money laundering offenses involved two or more levels of transactions. Defendant argues that his conduct simply involved "the diversion of payments into other accounts that Agriprocessors clearly and openly controlled, and then repaying the funds to the bank." Def. Sent. Mem. at 43. This characterization of Defendant's laundering misstates the evidence presented at trial. The court finds that Defendant's money laundering involved two or more levels of transactions. Defendant caused customer payments to be diverted from the depository account to another account controlled by Agriprocessors. From there, the funds were deposited into either KCG or TE's account before the payments were returned to Agriprocessors and then to FBBC. This involves two or more layers of transactions. It is of no consequence that each individual layer was not particularly sophisticated. *See United States v. Pizano*, 421 F.3d 707, 731 (8th Cir. 2005) ("The guideline does not require a finding that each layer was composed of a complex transaction.").

### b. Application

Because Defendant's laundering involved two or more layers of transactions, the court shall apply the 2-level upward adjustment for sophisticated laundering.[14] This brings

---

[14] The court notes that it did not base the upward adjustment pursuant to §2B1.1(b)(9)(C) for bank fraud committed with sophisticated means on the same conduct on which it based the enhancement for sophisticated laundering. The commentary regarding sophisticated laundering states that the court shall not apply the enhancement
(continued...)

Defendant's offense level to **35**.

### 2. Conclusion

In conclusion, the court finds that Defendant's offense level for money laundering is **35**. The court now turns to consider various sentencing adjustments in Chapter 3 of the Guidelines.

## VIII. CHAPTER THREE ADJUSTMENTS

The court turns to consider the application of the following Chapter Three adjustments: (1) a **4**-level increase if Defendant "was an organizer or leader of a criminal activity that involved five or more participants," pursuant to USSG §3B1.1(a); (2) a **2**-level increase if Defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," pursuant to §3B1.3; and (3) a **2**-level increase for obstruction of justice, pursuant to §3C1.1. Defendant argues that none of these adjustments should apply.

### A. Organizer or Leader: USSG §3B1.1(a)

Section 3B1.1(a) provides: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels." "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of §1B1.3 (Relevant Conduct), i.e., all conduct included under §1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction." USSG §3B1.1 (introductory commentary). Accordingly,

---

[14](...continued)

when "the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense [bank fraud] is the only conduct that forms the basis for application of [the sophisticated laundering enhancement]." USSG §2S1.1, cmt. 5(B). The court finds that Defendant committed bank fraud with sophisticated means primarily by creating an intricate system using numerous false documents, some of which contained forged signatures. The court finds that Defendant committed sophisticated laundering by laundering the diverted customer payments through two or more "layers."

the court considers all relevant conduct in determining Defendant's role.   Application Note 4 distinguishes a "leader" from one who is involved in "mere management or supervision":

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.   Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.  This adjustment does not apply to a defendant who merely suggests committing the offense.

USSG §3B1.1 (cmt.) 4.

### 1.   Analysis

Defendant argues that it is "factually inaccurate to characterize him as an organizer of the offense," because "he lacked  significant decision making authority that would have allowed him to stop the illegal conduct."[15] Def. Sent. Mem. at 38.  Defendant also argues that the fact he did not "claim a right to a larger share of the fruits of the crime," or "personally gain from the offense" demonstrates that this enhancement should not apply. Defendant does not dispute that there were five or more participants in the relevant criminal activity.

Even if the court assumes without deciding that Defendant did not have a claim to

---

[15] Although Defendant objects to the application of a 4-level enhancement for being an "organizer or leader" pursuant to §3B1.1(a), he concedes that a 3-level enhancement for being a "manager or supervisor (but not an organizer or leader)" pursuant to §3B1.1(b) is warranted.

a larger share in the fruits of the crime and did not personally gain from the offense,[16] the balance of the factors set forth in comment 4 weigh heavily in favor of a finding that Defendant was an organizer or leader. Among other reasons, the court finds that Defendant was a leader or organizer of the offense because he: (1) directed Hendry to create fake invoices and bills of lading; (2) told Hamilton to divert customer payments to different accounts and to refrain from posting payments to the customer accounts receivable; (3) directed Hamilton to maintain a separate set of books in order to keep track of actual accounts receivable; (4) directed Hamilton to add "round-up" checks to the deposits containing diverted checks in order to conceal the nature of the deposits; (5) directed Meltzer to write a personal check with the subject line "meat" as a round-up check; (6) directed Bensasson, and, in Bensasson's absence, Meltzer, to submit fraudulent advance requests and collateral certificates to FBBC; (7) directed Bensasson to fraudulently manipulate Agriprocessors' monthly financial statements; (8) directed Billmeyer to create a list of no-match employees and then prevented her from taking any action to resolve the issues surrounding those employees; (9) directed Althouse to place workers who did not have proper work identification on the Hunt payroll behind Billmeyer's back; (10) financed a scheme to help certain undocumented Agriprocessors workers obtain new fake employment identification documents with the assistance of Beebe, Guerrero-Espinoza and another beef employee who traveled to Minnesota to obtain false employment documents; and (11) personally inspected new fake documents on the Sunday immediately prior to the enforcement action as the fraudulent re-hiring took place.

Based on these facts, the court finds that Defendant exercised significant decision-making authority in the hatching and execution of the fraudulent scheme. He directed subordinate employees on the manner and means of committing bank fraud, money

---

[16] Defendant's fraudulent conduct kept the family business alive from which Defendant withdrew a substantial salary and monetary payments for his personal expenses.

laundering and harboring. The nature of Defendant's participation also demonstrates that, although he was not the owner of Agriprocessors, he was in charge. He himself rarely, if ever, drafted the false documents necessary to commit and conceal the bank fraud. These tasks were left to lower-level employees. Similarly, he directed Billmeyer, Althouse, Beebe and Guererro-Espinoza to maintain Agriprocessors' harboring of undocumented workers. The evidence shows that Defendant made it a point to remove himself from the details of the harboring scheme. Defendant also had sufficient control to direct his subordinate employees to adjust their behavior over time to continue concealing and perpetrating the fraud and harboring as it snowballed into a larger and more complicated scheme. Defendant also recruited others to commit various crimes. For example, when Billmeyer refused to take certain action with respect to harboring undocumented workers, Defendant directed Althouse to take the reins and re-hire the undocumented workers. Defendant's degree of control and authority was close to absolute. He told his employees when, where and how to commit the various crimes.

### 2. Application

In light of the foregoing analysis, the court finds that Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Accordingly, the court shall increase Defendant's offense level by **4**. This brings Defendant's offense level to **39**.

### B. Abuse of Position of Trust: USSG §3B1.3

Section 3B1.3 provides for a **2**-level upward adjustment "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitates the commission or concealment of the offense[.]" "Public or private trust" is:

> a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose

responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. The adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

USSG §3B1.3 cmt. (n.1).

"Once the sentencing court has determined that a person occupies a position of private trust, 'the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense' before the enhancement may apply." *Waldner*, 580 F.3d at 706 (quoting USSG §3B1.3 cmt. (n.1)).

## *1.*    *Analysis*

The government argues that Defendant occupied a position of trust as a corporate officer and manager of Agriprocessors. In support of this argument, the government cites trial evidence that suggests that Defendant was regarded as Agriprocessors' CEO and that he made the day-to-day financial decisions about Agriprocessors and was able to manipulate Agriprocessors' financial statements "at will." Gov't Sent. Mem. at 45.

Although courts have held that corporate officers sometimes hold positions of trust, "'the issue of whether an abuse-of-trust enhancement applies is fact intensive because it turns on the precise relationship between the defendant and his victims and therefore cannot be decided on the basis of generalities.'" *Waldner*, 580 F.3d at 707 n.5 (8th Cir. 2009) (citing *Septon*, 557 F.3d at 937) (alterations omitted). Typically, "'an arms-length commercial relationship will [. . .] not suffice for the enhancement to apply[.]'" *Id.* (quoting *Septon*, 557 F.3d at 937); *see also United States v. Blackwell*, 254 F. App'x 228,

230 (4th Cir. 2007) (stating that a district court "must carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on the defendant's position in the transaction") (internal quotation marks omitted).

The enhancement is proper in an arms-length transaction when "the defendant has broad discretion to act on behalf of the victim, and the victim believes the defendant will act in the victim's best interest." *Id.* (citing *United States v. Bollin*, 264 F.3d 391, 416 (4th Cir. 2001)). Stated another way, "'[a]pplication of the enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required.'" *Id.* (quoting *United States v. Caplinger*, 339 F.3d 226, 237 (4th Cir. 2003)); *see also United States v. Thorn*, 446 F.3d 378, 389-90 (2d Cir. 2006) ("'An abuse of trust enhancement may not be imposed on a defendant convicted of fraud solely because of a violation of a legal obligation to be truthful and a victim's reliance on a misrepresentation.'") (quoting *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001)).

In certain cases, the Eighth Circuit Court of Appeals has "'upheld the application of the enhancement in situations involving arms-length commercial relationships.'" *Waldner*, 580 F.3d at 707 (quoting *Septon*, 557 F.3d at 937). Such situations include: (1) statements made during a debtor's bankruptcy examination at a Section 341 meeting, *Id.* (citing *In re Parmetex, Inc.*, 199 F.3d 1029, 1036 (9th Cir. 1999) (McKeown, J., dissenting)); (2) a relationship between an insurance agent and an out-of-state mortgage company, *United States v. Fazio*, 487 F.3d 646, 659 (8th Cir. 2007); and (3) a relationship between a chiropractor and the insurance companies to which he submitted claims for reimbursement, *United States v. Erhart*, 415 F.3d 965, 972 (8th Cir. 2005). In each of these cases, the defendant exercised significant discretion in his or her relationship with the victimized commercial party.

Defendant was a corporate officer. The relationship at issue is Agriprocessors' business relationship with the victims, namely the victim banks. With respect to FBBC and MBFB, the court finds that Defendant did not have discretion to act on their behalf. Defendant's obligation was merely to remain truthful in his and Agriprocessors' dealings with those banks. FBBC and MBFB had confidence that Agriprocessors' representations were accurate and truthful. These banks suffered a loss because they believed that Agriprocessors' representations were true, when in fact Defendant had manipulated Agriprocessors' financial condition to appear much stronger than it was. In other words, the government has not shown that there was a fiduciary relationship between Defendant, Agriprocessors and the victim banks. Rather, the government has proven that, through Agriprocessors' misrepresentations, Defendant violated his legal obligation to deal truthfully with FBBC and that FBBC and MBFB relied on these misrepresentations to their detriment. This is insufficient for the application of the abuse of trust enhancement. *Blackwell*, 254 F. App'x at 230.

The government also argues that the enhancement should apply because: (1) Defendant owed a fiduciary duty to Agriprocessors' shareholder; and (2) Defendant abused his positions as a corporate officer of both KCG and TE when he committed the money laundering offenses. These arguments are unavailing. The abuse of trust enhancement "'turns on the precise relationship between the defendant and his *victims*,'" not other third parties. *Waldner*, 580 F.3d at 707 n.5 (quoting *Septon*, 557 F.3d at 937) (emphasis added). The government has not presented evidence showing that TE, KCG or Agriprocessors' owner, Aaron Rubashkin, are victims. As previously stated, the victims in this case include FBBC, MBFB and Waverly Sales, Inc. Because Defendant's relationship was an arms-length commercial transaction with these victims, the abuse of trust enhancement does not apply.

## 2. *Conclusion*

In light of the foregoing analysis, the court declines to apply the abuse of trust enhancement. *See United States v. Reid*, 164 F. App'x 308, 312 (4th Cir. 2006) (finding that upward adjustment pursuant to §3B1.3 "cannot be affirmed on the ground that [the defendant] had a position of trust with respect to the banks that were victimized by the check kite and induced to make loans in reliance on false information," since "[a]ll the transactions between representatives of [the business] and the victim banks were part of an arms-length commercial relationship that is not within the scope of §3B1.3").[17]

## C. *Obstruction of Justice: USSG §3C1.1*

The government argues that the court should apply a **2**-level upward adjustment pursuant to USSG §3C1.1 for obstruction of justice. Section 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense by **2** levels.

USSG §3C1.1 (emphasis in original).

## 1. *Analysis*

The government argues that the obstruction adjustment is warranted because Defendant: (1) committed perjury during trial; (2) committed perjury during the detention hearing held on November 18, 2009; (3) destroyed and concealed evidence; and (4) interfered with material witnesses. Because the court shall apply the adjustment in light of Defendant's perjured testimony at trial, it need not analyze the obstruction enhancement

---

[17] Defendant argues that the application of both the aggravating role adjustment and the abuse of trust adjustment would constitute double-counting. Because the court declines to apply the abuse of trust adjustment, it need not address this argument.

with respect to the other bases the government proposes.

"[C]ommitting, suborning, or attempting to suborn perjury" is an example of the type of conduct to which the obstruction adjustment applies. USSG §3C1.1 cmt. (n.4); *see also United States v. Titlbach*, 300 F.3d 919, 924 (8th Cir. 2002) ("A defendant who commits perjury is subject to an obstruction enhancement under USSG §3C1.1."). "A witness commits perjury 'if [he] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Taylor*, 207 F.3d 452, 454-55 (8th Cir. 2000) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

At trial, Defendant testified about his conduct underlying the offenses of conviction. The undersigned presided over Defendant's trial and was therefore able to observe the demeanor and credibility of each witness's testimony, including Defendant's. Based on the undersigned's observations at trial, the trial transcript and the other evidence presented and which the court credited, the court finds that Defendant lied at trial under oath. The court finds that Defendant's lies were willfull. The court also finds that Defendant's lies were material, because they related directly to the nature of his involvement in the offenses of conviction. For instance, Defendant's perjured trial testimony includes his claim that he never asked Hendry to create bills of lading to match false invoices. Defendant's testimony directly conflicted with Hendry's testimony on this matter, and the government introduced evidence of fake invoices and bills of lading in a folder labeled "Sholom." *See* Gov't Tr. Ex. 2096. The undersigned finds that Defendant's testimony on this matter is incredible and credits Hendry's testimony over Defendant's. Similarly, during his trial testimony, Defendant claimed that he had not directed Hamilton to create and add "round-up" checks to the customer checks that Agriprocessors diverted by depositing into accounts other than the sweep account. This conflicts directly with Hamilton's testimony. Again, the court credits Hamilton's testimony and discredits

Defendant's testimony. Defendant argues that the trial testimony at issue "is the type about which two witnesses easily could differ." Def. Sent. Mem. at 45. The court disagrees—based on its evaluation of the credibility of the respective witnesses, Defendant knew that his misstatements were inaccurate and untruthful.

### 2. Application

In light of the foregoing, the court finds that, by perjuring himself at trial, Defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the [. . .] prosecution [. . .] of the instant offense[s] of conviction," and that Defendant's obstructive conduct related to Defendant's offenses of conviction. Accordingly, the court shall apply the **2**-level upward adjustment in USSG §3C1.1. This brings Defendant's offense level to **41**.

## IX. PRE-DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE

Prior to the application of any departure or variance, Defendant is **Criminal History Category I** with a total adjusted offense level of **41**. His advisory Sentencing Guidelines range is **324-405 months of imprisonment**. *See* USSG Sentencing Table.

## X. DEPARTURES

Although it does not specifically request an upward departure, the government notes that the court has authority to depart upward in the instant sentencing. The government bases its upward departure argument on the following Guidelines provisions: (1) extraordinary obstruction of justice pursuant to USSG §5K2.0(a)(3); and (2) criminal conduct that did not enter into the above Guidelines analysis, pursuant to §5K2.2. Defendant asks the court to depart downward due to Defendant's relationship with his autistic minor son, his charitable and civic deeds and his mental health.

### A. Overview

In discussing the propriety of Chapter 5 departures generally, the Eighth Circuit Court of Appeals stated:

Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG §5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG §1A1.1, cmt. n.4(b).

*United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006) (formatting altered).

The decision whether to depart from the advisory Sentencing Guidelines rests within the sound discretion of the district court. *See, e.g., United States v. Thin Elk*, 321 F.3d 704, 707-08 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing court") (citations and internal quotation marks omitted). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases[.]" *Koon v. United States*, 518 U.S. 81, 98 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are unchartered." *United States v. Reinke*, 283 F.3d 918, 925-26 (8th Cir. 2002).

"The district court is not left adrift [. . .] in determining which cases fall within and which cases fall outside of the 'heartland.'" *United States v. McCart*, 377 F.3d 874, 877 (8th Cir. 2004) (citing *Koon*, 518 U.S. at 94). In USSG §5K2.1, *et seq.*, "[t]he Sentencing Commission enumerated some of the factors that it believed were not adequately accounted for in the formulation of the Guidelines and might merit consideration as aggravating or mitigating circumstances." *Thin Elk*, 321 F.3d at 708 (citing USSG §5K2.0).

## B. Upward Departures

First, the government argues that an upward departure pursuant to USSG §5K2.0(a)(3) may be warranted because Defendant engaged in "extraordinary obstruction of justice." Gov't Sent. Mem. at 69. Section 5K2.0(a)(3) provides, in relevant part:

> A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

USSG §5K2.0(a)(3). The government argues that "[D]efendant's obstructive conduct was present in the offense to a degree substantially in excess of the norm" and therefore warrants an upward departure.

Second, the government argues that an upward departure pursuant to USSG §5K2.21 is warranted due to Defendant's criminal conduct that the court has not already taken into consideration in its Guidelines analysis. Section 5K2.21 provides:

> The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

USSG §5K2.21. The government argues:

> Here, the record establishes [D]efendant committed an unprecedented amount of criminal conduct which has not entered into the determination of the advisory guidelines. For example, [D]efendant led one of the most extensive alien harboring conspiracies in the history of the Northern District of Iowa. Defendant financed an effort to obtain fake resident alien cards for dozens of illegal workers. Defendant regularly paid employees in cash and under the table. And [D]efendant made illicit cash payments to the former mayor of Postville.

Gov't Sent. Mem. at 70.

The court agrees that Defendant's obstructive conduct in the instant action was more excessive than that involved in a typical financial crime case and that it likely falls out of the heartland of similar cases. The court also agrees that its analysis of Defendant's Guidelines range does not take into account a large amount of Defendant's criminal conduct. These factors demonstrate that Defendant's conduct likely falls outside the heartland of typical financial fraud crimes.

Although an upward departure would be permitted under USSG §5K2.0(a)(3) and §5K2.21, the court declines to depart upward because a sentence within the computed Guidelines range is sufficient to satisfy the goals of sentencing. However, the court will consider the facts underlying the potential upward departures in conjunction with its analysis of the factors enumerated in 18 U.S.C. § 3553(a). Additionally, in the event the court is required to re-sentence Defendant, it reserves the right to revisit these upward departure provisions to determine whether their application would be appropriate.

## C. Downward Departures

Defendant moves the court for a downward departure based on his charitable and civic work and his mental condition. The court has considered Defendant's arguments and evidence on these matters and declines to exercise its discretion to depart downward. The court is unpersuaded that these factors move Defendant's offenses outside the heartland of typical financial fraud claims.

Defendant also contends that his relationship with his autistic minor son is a sufficient basis for a downward departure in this case, citing *United States v. Spero*, 382 F.3d 803 (8th Cir. 2004). In *Spero*, the Eighth Circuit Court of Appeals affirmed a district court's eight-level downward departure under §5K2.0 based in part on the defendant's relationship with his developmentally disabled child. *Spero*, 382 F.3d at 804-805. The Eighth Circuit Court of Appeals found "that [the defendant]'s role in [his son]'s life is

indispensable" and a lengthy incarceration "would cause an extreme setback for [the defendant's son] and the rest of the family." *Id.* at 805.

The court is unpersuaded that this factor merits a downward departure in this case. In *Spero*, the defendant's relationship with his son was one of multiple factors the court considered. *Id.* at 803. The downward departure in *Spero* was also based on the defendant's "extraordinary efforts at restitution." *Id.* This factor is not present in the instant action. Accordingly, the court declines to exercise its discretion to depart downward. However, the court shall further consider the arguments Defendant raises in support of a downward departure in conjunction with his Motion for Downward Variance. *See United States v. Chase*, 560 F.3d 828, 832 (8th Cir. 2009) ("[W]e now clarify that departure precedent does not *bind* district courts with respect to variance decisions, it is merely persuasive authority[.]") (emphasis in original).

## XI. VARIANCE

Next, the court turns to consider Defendant's Motion for Downward Variance. Post-*Booker*, the court must determine whether a non-Guidelines sentence is appropriate after determining the Guidelines range and any permissible departures within the Guidelines structure. *United States v. Myers*, 503 F.3d 676, 684 (8th Cir. 2007). The court has a "responsibility to select a sentence that [is] 'sufficient, but not greater than necessary' to comply with the statutory sentencing purposes." *United States v. Gray*, 577 F.3d 947, 950 (8th Cir. 2009) (quoting 18 U.S.C. § 3553(a)); *see also United States v. Butler*, 594 F.3d 955, 967 (8th Cir. 2010) (same). "[A] district court's job is not to impose a reasonable sentence, but rather to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a). *United States v. Lytle*, 336 F. App'x 587, 588 (8th Cir. 2009) (citations and internal quotation marks omitted). In analyzing a motion for a downward variance, a "district court has wide discretion to weigh the factors in each case and assign some factors greater weight than others[.]" *United*

*States v. Kane*, 552 F.3d 748, 755 (8th Cir. 2009) (citation omitted).

Defendant asks the court to vary downward because: (1) "the advisory [G]uidelines as calculated [. . .] call for a *fundamentally unreasonable* sentence"; (2) Defendant did not commit the offense conduct for personal gain or out of a sense of greed, but rather, "in order to continue what he viewed as the critical Lubavitch mission of providing Kosher food to the Jewish community"; (3) Defendant's "charitable and civic activities are truly extraordinary"; (4) Defendant has a special relationship with his developmentally-disabled minor son; and (5) Defendant suffers from depression "that affected him during the period of the offense conduct, impaired his judgment and attention, and combined with his upbringing and religion to make it almost impossible for him to oppose his father and leave the business." Motion for Downward Variance at 2, 8, 10, & 19 (emphasis in original).

Defendant devotes a substantial amount of evidence and argument to his contention that his offenses of conviction were not motivated out of a sense of personal greed, but rather, out of a sense of duty to maintain his family business for religious purposes. No matter Defendant's motive, he defrauded the victim banks out of millions of dollars. He unlawfully placed his family business's interest above the victim banks' interest. His family business and he personally benefitted at the expense of all the victim banks' innocent shareholders. The court finds that this is not a basis to vary downward in this case.

Defendant argues that a downward variance is warranted in light of his charitable deeds and civic involvement. The court finds Defendant's charitable and civic involvement is not an adequate basis for a downward variance in the instant action. Like most human beings, Defendant's character includes good traits and bad traits. In fashioning Defendant's sentence, the court shall consider all of defendant's history and characteristics—both the good, such as his charitable nature, and the bad, such as his dishonesty. In light of Defendant's character as a whole, the court finds that his charitable

and civic nature does not warrant a downward variance. Additionally, it is entirely possible that a number of Defendant's charitable deeds were funded with proceeds from his crimes. It is far easier to be generous with someone else's money instead of one's own.

Additionally, Defendant argues a downward variance is warranted in light of his special relationship with his developmentally-disabled son. The fact that Defendant's son is developmentally disabled is most unfortunate and evokes sympathy and compassion from all who know the child's circumstances. However, such considerations of sympathy and compassion are present in all criminal cases that come before this court. In the vast majority of cases, defendants leave behind loving family members, all of whom are adversely impacted by being separated from a spouse, parent or child. Defendant is not unique in that respect. Fortunately, and unlike many cases that come before this court, Defendant's son has a loving and competent mother as well as an extremely tight-knit, supportive extended family, all of whom are obviously devoted to him and accustomed to working with him. Accordingly, the court declines to vary downward on this basis.

Defendant argues that the court should vary because he suffers from depression that "affected him during the period of the offense conduct, impaired his judgment and attention, and combined with his upbringing and religion to make it almost impossible for him to oppose his father and leave the business." Motion for Downward Variance at 23. The court is unconvinced by this argument. The court finds the opinion testimony of Susan J. Fiester, M.D., to be unsupported by any credible and independent evidence. Dr. Fiester was called as a mitigating expert witness, not as a treating physician. In fact, she apparently did not even know Defendant during the relevant time period. Her opinions are based nearly exclusively on interviews of Defendant and his wife, both of whom have their own motivations in this case. Further, the court notes that, during the trial and the sentencing, many people described Defendant's behavior as energetic and cheerful during

the relevant time period. But, even if the court were to assume for the sake of argument that Defendant was depressed during the commission of the criminal offenses, there is no credible evidence that depression impaired his judgment and attention in any relevant respect. In fact, the contrary is true. The court declines to vary on this ground.

The court rejects Defendant's argument that a downward variance is necessary because "the advisory [G]uidelines as calculated [. . .] call for a *fundamentally unreasonable* sentence." *Id.* at 6 (emphasis in original). The court recognizes that this argument was made based on the probation officer's computation of the advisory Guidelines sentence being "life." Further, as previously noted, this court's mandate is to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of § 3553(a). "'Reasonableness is the appellate standard of review in judging whether a district court has accomplished its task.'" *United States v. Greene*, 513 F.3d 904, 907 (8th Cir. 2008) (quoting *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006)). Were the court to vary, the court would vary upward to take into account additional criminal conduct involving harboring of illegal aliens, which was charged in over seventy counts of the Seventh Superseding Indictment and were later dismissed.

## XII. FACTORS IN 18 U.S.C. § 3553(a)

In arriving at a sentence, the court carefully considered all of the statutory factors set forth in 18 U.S.C. § 3553(a). Having done so, the court finds that a sentence within the computed advisory Guidelines range is firmly rooted in credible evidence produced at trial and at sentencing and contained in the uncontested portions of the PSIR.

When the sentencing reconvenes, the court will impose a sentence of **324 months of imprisonment**.[18] This sentence is sufficient, but not greater than necessary, to comply

---

[18] The court notes that, even if it inadvertently erred in computing the advisory Guidelines sentence, it would still impose a sentence of 324 months of imprisonment after considering the factors in § 3553(a).

with the purposes of 18 U.S.C. § 3553(a).

## XIII.  RESTITUTION

The government asks the court to order Defendant to pay restitution to the victim banks and Waverly Sales, Inc. in an amount consistent with the court's actual loss calculation.  Defendant objects to restitution for the same reasons that he objected to the calculation of the victims' actual amount of loss.  Defendant also argues that MBFB is not a victim bank because it was not in privity of contract with Agriprocessors and that restitution is therefore not warranted.  For all the reasons advanced by the government and the reasons stated by the court in Section VII.A.2, the court adopts the government's position with respect to restitution.  The court finds S/A Van Gent's testimony on loss clearly and sufficiently establishes that Defendant should be responsible to pay restitution as follows: (1) $18,525,362.88 to FBBC; (2) $8,322,989.12. to MBFB; and (3) $3,800.51 to Waverly Sales, Inc.  Restitution is due immediately.  If, subsequent to the filing of the instant Sentencing Memorandum, any of the victims receive payments that reduce their actual loss, Defendant's restitution should be credited to reflect those payments.

## XIV.  FINE

Next, the court considers whether to impose a fine on Defendant.  "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  USSG §5E1.2(a).  In light of the significant restitution obligation owed by Defendant, the court finds Defendant is unable to pay a fine.  Accordingly, the court declines to impose a fine on Defendant.

## XV.  CONCLUSION

In light of the foregoing, the court finds that the appropriate sentence is **324 months of imprisonment**, followed by **5 years of supervised release**.  Defendant shall be required to pay restitution as follows: (1) $18,525,362.88 to FBBC; (2) $8,322,989.12. to MBFB; and (3) $3,800.51 to Waverly Sales, Inc. Defendant shall not be required to pay a fine.

When the court reconvenes the Hearing on **June 22, 2010**, it shall sentence Defendant in a manner consistent with the instant Sentencing Memorandum.

**IT IS SO ORDERED.**

**DATED** this 21st day of June, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA